UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

In re PROSHARES TRUST II SECURITIES
LITIGATION

——————————————————————

This Document Relates To:

    ALL ACTIONS.

—————————————————————— x

:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:19-cv-00886-DLC

<u>CLASS ACTION</u>

CONSOLIDATED AMENDED
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

<u>DEMAND FOR JURY TRIAL</u>

## GLOSSARY OF FINANCIAL TERMS

**CBOE**:  Cboe Global Markets, Inc.  CBOE calculates the VIX pursuant to a complicated formula that takes as inputs the market prices of options on the S&P 500 Index with an average expiration of 30 days.

**Creation Units**:  Blocks of 50,000 shares of SVXY.  The Underwriter Defendants purchased Creation Units from the Trust, broke the Creation Units down into constituent shares, and sold those shares to investors.

**Derivative**:  A security with a value that is reliant upon, or derived from, an underlying asset or group of assets – *i.e*., a benchmark.

**ETP**:  Exchange-traded product – a term that encompasses both exchange-traded funds such as SVXY, and exchange-traded notes, which are debt instruments.  ETPs bundle together securities to offer investors the ability to invest in diversified portfolios, much like mutual funds.

**Front-running**:  When a broker or other entity enters into a trade because they have foreknowledge of a non-publicized transaction that will influence the price of the asset, resulting in a likely financial gain for the broker or other entity.

**Futures Contract**:  An agreement to buy or sell a predetermined amount of a commodity at a specific price on a specific date in the future.

**Liquidity Gap**:  A discrepancy between the supply and demand for VIX futures contracts.

**NAV**:  Net asset value.  The NAV of an ETF refers to the ETF's total assets minus its total liabilities.

**Option**:  An option gives an investor the right, but not the obligation, to buy or sell a stock at an agreed-upon price and date.

**S&P 500 Index**:  Standard & Poor's 500 Index.  The S&P 500 Index is a stock index based on the 500 largest companies whose shares are listed for trading on the New York Stock Exchange or the NASDAQ.

**VIX**:  The CBOE Volatility Index.  The VIX seeks to measure the expected volatility of the S&P 500, and is sometimes referred to as the market "fear gauge."

**VIX Short-Term Futures Index**:  The S&P 500 VIX Short-Term Futures Index, which is an investable index of VIX futures contracts with the ticker symbol "SPVXSPID."

## TABLE OF CONTENTS

Page

I. NATURE OF THE ACTION ..................................................................................1

II. JURISDICTION AND VENUE ............................................................................7

III. PARTIES .............................................................................................................8

    A. Lead Plaintiffs.............................................................................................8

    B. The ProShares Defendants..........................................................................8

    C. The Underwriter Defendants........................................................................9

IV. CLASS ACTION ALLEGATIONS ....................................................................11

V. SUBSTANTIVE ALLEGATIONS .....................................................................12

    A. SVXY's Background .................................................................................12

        1. ETPs..............................................................................................12

        2. The VIX.........................................................................................13

        3. The VIX Short-Term Futures Index ..............................................13

        4. SVXY.............................................................................................14

    B. The Markets Experience Historic Low Volatility During 2017 ..............15

    C. Retail Investors Pour Money into Volatility-Related ETPs Such as SVXY .........16

    D. SVXY Is Subject to Extreme Undisclosed Risks ....................................18

        1. The Risk Posed by SVXY's Derivative Structure ......................18

        2. The Risk Posed by Historic Low Volatility................................19

        3. The Risk Posed by the Mean-Reverting Nature of Volatility.................20

        4. The Risk Posed by SVXY's Daily Rebalancing Requirement .................20

        5. The Risk Posed by SVXY's Vulnerability to Front-Running .................21

        6. The Risk Posed by Over-Crowding of the VIX Futures Market .............22

        7. The Risk of a VIX Futures Liquidity Gap .................................24

**Page**

E.      Unbeknownst to Investors, SVXY Was Poised to Experience a Destructive
        Feedback Loop When Volatility Inevitably Spiked........................................25

F.      The Undisclosed Risks Materialize in a "Volpocalypse" ....................................27

VI.     1933 ACT ALLEGATIONS ...............................................................................32

A.      False and Misleading Statements in the Registration Statement ...........................32

B.      Violations of Items 303 and 105 of Regulation S-K...........................................44

VII.    1933 ACT COUNTS......................................................................................46

COUNT I ....................................................................................................................46

        For Violations of §11 of the 1933 Act
        Against All Defendants............................................................................................46

COUNT II ....................................................................................................................47

        For Violation of §15 of the 1933 Act
        Against the ProShares Defendants...........................................................................47

VIII.   1934 ACT ALLEGATIONS ...............................................................................48

A.      False and Misleading Statements During the Class Period ...................................48

B.      1934 Act Violations of Items 303 and 105 of Regulation S-K............................49

C.      Additional Scienter Allegations.................................................................50

D.      Loss Causation and Economic Loss ..................................................................53

E.      Applicability of Presumption of Reliance:
        Fraud-on-the-Market Doctrine.........................................................................54

F.      No Safe Harbor ..........................................................................................55

IX.     1934 ACT COUNTS......................................................................................56

COUNT III ....................................................................................................................56

        For Violation of §10(b) of the 1934 Act and Rule 10b-5
        Against the ProShares Defendants...........................................................................56

**Page**

COUNT IV ................................................................................................................................57

    For Violation of §20(a) of the 1934 Act
    Against the ProShares Defendants .......................................................................................57

X.      PRAYER FOR RELIEF ................................................................................................57

JURY DEMAND ......................................................................................................................58

Lead Plaintiffs Thomas Butler, III, Anthony Ludovici, and Lisa Ludovici ("Lead Plaintiffs"), individually and on behalf of all others similarly situated, by their undersigned attorneys, allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters based on the investigation undertaken by their counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings and other public filings and statements of ProShares Trust II ("ProShares" or the "Trust"), a review of media reports and other public information by or about the Trust, research reports from securities analysts, price and volume data for SVXY shares, and consultations with experts.  Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all those who purchased or otherwise acquired shares of ProShares Short VIX Short-Term Futures ETF ("SVXY" or the "Fund"): (i) pursuant or otherwise traceable to the May 15, 2017 registration statement, as amended (together with the July 13, 2017 prospectus, the "Registration Statement"), seeking to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "1933 Act"); and (ii) during the period from May 15, 2017 to the time that trading in SVXY shares resumed at 11:35 am Eastern on February 6, 2018 (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act").

2.      This case arises from the near-collapse of SVXY, an exchange-traded product ("ETP") issued by defendant ProShares.  SVXY was designed to replicate the inverse of the daily performance of the S&P 500 VIX Short-Term Futures Index (the "VIX Short-Term Futures Index"), the value of which was based on a hypothetical portfolio of near-term futures contracts on the CBOE

Volatility Index (the "VIX").[1]  This meant that, if the VIX Short-Term Futures Index declined by a certain percentage, SVXY was designed to rise by that same percentage, and *vice versa*. Accordingly, investors purchased SVXY shares if they believed that volatility would decline in the immediate future.

3.      Prior to and during the Class Period, an extended period of historic low market volatility led SVXY to generate returns of approximately 180% during 2017 – placing it on the radar of even casual investors, despite its complexity, and fueling demand for the Fund.  Defendants were happy to meet this demand, garnering significant fees as SVXY grew to become the second-largest inverse-volatility ETP.

4.      Unbeknownst to investors, however, by the start of the Class Period, the exponential growth of SVXY and other volatility-related ETPs had transformed the Fund into a ticking time-bomb that was poised to self-destruct if market volatility increased even moderately.

5.      In order to deliver its objective of replicating the inverse of the daily performance of the VIX Short-Term Futures Index, SVXY needed to "rebalance" its portfolio at the end of each trading day, by purchasing VIX futures contracts on days when the VIX Short-Term Futures Index had risen, and selling VIX futures contracts on days when that index had declined.  SVXY's daily rebalancing was conducted shortly after the close of trading, at 4:15 pm Eastern.  Significantly, other volatility-related ETPs also rebalanced their portfolios each trading day around the same time – between 4:00 pm Eastern (when the regular trading session of the stock market closed) and 4:15 pm Eastern (when the regular trading session of the VIX futures market closed).  This meant that SVXY was purchasing VIX future contracts when demand was highest, and selling VIX futures contracts

---

[1]      The VIX, referred to as Wall Street's "fear gauge," measures the stock market's expectation of future volatility, as implied by S&P 500 index options.  Essentially, the VIX reflects how much the market thinks the S&P 500 Index will fluctuate over the next 30 days.

when demand was lowest – resulting in adverse pricing pressure.  And because daily rebalancing was mandatory for SVXY and other volatility-related ETPs, fund managers were "price-insensitive," meaning that they would purchase or sell the requisite amount of VIX futures contracts in order to rebalance their funds' portfolios irrespective of the price of VIX futures contracts.

6.     The number of VIX futures contracts that SVXY needed to purchase or sell in connection with its daily rebalancing depended upon both the size of the Fund and how much the VIX Short-Term Futures Index had moved on a given trading day.  The exponential growth of SVXY and other volatility-related ETPs prior to and during the Class Period pushed the size of their potential rebalancing requirements to unprecedented levels.  For example, in early 2013, volatility-related ETPs would have needed to collectively purchase approximately 20,000 VIX futures contracts to rebalance their portfolios if VIX futures rose by 4 points.  But by December 2017, the same 4-point increase in VIX futures would have required volatility-related ETPs to collectively purchase approximately 140,000 VIX futures contracts to rebalance their portfolios – 70% of the average daily trading volume for VIX futures contracts.  As the size of SVXY's rebalancing requirements grew, so too did the risk that the number of VIX futures contracts that SVXY and other volatility-related ETPs would need to trade shortly after the close of the market would simply be too large in relation to what the market could provide.

7.     By the start of the Class Period, this situation presented an acute risk that even a relatively moderate increase in expected market volatility would lead to a VIX futures "liquidity gap" – *i.e.*, a discrepancy between the supply and demand for VIX futures contracts.  As SVXY and other volatility-related ETPs rebalanced their portfolios during the same 15-minute interval, the heightened demand and strained supply would cause the prices of VIX futures contracts to skyrocket.  Purchasing VIX futures contracts as prices rose would drive down the value of the Fund,

thereby necessitating that SVXY purchase even more VIX futures contracts at higher prices in order to rebalance in accordance with its targeted inverse leverage ratio. Moreover, by purchasing VIX futures contracts, SVXY and other volatility-related ETPs were, in essence, purchasing expected volatility – which drove expected volatility up further. This would cause the VIX and the VIX Short-Term Futures Index to rise even higher – setting in motion a destructive feedback loop. Once this self-inflicted death spiral took hold, it would cause SVXY's value to plummet in a matter of minutes – leading to catastrophic losses for investors.

8.      By design, the complexity of SVXY concealed and magnified these risks, which were poorly understood, even by sophisticated industry participants. Defendants possessed unique knowledge about the risks faced by the Fund throughout the Class Period, yet failed to adequately inform investors about those risks, even as they pocketed millions of dollars from the management of the Fund and sale of SVXY shares.

9.      Instead, defendants represented that SVXY could be a "useful tool[,]" "if used properly and in conjunction with the investor's view on the future . . . volatility of the markets" – provided that investors were willing to "actively manage and monitor their investments, as frequently as daily." In truth, by the start of the Class Period, SVXY was inappropriate even for investors who "actively manage[d] and monitor[ed] their investments" on a "daily" basis, as even a relatively modest increase in volatility would subject investors to catastrophic losses occurring in a matter of minutes. Moreover, investors who purchased or held SVXY shares at the end of the trading day to express an entirely correct "view on the future . . . volatility of the markets" nonetheless risked losing almost the entirety of their investment in an after-market death spiral.

10.     Defendants also purported to warn investors about certain factors that could lead to losses, such as risks associated with SVXY's inverse structure, daily rebalancing, market volatility,

and the purchasing and selling of VIX futures contracts.  But none of these warnings apprised investors of the fact that SVXY's ***own conduct*** of rebalancing in an overly-crowded VIX futures market could ***itself*** drive up the price of VIX futures contracts, the level of expected market volatility, and the level of the VIX Short-Term Futures Index – thereby driving down the value of SVXY shares.  For example, Defendants represented that SVXY's inverse structure "could result in the total loss . . . of an investor's investment" if the VIX Short-Term Futures Index experienced an increase "approaching 100%," but failed to disclose that SVXY's own conduct could cause the VIX Short-Term Futures Index to experience an increase "approaching 100%."

11.     Had defendants adequately disclosed these risks, no reasonable investor would have purchased or held SVXY shares after 4:00 pm Eastern on any day – and certainly not on any day when volatility had increased appreciably.

12.     On February 5, 2018, the undisclosed risk that a VIX futures liquidity gap would trigger a destructive feedback loop suddenly materialized.  That day, the S&P 500 Index fell approximately 4% amid concerns about rising bond yields and higher inflation.  On a historical basis, the decline was unremarkable.  Percentage-wise, it was less than half the greatest single-day decline in the S&P 500 Index over the last 30 years (a 9% decline that occurred on October 15, 2008) and a fraction of the 20% decline in the S&P 500 Index that occurred on October 19, 1987.  By the close of regular trading at 4:00 pm Eastern, the VIX Short-Term Futures Index had risen 33%.  As expected, SVXY's share price fell a roughly equivalent 32% as of 4:00 pm Eastern.  Trading was orderly and positions in the stock, equity options, and VIX futures markets remained liquid.

13.     However, between 4:00 pm and 4:15 pm Eastern, as SVXY and other volatility-related ETPs sought to rebalance their portfolios by purchasing hundreds of millions of dollars'

worth of VIX futures contracts in an overly-crowded VIX futures market, that market spiraled out of control. The price of VIX futures contracts rose, which in turn drove down SVXY's value, resulting in a feedback loop which required the purchase of yet more VIX futures contracts by SVXY and other volatility-related ETPs, causing SVXY's value to decline further – as the undisclosed peril of a self-inflicted death spiral ensued.

14.    Between 4:00 pm and 4:15 pm Eastern on February 5, 2018, the prices of the VIX futures contracts making up the VIX Short-Term Futures Index rocketed upward 96% over the settlement price of the prior trading day, February 2, 2018. As the death spiral accelerated, approximately 116,000 VIX futures contracts – 25% of the entire market – were traded within a single minute, at 4:08 pm Eastern. Rebalancing SVXY on February 5, 2018 required the purchase of between 100,000 and 120,000 VIX futures contracts – an amount that roughly equaled the total volume of VIX futures contracts traded during the period from 4:00 pm to 4:15 pm Eastern (which was approximately 110,000 VIX futures contracts). Given that other volatility-related ETPs also needed to purchase VIX futures contracts during this 15-minute interval, it is apparent that there simply were not enough VIX futures contracts available in the market, and a liquidity gap ensued.

15.    Investor losses were staggering. SVXY lost essentially its entire returns over the preceding *six-and-a-half years* in a matter of minutes. Market regulators ultimately put the brakes on SVXY's death spiral by halting trading in SVXY shares. When trading resumed at 11:35 am Eastern on February 6, 2018, SVXY opened at $11.11 per share – a decline of *90%* from the prior day's high of $107.19 per share.

16.    Investors, believing – correctly – that stock market volatility would recede after the modest spike which had occurred during the regular trading session of the stock market on February 5, 2018, purchased hundreds of millions of dollars' worth of SVXY shares after 4:00 p.m.

Eastern.  Due to the undisclosed risk of an after-market death spiral, however, the value of those investments was virtually wiped out.

17.     Significantly, the collapse in SVXY's value occurred after the equities market had closed its trading session, and was therefore largely, if not completely, unrelated to changes in equity market value or volatility, or any other market-wide phenomenon.  Indeed, in after-hours trading from 4:00 p.m. to 4:15 p.m. Eastern on February 5, 2018, the VIX rose just 13%.  Rather, the catastrophic losses experienced by SVXY's investors were the result of a destructive feedback loop of the Fund's own making.

## II.     JURISDICTION AND VENUE

18.     The claims alleged herein arise under §§11 and 15 of the 1933 Act, 15 U.S.C. §§77k and 77o, and §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the 1933 Act, and §27 of the 1934 Act.

20.     Venue is proper in this District pursuant to §22 of the 1933 Act, §27 of the 1934 Act, and 28 U.S.C. §1391(b).  SVXY shares trade and were distributed in this District, and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

21.     In connection with the acts alleged in this consolidated amended complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NYSE Arca Equities, Inc. ("NYSE Arca"), a national securities exchange.

III.    **PARTIES**

A.    **Lead Plaintiffs**

22.     Lead Plaintiffs Thomas Butler, III, Anthony Ludovici, and Lisa Ludovici purchased SVXY shares during the Class Period and/or pursuant or otherwise traceable to the Registration Statement, as set forth in the certifications previously filed with the Court and incorporated herein by reference, and have been damaged thereby.

B.    **The ProShares Defendants**

23.     Defendant ProShares is a Delaware statutory trust whose principal executive office is located in Bethesda, Maryland.  The Trust was the registrant for SVXY and the issuer of SVXY shares.  The Trust operates a fund management firm that (together with its affiliate ProFunds) manages various investment funds with combined assets under management of $29 billion – making it one of the world's largest managers of inverse and leveraged exchange-traded funds.  These products differ from traditional methods of investing because, instead of investing directly in a specific commodity or volatility product, the exchange-traded fund's value is derived by gaining exposure to the underlying benchmark or index that tracks the commodity or volatility index.  During the Class Period, the Trust was organized into 18 different funds, each tracking a specific commodity, rate, or index.  One of those funds was SVXY.

24.     Defendant ProShare Capital Management LLC (the "Sponsor") serves as the sponsor and commodity pool operator for SVXY.[2]  The Sponsor has exclusive management and control of all aspects of SVXY's business, including managing its portfolio of assets with a view toward achieving SVXY's investment objectives.  The Sponsor shares the same principal executive office location as the Trust.

---

[2]     A commodity pool operator is an enterprise in which funds are combined for the purpose of trading futures contracts.

- 8 -

25.     Defendant Michael L. Sapir is a co-founder of the Sponsor and was, at all relevant times, Chief Executive Officer and a principal of the Sponsor.  In those positions, Sapir was responsible for oversight of all aspects of the Sponsor's business.

26.     Defendant Louis M. Mayberg was, at all relevant times, a member and a principal of the Sponsor.

27.     Defendant Edward J. Karpowicz was, at all relevant times, Principal Financial Officer of the Trust and a principal of the Sponsor.

28.     Defendant Todd B. Johnson was, at all relevant times, Principal Executive Officer of the Trust.  In that position, Johnson was responsible for oversight of the operations of the Trust.  In addition, Johnson was, at all relevant times, Chief Investment Officer and a principal of the Sponsor, and was responsible for oversight of the investment management activities of the Sponsor.

29.     The defendants identified in ¶¶25-28 are collectively referred to herein as the "Individual Defendants."  Each of the Individual Defendants signed the Registration Statement and the Draft Registration Statement (defined below).  Defendants Karpowicz and Johnson signed the 2Q17 10-Q and the 3Q17 10-Q (defined below).  In addition, as principals and/or executive officers of the Trust and/or the Sponsor, the Individual Defendants participated in the solicitation and sale of SVXY shares to investors in the Fund for their own benefit and for the benefit of the Sponsor.

30.     The Individual Defendants, the Sponsor, and the Trust are collectively referred to herein as the "ProShares Defendants."

C.      **The Underwriter Defendants**

31.     Defendants ABN AMRO Clearing Chicago LLC, Deutsche Bank Securities Inc., Goldman, Sachs & Co., J.P. Morgan Securities LLC, Knight Execution & Clearing Services, LLC, Merrill Lynch Professional Clearing Corp., Newedge USA LLC, SG Americas Securities, LLC, and

Virtu Financial BD LLC (collectively, the "Underwriter Defendants") served as underwriters for the offer and sale of SVXY shares during the Class Period.

32.     Each of the Underwriter Defendants executed an Authorized Participant Agreement with the Trust and the Sponsor for the sale of SVXY shares to the public.  These agreements provided the Underwriter Defendants with exclusive authorization to purchase and redeem shares of SVXY in blocks of 50,000 shares, dubbed "Creation Units."  Throughout the Class Period, the Underwriter Defendants continuously purchased and redeemed Creation Units.  The Underwriter Defendants purchased Creation Units from the Trust at SVXY's end-of-day net asset value ("NAV") price – *i.e.*, the Fund's total assets minus its total liabilities.  The Underwriter Defendants then sold the shares from these Creation Units to the investing public at a per-share market price.

33.     The Underwriter Defendants received profits from the spread between the NAV at which they received Fund shares from the Trust and the market price at which the shares were sold to the investing public.  For example, if SVXY shares were trading at a premium to NAV, the Underwriter Defendants would purchase Creation Units from the Trust at the lower NAV and sell shares from these Creation Units to investors at the higher market price.  Conversely, if SVXY shares were trading at a discount to NAV, the Underwriter Defendants would purchase shares in the secondary market, at the lower market price, and redeem Creation Units derived from those shares at the higher NAV.  This mechanism was designed to ensure that the market price of SVXY shares hewed closely to the Fund's NAV per share.

34.     By purchasing Creation Units from the Trust (*i.e.*, the issuer), breaking such Creation Units down into constituent shares, and selling those shares to investors, the Underwriter Defendants acted as statutory underwriters within the meaning of the 1933 Act.  *See* 15 U.S.C. §77b(a)(11).  The

Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

35.     The defendants referenced above in Section III. are collectively referred to herein as the "Defendants."

## IV.     CLASS ACTION ALLEGATIONS

36.     Lead Plaintiffs bring this action as a class action on behalf of all persons or entities who purchased or otherwise acquired SVXY shares pursuant or otherwise traceable to the Registration Statement and/or during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers, directors and affiliates of the Defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

37.     The members of the Class are so numerous that joinder of all members is impracticable. Fund shares are actively traded on the NYSE Arca under the ticker symbol "SVXY" and millions of shares were sold throughout the Class Period. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds of members in the proposed Class. Beneficial owners and other members of the Class may be identified from records maintained by the Trust or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

38.     Lead Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

39.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

40.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the 1933 Act and/or the 1934 Act;

(b)    whether statements made by Defendants to the investing public in the Registration Statement and during the Class Period about the business, operations and risks of investing in the Fund were false, misleading, or omitted material facts; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

41.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    SVXY's Background

#### 1.    ETPs

42.    The Trust is a Delaware statutory trust organized into separate series of exchange-traded funds.  Exchange-traded funds are a type of exchange-traded product, or ETP.[3]  ETPs bundle securities together to offer investors the ability to invest in diversified portfolios, much like mutual

---

[3]    The term "ETP" refers to both exchange-traded funds such as SVXY, and exchange-traded notes, which are debt instruments.

funds.  However, while mutual funds trade only at the end-of-day NAV price, ETP shares trade on stock exchanges throughout the trading day at varying prices, like stocks.  An ETP holds assets such as stocks, commodities, or bonds.  ETPs are usually designed to keep their market price close to their NAV per share.

43.     Most ETPs track an index, such as a stock index or bond index.  Inverse ETPs seek to deliver the opposite of the performance of the index or benchmark they track, while leveraged ETPs seek to deliver a multiple of the performance of the index or benchmark they track.

### 2.     The VIX

44.     Launched in 1993, the VIX is an index that seeks to measure the expected (*i.e.*, future) volatility of the S&P 500 Index over the next 30 days.[4]  Volatility is the range of price change that a security experiences over a given period of time.  A security whose price remains relatively stable has low volatility, whereas a security whose price fluctuates significantly has high volatility.

45.     Cboe Global Markets, Inc. ("CBOE") calculates the VIX pursuant to a complicated formula, and reports it as a numeric value.  That formula takes as inputs the market prices of stock options on the S&P 500 Index with an average expiration of 30 days.[5]  Because the VIX measures expected market swings and uncertainty, it is sometimes referred to as the market's "fear gauge."

### 3.     The VIX Short-Term Futures Index

46.     Due to its composition, the VIX is not tradeable, and therefore it is not possible to invest directly in the VIX.  As a result, SVXY is not benchmarked to the VIX, but rather, is

---

[4]     The "S&P 500 Index" refers to Standard & Poor's 500 Index, a stock index based on the 500 largest companies whose shares are listed for trading on the New York Stock Exchange or the NASDAQ.

[5]     A stock option gives an investor the right, but not the obligation, to buy or sell a stock at an agreed-upon price and date.

benchmarked to the VIX Short-Term Futures Index.  The VIX Short-Term Futures Index is an investable index of VIX futures contracts with the ticker symbol "SPVXSPID."[6]

47.     Specifically, the VIX futures contracts comprising the VIX Short-Term Futures Index represent the prices of the two nearest-to-expiration VIX futures contracts, replicating a position that rolls the nearest month VIX futures to the next month VIX futures on a daily basis in equal fractional amounts.  This results in a constant weighted average portfolio maturity of one month.  Thus, the VIX Short-Term Futures Index is one step removed from the VIX, and essentially represents the market's expectation as to how the VIX will perform over the next 30 days.

### 4.     SVXY

48.     Created in October 2011, SVXY's investment objective during the Class Period was to achieve results (before fees and expenses) that corresponded to the inverse (-1x) of the daily performance of the VIX Short-Term Futures Index.  For example, if the VIX Short-Term Futures Index decreased 5% on a given day due to low market volatility, the investment objective of the Fund was to increase 5% that same day.  The Fund accomplished this by buying and selling VIX futures contracts during the trading day.  Accordingly, SVXY invested substantially all of its assets in VIX futures contracts.

49.     SVXY's NAV was calculated at the end of each trading day, at 4:15 pm Eastern.  At that time, the Sponsor sought to ensure that the portfolio of VIX future contracts owned by the Fund was "rebalanced" in order to maintain the appropriate -1x leverage ratio, consistent with the Fund's investment objective.

50.     If the value of the VIX Short-Term Futures Index had increased during the trading day due to an increase in expected market volatility, then the NAV of the Fund would fall, due to the

---

[6]     A futures contract is an agreement to buy or sell a predetermined amount of a commodity – in this case, volatility itself – at a specific price on a specific date in the future.

Fund's inverse nature.  As a result, the Fund would need to decrease its inverse exposure to the VIX Short-Term Futures Index, in order to maintain its -1x ratio, by purchasing VIX futures contracts. Conversely, if the value of the VIX Short-Term Futures Index had decreased during the trading day due to a decrease in expected market volatility, then the NAV of the Fund would rise.  As a result, the Fund would need to increase its inverse exposure to the VIX Short-Term Futures Index by selling VIX futures contracts.

51.     Investing in inverse-volatility ETPs such as SVXY can be used as a means to hedge investment risks and diversify an investment portfolio.  For example, the Registration Statement described SVXY (which the Registration Statement labeled a "geared fund" due to the Fund's inverse leverage to the VIX Short-Term Futures Index) as follows:

> Daily objective geared funds, if used properly and in conjunction with the investor's view on the future direction and volatility of the markets, ***can be useful tools for investors who want to manage their exposure to various markets and market segments*** and who are willing to monitor and/or periodically rebalance their portfolios.

**B.     The Markets Experience Historic Low Volatility During 2017**

52.     In the wake of the 2008 financial crisis, the Federal Reserve and other central banks began supporting global markets, which resulted in stock market declines becoming relatively infrequent, and equity market volatility decreasing.

53.     During 2017, the markets experienced a period of historic low volatility.  In fact, 2017 was the least volatile year for stocks since 1965.  In May 2017, the VIX closed below 10 – less than half its historical average of approximately 20.

54.     According to an analysis performed by the investment bank Goldman Sachs, the S&P 500 Index had a realized (*i.e.*, past) volatility score of 7 during 2017, which "ranked in the first percentile since 1930."  Of the 56 lowest closing levels in the history of the VIX since 1990, 47 of them occurred in 2017.

55.     As a result of the decline in the VIX, the VIX Short-Term Futures Index, to which SVXY was inversely benchmarked, also declined during 2017 and remained at historic low levels throughout the year.  The following chart illustrates the abnormally low level that the VIX Short-Term Futures Index had reached by 2017:



### C.     Retail Investors Pour Money into Volatility-Related ETPs Such as SVXY

56.     At the same time, investments in volatility-related ETPs and other financial instruments used to trade volatility dramatically increased.  Billions of dollars' worth of invested capital flowed into volatility-related ETPs by the start of the Class Period, as the number of ETPs tied to volatility increased to nearly 40 such products.

57.     Many of these ETPs were leveraged, with investment objectives that sought to achieve some multiple of the underlying volatility index (generally 2x).  Like inverse ETPs such as SVXY, leveraged ETPs require daily rebalancing.  The Trust alone issued hundreds of millions of

dollars' worth of such products, including ETPs that traded under the ticker symbols "UVXY" (with a target leverage ratio of 2x) and "VIXY" (with a target leverage ratio of 1x).

58.     Investments in volatility-related ETPs were heavily skewed toward shorting volatility, as investors poured billions of dollars into bets that historic low volatility would continue unabated.[7] Indeed, as volatility continued to decline during 2017, inverse ETPs such as SVXY delivered handsome returns far in excess of those provided by investing in equity indexes such as the S&P 500 Index.  SVXY and similar inverse-volatility ETPs gained approximately 180% during 2017, while the S&P 500 Index gained just 20%.

59.     Those returns put inverse-volatility ETPs on the radar of even casual investors, fueling demand for ETPs such as SVXY.  While investing directly in VIX futures contracts, such as those traded by SVXY, would require an investor to qualify to open an options trading account, retail investors were able to buy SVXY directly through their retirement and brokerage accounts – and even the social media investing website Stock Twits – without needing any qualifications.

60.     Defendants were happy to meet the burgeoning demand from retail investors, garnering significant fees in the process, as SVXY grew to become the second-largest inverse-volatility ETP.

61.     By May 31, 2017, aggregate gross capital subscriptions in the Fund had increased to $7.9 billion, from $5.1 billion as of July 31, 2016.  This massive inflow into the Fund continued throughout the Class Period.  From December 31, 2016, to December 31, 2017, total Fund assets increased 257%, from $228.6 million to $816.3 million.  As of February 1, 2018, the market capitalization of SVXY was approximately $1.4 billion.

---

[7]     "Shorting" refers to a bet that an asset will fall in value.  By contrast, a "long" position refers to a bet that an asset will increase in value.

### D.     SVXY Is Subject to Extreme Undisclosed Risks

62.     Throughout the Class Period, SVXY was subject to extreme risks that were not adequately disclosed to investors.  While Defendants told investors in the Fund that SVXY was appropriate for managing daily trading risks, in fact the Fund was inappropriate for this purpose as, given its structure, it was subject to catastrophic losses that could materialize *in a matter of minutes*. No reasonable investor would have invested in SVXY at prevailing market prices had the true risks and significant likelihood of catastrophic losses been disclosed by Defendants.

63.     During the Class Period, an investment in SVXY was like picking up pennies in front of a proverbial steamroller.  Historic low volatility and a glut of volatility-related ETPs (including SVXY) subject to daily rebalancing made SVXY a ticking time-bomb that was set to self-destruct when market turbulence inevitably returned.

64.     While these risks manifested and increased during the Class Period, Defendants failed to appropriately update the Fund's risk disclosures, misleading investors into believing that the Fund was just as risky as it had always been – even as conditions significantly changed and thereby exposed investors to a substantial likelihood of suffering catastrophic losses.

### 1.     The Risk Posed by SVXY's Derivative Structure

65.     Despite the apparent simplicity of buying shares in SVXY to bet that low levels of market volatility would continue, an investment in SVXY was in fact an investment in a highly complex and exotic derivative.[8]

66.     First, options contracts on the S&P 500 Index are derivatives of that index.  That means that the VIX, which is built on those options contracts, is a derivative-of-a-derivative, or a derivative-squared.  In turn, the VIX Short-Term Futures Index, to which SVXY is inversely

---

[8]     A derivative is a security with a value that is reliant upon, or derived from, an underlying asset or group of assets.

benchmarked, is an index of VIX futures contracts, meaning that it is a derivative-cubed.  Finally, SVXY, which seeks to replicate the inverse of the daily performance of the VIX Short-Term Futures Index, is yet another step removed – making it a derivative-to-the-fourth power.  In other words, SVXY is one of the most "derived" of derivatives.  It is an ETP, which is inverse, derived from a futures index, derived from the VIX index, which is itself an abstract aggregate calculation of options, derived from stocks of the S&P 500 Index.

67.     Like the collateralized debt obligations that precipitated the 2008 financial crisis and the portfolio insurance algorithms that brought about the "Black Monday" crash of 1987, SVXY's complex structure posed a heightened risk of extreme and sudden price movements.

## 2.     The Risk Posed by Historic Low Volatility

68.     The historic low market volatility during the Class Period meant that relatively small point increases in the value of the VIX, and in turn, the VIX Short-Term Futures Index, would amount to significant percentage increases.  For example, at the VIX's historical average of 20, a two-point move from 20 to 22 would constitute an increase in volatility of just 9.1%.  But, with the VIX hovering around 10, a two-point move from 10 to 12 would constitute a 16.7% increase in volatility.

69.     Although both the VIX and the VIX Short-Term Futures Index were reported as an absolute numeric value, SVXY was rebalanced daily based on the percentage change in the VIX Short-Term Futures Index.  Therefore, the historic low level of volatility during the Class Period presented a significant risk that even a modest spike in volatility would amount to a significant percentage increase in the VIX Short-Term Futures Index – and in turn, an extreme decrease in the value of SVXY shares.

### 3.    The Risk Posed by the Mean-Reverting Nature of Volatility

70.    The risk that volatility would increase during the Class Period was exacerbated by the fact that volatility has historically been a "mean-reverting" asset.  Unlike stocks, which historically have risen over time, the VIX has historically had a sideways trajectory – meaning that it eventually reverts to its long-term historical average of approximately 20.  In light of the extended period of time that volatility had hovered far below its long-term historical average, and the mean-reverting nature of volatility, a spike in volatility was virtually inevitable.

71.    After the end of the Class Period, Artur Sepp, a former analyst for Merrill Lynch and Bank of America, analyzed the probability of a one-day VIX futures spike of 80% occurring.  Based on historical data, Sepp found that the probability of such a spike was about 0.37% at the high range, meaning such an event is expected to *occur every year*, or 0.18% at the low range, meaning such an event is expected to *occur once every-other-year*.  In other words, there was a high statistical probability that volatility would spike significantly during the Class Period.

### 4.    The Risk Posed by SVXY's Daily Rebalancing Requirement

72.    As alleged above, because SVXY's objective was to deliver the inverse of the daily returns of the VIX Short-Term Futures Index, its underlying holdings needed to be rebalanced at the end of every trading day in order to maintain the appropriate -1x leverage ratio.  The Fund accomplished this by buying VIX futures on trading days when the VIX Short-Term Futures Index rose and selling VIX futures on trading days when the VIX Short-Term Futures Index fell.  SVXY's rebalancing was conducted shortly after the close of the stock market – at 4:15 pm Eastern.

73.    Like inverse ETPs, ETPs with leveraged multiples (*e.g.*, 2x) require daily rebalancing after the close of trading.  And, although leveraged ETPs aim to deliver a multiple of the performance of the underlying volatility index, they nonetheless must buy VIX futures contracts on

days when volatility has risen, and sell VIX futures contracts on days when volatility has fallen – just like SVXY.[9]

74.      Although not disclosed in the Registration Statement, it is now apparent that SVXY and other volatility-related ETPs all rebalanced their portfolios around the same time each trading day – between 4:00 pm Eastern (when the regular trading session of the stock market closed) and 4:15 pm Eastern (when the regular trading session of the VIX futures market closed).

75.      Since other volatility-related ETPs also rebalanced their portfolios around the same time and traded in the same direction as SVXY, the Fund was purchasing VIX future contracts when demand was highest and selling VIX futures contracts when demand was lowest – resulting in adverse pricing pressure.

76.      And because daily rebalancing was mandatory for SVXY and other volatility-related ETPs, fund managers were "price-insensitive," meaning that they would purchase or sell the requisite amount of VIX futures contracts in order to rebalance their funds' portfolios irrespective of the price of VIX futures contracts.

**5.      The Risk Posed by SVXY's Vulnerability to Front-Running**

77.      In addition, the timing and demand associated with the rebalancing made SVXY vulnerable to "front-running" by sophisticated market participants such as market-makers, specialist volatility trading firms, and hedge funds.[10]  These sophisticated market participants had access to proprietary market data and non-public modeling capabilities, which gave them visibility into the Fund's rebalancing needs based on market movements during the trading day.  This proprietary

---

[9]       This is because leveraged ETPs with long volatility exposure must match their targeted leveraged ratios, and inverse ETPs with short volatility exposure must cover their short positions.

[10]      Front-running is when a broker or other entity enters into a trade because they have foreknowledge of a non-publicized transaction that will influence the price of the asset, resulting in a likely financial gain for the broker or other entity.

information enabled sophisticated market participants to start bidding up the price of VIX futures contracts ahead of the end-of-day rebalancing – exacerbating the pricing pressure that SVXY faced in conducting the rebalancing.

**6.      The Risk Posed by Over-Crowding of the VIX Futures Market**

78.      The number of VIX futures contracts that SVXY needed to purchase or sell in connection with its daily rebalancing was a function of both the size of the Fund's portfolio and how much the VIX Short-Term Futures Index had moved on a given trading day.  The exponential growth of SVXY and other volatility-related ETPs prior to and during the Class Period pushed the size of their potential rebalancing requirements to unprecedented levels.

79.      For example, in early 2013, volatility-related ETPs would have needed to collectively purchase approximately 20,000 VIX futures contracts to rebalance their portfolios if VIX futures rose by 4 points.  By June 2017, volatility-related ETPs would have needed to collectively purchase approximately *88,000* VIX futures contracts to rebalance their portfolios after the same 4-point increase in VIX futures.  The following chart illustrates the increase in the number of VIX futures contracts that volatility-related ETPs would need to purchase following a 4-point increase in VIX futures, through June 2017:



80.     By December 2017, an increase in VIX futures of just *two points* would have required volatility-related ETPs to collectively purchase approximately 80,000 VIX futures contracts to rebalance their portfolios.  And, a 4-point increase in VIX futures would have required volatility-related ETPs to collectively purchase approximately *140,000* VIX futures contracts to rebalance their portfolios – 70% of the average daily trading volume of approximately 200,000 VIX futures contracts.

81.     Prior to the end of the Class Period, the event that precipitated the largest rebalance by volatility-related ETPs was the "Brexit" vote, which occurred on June 24, 2016.  On that date, the VIX rose by 5.6 points, and the price of 30-day VIX futures contracts increased by 33%, requiring volatility-related ETPs to purchase approximately 66,000 VIX futures contracts to rebalance their portfolios.  Approximately one year later, by June 2017, the same 5.6-point increase in the VIX would have required volatility-related ETPs to purchase approximately 100,000 VIX futures contracts to rebalance their portfolios.

- 23 -

82.     As the size of SVXY's rebalance requirements grew, so too did the risk that the number of VIX futures contracts that SVXY and other volatility-related ETPs would need to trade shortly after the close of the market would simply be too large in relation to what the market could provide.

### 7.     The Risk of a VIX Futures Liquidity Gap

83.     By the start of the Class Period, the proliferation of volatility-related products that relied on trading in the VIX futures market had led to skyrocketing demand for VIX futures contracts.  This created an acute risk of a "liquidity gap" – *i.e.*, a discrepancy between the supply and demand for VIX futures contracts – that ensured SVXY would not perform as represented in the face of significant market turbulence.

84.     Given the billions of dollars that had been invested in volatility-related ETPs prior to and during the Class Period – in addition to the billions of dollars invested in volatility trades outside of ETPs – any significant movement in the S&P 500 Index would cause an outsized movement in VIX future contracts, as market participants rushed to cover short positions, hedge risks and rebalance investment portfolios in overly-crowded volatility markets.  There simply were not enough VIX futures contracts available from liquidity providers to absorb such an event without a run on the market.

85.     Inverse ETPs such as SVXY were particularly at risk of catastrophic losses, in light of their sizeable, mandatory, and price-insensitive rebalancing requirements.

86.     Signs of these liquidity issues began to appear during 2017.  As a consequence of investors' crowding into volatility-related ETPs and other volatility-related investments, VIX futures contracts began to experience larger price moves following relatively small moves in the S&P 500 Index.  As shown by the following chart, during 2017, VIX futures became more reactive to changes in the S&P 500 Index:



**In 2017, VIX futures moves have been large for relatively small SPX moves**

E.     **Unbeknownst to Investors, SVXY Was Poised to Experience a Destructive Feedback Loop When Volatility Inevitably Spiked**

87.     In light of SVXY's exponential growth, the low volatility environment, and the design of the Fund, even a small-to-moderate movement in the S&P 500 Index during the Class Period would cause a rebalance so large that a VIX futures liquidity gap would develop – setting in motion a destructive feedback loop, or death spiral, that would obliterate SVXY's value in a matter of minutes and cause investors to suffer catastrophic losses.

88.     If an event impacting the broader market caused the VIX (which measures the expected volatility of the S&P 500 Index) to rise, the VIX Short-Term Futures Index, to which SVXY is inversely benchmarked, would rise as well.  Volatility-related ETPs including SVXY would then need to rebalance their portfolios by purchasing VIX futures contracts.

89.     As volatility-related ETPs and other opportunistic market participants simultaneously rushed to purchase VIX futures contracts around the time that the markets closed, the heightened demand and strained supply would drive up the price of VIX futures contracts.

- 25 -

90.     Purchasing VIX futures contracts as prices rose would drive down SVXY's NAV, thereby necessitating that the Fund buy even more VIX futures contracts at higher prices in order to rebalance in accordance with its targeted -1x leverage ratio.

91.     Moreover, by purchasing VIX futures contracts, volatility-related ETPs were, in essence, purchasing expected volatility – which drove expected volatility up further.  This would cause the VIX and the VIX Short-Term Futures Index to rise even higher – triggering a feedback loop, or death spiral, that would continue until SVXY collapsed or suffered catastrophic losses.

92.     Once this destructive feedback loop developed, it would cause SVXY's value to plummet in a matter of minutes.

*     *     *

93.     By design, the complexity of SVXY concealed and magnified these risks, which were poorly understood, even by sophisticated industry participants.  Many (if not most) of the investors in SVXY were – like Lead Plaintiffs – retail investors who did not have access to non-public predictive models, sophisticated analytical tools, or the massive amounts of data (which included proprietary and non-public data) necessary to comprehend the true risks of SVXY or how it would perform in stress scenarios.

94.     Defendants – the creators, portfolio managers and underwriters of SVXY – possessed unique knowledge about the risks faced by the Fund throughout the Class Period.  Yet, Defendants failed to apprise investors of these risks, even as they pocketed millions of dollars from the management of the Fund and sale of SVXY shares.

95.     To the contrary, the Registration Statement stated that investors in the Fund faced a risk of loss "*[a]s with all investments*."  However, SVXY was not like all investments.  During the Class Period, SVXY was a ticking time-bomb, and the question was not if it would self-destruct, but when.

96.     Had Defendants adequately disclosed the pertinent risks, no reasonable investor would have purchased or held SVXY shares after 4:00 pm Eastern on any day – and certainly not on any day when volatility had increased appreciably.

**F.     The Undisclosed Risks Materialize in a "Volpocalypse"**

97.     On Monday, February 5, 2018, the risk of a liquidity gap in VIX futures suddenly materialized.  On that date, the S&P 500 Index fell approximately 4% amid concerns about rising bond yields and higher inflation.  On a historical basis, the decline was unremarkable.  Percentage-wise, it was less than half the greatest single-day decline in the S&P 500 Index over the last 30 years (a 9% decline that occurred on October 15, 2008) and a fraction of the 20% decline in the S&P 500 Index that occurred on October 19, 1987.

98.     By 4:00 pm Eastern (the close of regular trading for SVXY shares), the VIX Short-Term Futures Index had risen 33%, from a prior day settlement value of 49.43, to 65.75.  As expected, SVXY's share price fell a roughly equivalent 32%, from a prior daily close of $105.60 per share, to $71.82 per share as of 4:00 pm Eastern on February 5, 2018.  Trading was orderly and positions in the stock, equity options, and VIX futures markets remained liquid.

99.     However, between 4:00 pm and 4:15 pm Eastern, as SVXY and other volatility-related ETPs sought to rebalance their portfolios by purchasing hundreds of millions of dollars' worth of VIX futures contracts in an overly-crowded VIX futures market, that market spiraled out of control.  The price of VIX futures contracts rose, which in turn drove down SVXY's NAV, resulting in a feedback loop which required the purchase of yet more VIX futures contracts by SVXY and other volatility-related ETPs, causing SVXY's NAV to decline further, and so on.  The undisclosed peril of a death spiral ensued.

100.    Between 4:00 pm and 4:15 pm Eastern on February 5, 2018, the prices of the VIX futures contracts making up the VIX Short-Term Futures Index rocketed upward 96% over the

settlement price of the prior trading day, February 2, 2018.  The following figures illustrate the dramatic rise in the price of March VIX futures contracts (which formed part of the VIX Short-Term Futures Index) that occurred shortly after 4:00 pm Eastern:





March Vix futures contract rockets higher



Source: Bloomberg
© FT

101.     As the death spiral accelerated, approximately 116,000 VIX futures contracts – 25%
of the entire market – were traded within a single minute, at 4:08 pm Eastern.

102.     Rebalancing SVXY on February 5, 2018 required the purchase of between 100,000
and 120,000 VIX futures contracts – an amount that roughly equaled the total volume of VIX futures
contracts traded during the period from 4:00 pm to 4:15 pm Eastern (which was approximately
110,000 VIX futures contracts).  Given that other volatility-related ETPs also needed to purchase
VIX futures contracts during this 15-minute interval, it is apparent that there simply were not enough
VIX futures contracts available in the market, and a liquidity gap ensued.

103.     Investor losses were staggering.  SVXY lost essentially its entire returns over the
preceding *six-and-a-half years* in a matter of minutes.  After the Sponsor inexplicably failed to
publish SVXY's NAV at 4:15 pm Eastern, and still had not done so by the time that pre-market
trading commenced at 4:00 am Eastern on February 6, 2018, the NYSE Arca put the brakes on
SVXY's death spiral by halting trading in SVXY shares.  When trading resumed at 11:35 am Eastern

on February 6, 2018, SVXY opened at $11.11 per share – a decline of **90%** from the prior day's high of $107.19 per share.  The following chart illustrates the dramatic decline in the price of SVXY shares:



104.     Investors, believing – correctly – that stock market volatility would recede after the modest spike which had occurred during the regular trading session of the stock market on February 5, 2018, purchased hundreds of millions of dollars' worth of SVXY shares after 4:00 pm Eastern. Due to the undisclosed risk of an after-market death spiral, however, the value of those investments was virtually wiped out.

105.     Significantly, the collapse in SVXY's value occurred after the equities market had closed its trading session, and was therefore largely, if not completely, unrelated to changes in equity market value or volatility, or any other market-wide phenomenon.  Indeed, in after-hours trading from 4:00 pm to 4:15 pm Eastern on February 5, 2018, the VIX rose just 13% – from 32.98 to 37.32. Rather, the collapse in SVXY's value during that time period was due to the undisclosed material

risks inherent in the rebalancing requirements of SVXY, given what was, by the beginning of the Class Period, a VIX futures market that was insufficiently liquid to handle those requirements without a disproportionate impact on the prices of VIX futures contracts.

106.    Media commentators described the shocking and complete collapse of SVXY and similar products in suitably cataclysmic terms such as "VIX-mageddon" and the "Volpocalypse." Others noted that investors had been "blindsided" as latent risks inherent in SVXY and other inverse and leveraged ETPs materialized, exposing fatal design flaws that made the products far riskier than disclosed by Defendants.

107.    Several inverse ETPs wound down in the days that followed, with one issuer, Nomura Holdings Inc., stating that it "'sincerely apologize[d] for causing significant difficulties to investors.'"  The Sponsor was far less contrite, issuing a curt statement that nonetheless recognized that the extreme risks exposed on Monday, February 5, 2018 had existed in the Fund all along – indeed existed *by design* – and were not the result of some aberrant market event.  According to the Sponsor, "'the performance on Monday of the ProShares Short VIX Short-Term Futures ETF (SVXY) was consistent with its objective and reflected the changes in the level of its underlying index.'"

108.    Soon after its belated acknowledgement of SVXY's true risks, the Sponsor abruptly changed the Fund's investment objective.  This act essentially acknowledged that the design of SVXY was fundamentally flawed and had exposed investors to unreasonable risks during the Class Period.  Although the risk of a liquidity gap had been dramatically reduced by the events of February 5, 2018 (for example, due to the destruction of billions of dollars' of worth of volatility-related ETP investments), the Sponsor cut SVXY's inverse leverage in half because it was still far too risky to be traded by the Fund's investors.

109.    On February 27, 2018, the Sponsor announced that SVXY's new investment objective would be to seek results (before fees and expenses) that correspond to one-half the inverse (-0.5x) of the VIX Short-Term Futures Index for a single day.  In a statement filed with the SEC, the Sponsor described the change as follows:

> The Sponsor believes the change to each Fund's investment objective . . . is appropriate and consistent with the best interest of each Fund and Fund shareholders in light of recent extreme changes in the value of the . . . Index.  As a result of the change to each Fund's investment objective, the Sponsor expects the risk profile and volatility of each Fund to be significantly reduced.

110.    This belated de-risking of SVXY in "the best interest" of Fund shareholders came only *after Bloomberg* reported that both the SEC and the Commodity Futures Trading Commission were investigating whether wrongdoing contributed to steep losses for volatility-related ETPs on February 5, 2018.  Later, the Financial Industry Regulatory Authority launched its own investigation into whether broker-dealers – a category that includes the Underwriter Defendants – made unsuitable recommendations and misrepresentations or failed to make required disclosures to investors in volatility-related ETPs such as SVXY.

111.    While Defendants may now seek to mitigate regulatory scrutiny, their failure to fully disclose SVXY's true risks during the Class Period caused SVXY investors to suffer hundreds of millions of dollars in economic losses and damages under the federal securities laws.

## VI.    1933 ACT ALLEGATIONS

### A.    False and Misleading Statements in the Registration Statement

112.    On May 15, 2017, the Trust filed with the SEC a registration statement on Form S-3, which was amended on July 11, 2017.  On July 13, 2017, the Trust filed with the SEC a prospectus on Form 424B3, which incorporated and formed part of the registration statement.  These documents are collectively referred to herein as the "Registration Statement."

113.    The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

114.    The Registration Statement described SVXY as a "useful tool[] for investors who want to manage their exposure to various markets and market segments," provided that investors were willing to "actively manage and monitor their investments, as frequently as daily":

> *Daily objective geared funds [such as SVXY], if used properly and in conjunction with the investor's view on the future direction and volatility of the markets, can be useful tools for investors who want to manage their exposure to various markets and market segments and who are willing to monitor and/or periodically rebalance their portfolios.  Shareholders who invest in the Geared Funds should actively manage and monitor their investments, as frequently as daily.*

115.    The statements referenced above in ¶114 were materially false and misleading when made because they failed to disclose that, by the start of the Class Period: (i) SVXY was inappropriate even for investors who "actively manage[d] and monitor[ed] their investments" on a "daily" basis, as even a relatively modest increase in volatility would subject investors to catastrophic losses occurring in a matter of minutes; and (ii) investors who purchased SVXY shares at the end of the trading day to express an entirely correct "view on the future direction and volatility of the markets" nonetheless risked losing almost the entirety of their investment in an after-market death spiral.

116.    While the Registration Statement stated that an investor "could potentially lose the full principal value of his/her investment, even over periods as short as one day," the Registration Statement significantly qualified this statement by stating that the risk of loss was "[a]s with all investments":

The Funds generally are intended to be used as trading tools for short-term investment horizons and investors holding shares of the Fund over longer-term periods may be subject to increased risk of loss.

***The Funds generally are intended to be used only for short-term investment horizons. As with all investments, an investor in any of the Funds could potentially lose the full principal value of his/her investment, even over periods as short as one day***.

117. The statements referenced above in ¶116 were materially false and misleading when made because they failed to disclose that: (i) SVXY was not like "all investments," since by the start of the Class Period, even a relatively modest increase in volatility would subject investors to catastrophic losses occurring in a matter of minutes; and (ii) investors who used SVXY "only for short-term investment horizons" as "intended" nonetheless risked losing almost "the full principal value of [their] investment" over "periods as short as" several minutes.

118. The Registration Statement described SVXY's investment objective and the Sponsor's method of achieving that objective, as follows:

The [] Fund seeks results (before fees and expenses) that correspond to the inverse (-1x) of the performance of the [VIX Short-Term Futures] Index for a single day.

\* \* \*

A "single day" is measured from the time the Inverse Fund calculates its NAV to the time of the [] Fund's next NAV calculation. If the [] Fund is successful in meeting its objective, its value on a given day (before fees and expenses) should gain approximately as much on a percentage basis as the level of the [VIX Short-Term Futures] Index when the Index declines. Conversely, its value on a given day (before fees and expenses) should lose approximately as much on a percentage basis as the level of the Index when the [VIX Short-Term Futures] Index rises.

\* \* \*

***The Funds seek to achieve their respective investment objectives through the appropriate amount of exposure to the VIX futures contracts included in the [VIX Short-Term Futures] Index***.

119. The Registration Statement stated that SVXY sought to achieve its investment objective of -1x exposure to the VIX Short-Term Futures Index "even during periods when the [VIX

- 34 -

Short-Term Futures] Index is flat or when the [VIX Short-Term Futures] Index is moving in a manner which causes the value of the Fund to decline."  The Registration Statement further stated:

> Other than for cash management purposes, the Funds are not actively managed by traditional methods (*e.g.*, by effecting changes in the composition of a portfolio on the basis of judgments relating to economic, financial and market considerations with a view toward obtaining positive results under all market conditions).  Rather, ***the Sponsor seeks to cause the NAV of each Fund to track the daily performance of the [VIX Short-Term Futures] Index in accordance with such Fund's investment objective, even during periods in which the [VIX Short-Term Futures] Index is flat or moving in a manner which causes the value of the Fund to decline***.

> \*        \*        \*

> ***In seeking to achieve the Funds' investment objectives, the Sponsor uses a mathematical approach to investing***.  Using this approach, the Sponsor determines the type, quantity and mix of investment positions that the Sponsor believes, in combination, should produce daily returns consistent with the Funds' objectives. ***The Sponsor relies upon a pre-determined model to generate orders that result in repositioning the Funds' investments in accordance with their respective investment objective***.

> \*        \*        \*

> The Sponsor does not invest the assets of the Funds based on its view of the investment merit of a particular investment, other than for cash management purposes, nor does it conduct conventional volatility research or analysis, or forecast market movement or trends in managing the assets of the Funds.  ***Each Fund generally seeks to*** remain fully invested at all times in Financial Instruments and money market instruments that, in combination, ***provide exposure to the [VIX Short-Term Futures] Index consistent with its investment objective without regard to market conditions, trends or direction***.

120.    The statements referenced above in ¶¶118-19 were materially false and misleading when made because they failed to disclose that, by the start of the Class Period: (i) the Sponsor's price-insensitive mandate of achieving SVXY's investment objective "through the appropriate amount of exposure to [] VIX futures contracts" – "even during periods when the [VIX Short-Term Futures] Index . . . [was] moving in a manner which cause[d] the value of the Fund to decline" – meant that the rebalancing of the Fund in an overly-crowded VIX futures market would lead to a VIX futures liquidity gap; and (ii) this, in turn, would cause the prices of VIX futures contracts to

skyrocket – initiating a destructive feedback loop perpetuated by the Sponsor's "mathematical approach to investing" that would lead to catastrophic losses for SVXY.

121.     The Registration Statement purported to caution investors that it was "possible to lose money over time regardless of the performance of the [VIX Short-Term Futures] Index, due to the effects of daily rebalancing, volatility and compounding," stating in pertinent part:

> **It is possible to lose money over time regardless of the performance of the [VIX Short-Term Futures] Index, due to the effects of daily rebalancing, volatility and compounding** . . . .
>
> \*          \*          \*
>
> . . . [SVXY] seeks to return (before fees and expenses) . . . the inverse (-1x) . . . of the performance of the [VIX Short-Term Futures] Index for a single day, not for any other period. **The return of . . . [the] Fund for a period longer than a single day is the result of its return for each day compounded over the period and usually will differ from the [] Fund's multiple times the return of the . . . [VIX Short-Term Futures] Index for the same period. Daily compounding of . . . [the] Fund's investment returns can dramatically and adversely affect its longer-term performance during periods of high volatility**.
>
> \*          \*          \*
>
> **Daily rebalancing and the compounding of each day's return over time means that the return of each Geared Fund for a period longer than a single day** will be the result of each day's returns compounded over the period, which **will very likely differ from . . . the inverse (-1x) of the return of the [VIX Short-Term Futures] Index for the same period**. A Geared Fund will lose money if the [VIX Short-Term Futures] Index's performance is flat over time, **and it is possible for the [] Fund to lose money over time regardless of the performance of the [VIX Short-Term Futures] Index, as a result of daily rebalancing, the [VIX Short-Term Futures] Index's volatility and compounding**.

122.     The statements referenced above in ¶121 were materially false and misleading when made because they failed to disclose that, by the start of the Class Period: (i) it was highly likely, if not probable, (and not just "possible") that investors in SVXY would "lose money" in a matter of minutes (and not just "over time") "due to the effects of daily rebalancing" if there was even a relatively modest increase in volatility; and (ii) as such, the Fund's "performance" would be

"dramatically and adversely affect[ed] . . . during periods of high volatility" due to a destructive feedback loop, set in motion by the rebalancing of the Fund in an overly-crowded VIX futures market – and not as a result of "[d]aily compounding."

123.     The Registration Statement provided the following discussion of SVXY's daily rebalancing and NAV calculation:

> *As of the NAV calculation time each trading day, each Geared Fund [including SVXY] will seek to position its portfolio so that its exposure to the [VIX Short-Term Futures] Index is consistent with its investment objective. The impact of the Index's movements during the day will affect whether the [] Fund's portfolio needs to be rebalanced*. For example, if the [VIX Short-Term Futures] Index has risen on a given day, net assets of the [] Fund should fall. As a result, inverse exposure will need to be decreased. Conversely, if the [VIX Short-Term Futures] Index has fallen on a given day, net assets of the [] Fund should rise. As a result, inverse exposure will need to be increased.
>
> *        *        *
>
> . . . The Shares of each Fund trade on the [NYSE Arca] from 9:30 a.m. to 4:00 p.m. (Eastern Time). The NAV for each Share of a Fund, however, will be calculated at 4:15 p.m. (Eastern Time). *Consequently, during the time when the [NYSE Arca] is closed but before the determination of NAV, there could be market developments or other events that cause or exacerbate the difference between the price of the Shares of a Fund and the NAV of such Shares*.

124.     The statements referenced above in ¶123 were materially false and misleading when made because they failed to disclose that, by the start of the Class Period: (i) the exponential growth of SVXY and other volatility-related ETPs had pushed the size of their potential rebalancing requirements to unprecedented levels; (ii) SVXY and other volatility-related ETPs all rebalanced their portfolios "during the time when the [NYSE Arca] [] closed" at 4:00 pm Eastern, "but before the determination of NAV" at 4:15 pm Eastern; (iii) as such, SVXY's own conduct of rebalancing in an overly-crowded VIX futures market would lead to a VIX futures liquidity gap, thereby causing the prices of VIX futures contracts to skyrocket; and (iv) accordingly, the "market developments" that "could" arise during this 15-minute interval included a destructive feedback loop that would

lead to catastrophic losses for SVXY – an event with far more dire consequences than "exacerbat[ing] the difference between the price of the Shares of a Fund and the NAV of such Shares."

125.    The Registration Statement provided the following discussion of the VIX futures contracts comprising the VIX Short-Term Futures Index:

> The number of underlying components included in the [VIX Short-Term Futures] Index may impact volatility, which could adversely affect an investment in the Shares.
>
> **The [VIX Short-Term Futures] Index for the Funds is concentrated solely in VIX futures contracts**.  Investors should be aware that other volatility indexes may be more diversified in terms of both the number and variety of instruments included or in terms of the volatility exposure offered.  **Concentration in fewer underlying components may result in a greater degree of volatility in an index and the NAV of the fund which tracks that index under specific market conditions and over time**.

126.    The statements referenced above in ¶125 were materially false and misleading when made because they failed to disclose that, by the start of the Class Period: (i) one such "specific market condition[]" that would "result in a greater degree of volatility in" the VIX Short-Term Futures Index "and the NAV of the [F]und" was a VIX futures liquidity gap, caused by SVXY's own conduct of rebalancing in an overly-crowded VIX futures market; and (ii) this liquidity gap would, in turn, cause the prices of VIX futures contracts to skyrocket – initiating a destructive feedback loop that would lead to catastrophic losses for SVXY.

127.    Similarly, the Registration Statement provided the following discussion of the risks associated with SVXY's buying and selling of VIX futures contracts:

> **The assets that the Funds invest in can be highly volatile and the Funds may experience large losses when buying, selling or holding such instruments.**
>
> **Investments linked to equity market volatility, including VIX futures contracts, can be highly volatile and may experience large losses.  High volatility may have an adverse impact on the Funds beyond the impact of any performance-based losses of the underlying indexes, especially with respect to the Geared Funds [such as SVXY]** . . . .

- 38 -

128.     The statements referenced above in ¶127 were materially false and misleading when made because they failed to disclose that, by the start of the Class Period: (i) SVXY's own conduct of rebalancing in an overly-crowded VIX futures market would serve as the catalyst for "[h]igh volatility" in "VIX futures contracts" – sending the prices of VIX futures contracts skyward and initiating a destructive feedback loop that would lead to catastrophic losses for SVXY; and (ii) this death spiral would "have an adverse impact on" SVXY far "beyond the impact of any performance-based losses [in] the underlying" VIX Short-Term Futures Index that would have otherwise occurred.

129.     Additionally, the Registration Statement warned of factors that "may affect" the price and liquidity of VIX futures contracts:

> *Several factors may affect the price and/or liquidity of VIX futures contracts* and other assets, if any, owned by a Fund, including, but not limited to:
>
> - *Prevailing market prices and forward volatility levels of the U.S. stock markets, the S&P 500, the equity securities included in the S&P 500 and prevailing market prices of options on the S&P 500, the VIX, options on the VIX, the relevant VIX futures contracts, or any other financial instruments related to the S&P 500 and the VIX or VIX futures contracts*;
>
> - Interest rates;
>
> - Inflation rates and investors' expectations concerning inflation rates;
>
> - *Economic, financial, political, regulatory, geographical, biological or judicial events that affect the level of the [VIX Short-Term Futures] Index or the market price or forward volatility of the U.S. stock markets, the equity securities included in the S&P 500, the S&P 500, the VIX or the relevant futures or option contracts on the VIX*;
>
> - Supply and demand as well as hedging activities in the listed and over-the-counter ("OTC") equity derivatives markets;
>
> - Disruptions in trading of the S&P 500, futures contracts on the S&P 500 or options on the S&P 500; and
>
> - The level of contango or backwardation in the VIX futures contracts market.

These factors interrelate in complex ways, and the effect of one factor on the market value of a Fund may offset or enhance the effect of another factor.

130.     The statements referenced above in ¶129 were materially false and misleading when made because they failed to disclose that, by the start of the Class Period: (i) the "prevailing market prices" of "the relevant VIX futures contracts" were being driven by the massive rebalancing requirements of SVXY and other volatility-related ETPs in an overly-crowded VIX futures market; (ii) as such, a VIX futures liquidity gap would cause the prices of VIX futures contracts to skyrocket, which would in turn drive up "forward [*i.e.*, expected] volatility levels" of "the VIX, options on the VIX, [and] the relevant VIX futures contracts" – driving the prices of VIX futures contracts even higher, as a destructive feedback loop took hold; and (iii) accordingly, the most significant "factor[]" that could "affect the price and/or liquidity of VIX futures contracts . . . owned by [the] Fund" was a destructive feedback loop, set in motion by a VIX futures liquidity gap of SVXY's own making.

131.     The Registration Statement also purported to warn of "possible" liquidity risks that "may cause" or "exacerbate losses" for SVXY, as follows:

> ***Possible illiquid markets may exacerbate losses***.
>
> ***Financial Instruments [such as VIX futures contracts] cannot always be liquidated at the desired price***.  It is difficult to execute a trade at a specific price when there is a relatively small volume of buy and sell orders in a market.  ***A market disruption can also make it difficult to liquidate a position or find a swap or forward contract counterparty at a reasonable cost***.
>
> ***Market illiquidity may cause losses for the Funds.  The large size of the positions which the Funds may acquire increases the risk of illiquidity by both making their positions more difficult to liquidate and increasing the losses incurred while trying to do so***.  Any type of disruption or illiquidity will potentially be exacerbated due to the fact that the Funds will typically invest in Financial Instruments related to one benchmark, which in many cases is highly concentrated.

132.     The statements referenced above in ¶131 were materially false and misleading when made because they failed to disclose that, by the start of the Class Period: (i) a likely "market disruption" that would "make it difficult to" purchase or sell the requisite amount of VIX futures

contracts "at a reasonable cost" was a situation of SVXY's own making – namely, "[t]he large size of the positions which the Fund[]" now needed to "acquire" in order to effectuate its daily rebalancing meant that a VIX futures liquidity gap would develop if there was even a relatively modest increase in volatility; and (ii) this, in turn, would set in motion a destructive feedback loop that would continue to "exacerbate losses" until the Fund collapsed or suffered catastrophic losses.

133.    The Registration Statement discussed the mean-reverting nature of volatility, in pertinent part:

> Unlike certain other asset classes that, in general, have historically increased in price over long periods of time, **the volatility of the S&P 500 as measured by the VIX has historically reverted to a long-term average level over time**.
>
> *       *       *
>
> **The level of the VIX has historically reverted to a long-term mean (i.e., average) level and any increase or decrease in the level of the VIX will likely continue to be constrained**.
>
> **In the past, the level of the VIX has typically reverted over the longer term to a historical mean**, and its absolute level has been constrained within a band.  **As such, the potential upside of long or short exposure to VIX futures contracts may be limited as the performance of VIX reverts to its long-term average.  In addition, any gains may be subject to significant and unexpected reversals as the VIX reverts to its long term mean**.
>
> When economic uncertainty or other market risks increase and there is an associated increase in expected volatility, the value of VIX futures contracts has historically tended to increase.  Similarly, when economic uncertainty or other market risks recede and there is an associated decrease in expected volatility, the value of VIX futures contracts has historically tended to decrease.  Historically, each of these patterns have tended to reverse.

134.    The statements referenced above in ¶133 were materially false and misleading when made because they failed to disclose that, by the start of the Class Period: (i) SVXY's own conduct of rebalancing in an overly-crowded VIX futures market following even a modest spike in volatility would lead to a VIX futures liquidity gap – triggering a destructive feedback loop that would drive the VIX and the VIX Short-Term Futures Index back up to their long-term historical averages; and

- 41 -

(ii) accordingly, "any gains" would be "subject to significant and unexpected reversals" as a result of this self-inflicted death spiral, and not as a result of the historical tendency of the VIX (and the VIX Short-Term Futures Index) to "revert[] to [their] long-term average level[s]" in the course of ordinary market patterns.

135.    The Registration Statement stated that SVXY's inverse structure "could result in the total loss or almost total loss of an investor's investment" if the VIX Short-Term Futures Index experienced an increase "approaching 100%":

> *Inverse positions can also result in the total loss of an investor's investment. For the Inverse Fund, a single-day or intraday increase in the level of the Fund's benchmark approaching 100% could result in the total loss or almost total loss of an investor's investment, even if such Fund's benchmark subsequently moves lower*.

136.    The statements referenced above in ¶135 were materially false and misleading when made because they failed to disclose that, by the start of the Class Period: (i) SVXY's price-insensitive rebalancing in an overly-crowded VIX futures market would itself serve as the catalyst for "a single-day . . . increase in the level of the" VIX Short-Term Futures Index "approaching 100%" if there was even a relatively modest increase in equity market volatility – by causing the prices of VIX futures contracts to skyrocket and setting in motion a destructive feedback loop that would continue to drive up expected volatility (and in turn, the level of the VIX Short-Term Futures Index); and (ii) once this self-inflicted death spiral took hold, it would cause catastrophic losses for SVXY in a matter of minutes, such that investors who purchased or held SVXY shares to correctly express the view that volatility would recede would nonetheless lose almost the entirety of their investment in after-market trading, before there was any opportunity for the VIX Short-Term Futures Index to "subsequently move[] lower."

137.    The Registration Statement also included a contra-indicator that suggested that SVXY was far less risky than it in fact was.  Notably, although the Registration Statement purported to

caution investors that SVXY was "generally [] intended to be used only for short-term investment horizons," it also provided a table setting forth "estimated [F]und returns" in a variety of market scenarios "*over a one-year period*."  The table showed annualized returns as high as 150%, while the worst-case scenario provided was the loss of ***61.7%*** of SVXY's value over the course of a one-year period, as follows:

Estimated Fund Return Over One Year When the Fund Objective is to Seek Investment Results For a single day, Before Fees and Expenses, that Correspond to the Inverse (-1x) of the Daily Performance of an Index.



138.   The statements referenced above in ¶137 were materially false and misleading when made because the actual worst-case scenario in light of SVXY's true risks was the near-complete loss of the Fund's value in a matter of minutes.  In addition, the statements referenced above in ¶137 reinforced the misleading impression that SVXY was subject to risks within the range of ordinary trading risks and was potentially appropriate for long-term investment, when in truth, SVXY was inappropriate even for short-term investing, and was subject to extreme losses in a matter of minutes.

139.   In addition, the Registration Statement also provided a series of generic risk warnings, in pertinent part, as follows:

> ***There can be no assurance that a Fund will achieve its investment objective or avoid substantial losses.***
>
>        \*      \*      \*
>
> ***The Geared Funds [including SVXY] are not appropriate for all investors and present different risks than other funds . . . . An investor should only consider an***

*investment in a Geared Fund if he or she understands the consequences of seeking . . . inverse investment results for a single day.*

\*       \*       \*

*The Funds are not appropriate for all investors and present many different risks than other types of funds, including risks relating to investing in VIX futures and, with respect to the Geared Funds, risks associated with the use of leverage.*

*An investor should only consider an investment in a Fund if he or she understands the consequences of seeking exposure to VIX futures contracts.*

\*       \*       \*

*The Funds' investments can be highly volatile and the Funds may experience large losses from buying, selling* or holding such investments.

140.    The statements referenced above in ¶139 were materially false and misleading when made because they failed to disclose that, by the start of the Class Period, SVXY essentially was "not appropriate for [**any**] investor[]," as the "different risks" presented by SVXY included that SVXY's own conduct of rebalancing in an overly-crowded VIX futures market would lead to a VIX futures liquidity gap if there was even a modest increase in volatility – setting in motion a destructive feedback loop that would cause the Fund to "experience large" and "substantial losses" in a matter of minutes.  Even investors who fully understood "the consequences of seeking . . . inverse investment results for a single day" and of "seeking exposure to VIX futures contracts" were unaware of this peril.

### B.    Violations of Items 303 and 105 of Regulation S-K

141.    In addition to the false and misleading statements alleged herein, Defendants also violated the affirmative disclosure requirements imposed by SEC Regulation S-K.  Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item 303"), requires issuers to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing

- 44 -

operations."  Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105") requires, in the "Risk Factors" section of registration statements and prospectuses (as well as in an issuer's periodic filings), "a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky" and requires each risk factor to "adequately describe[] the risk."[11]

142.    Defendants violated the affirmative disclosure duties imposed by Item 303 by failing to disclose that, by the start of the Class Period: (i) the exponential growth of SVXY and other volatility-related ETPs had pushed the size of their potential rebalancing requirements to unprecedented levels; (ii) as such, even a relatively moderate increase in volatility would lead to a VIX futures liquidity gap, as SVXY and other volatility-related ETPs rebalanced their portfolios in an overly-crowded VIX futures market during the same 15-minute interval – thereby causing the prices of VIX futures contracts to skyrocket; (iii) this, in turn, would trigger a destructive feedback loop, as the rising prices of VIX futures contracts drove the level of the VIX Short-Term Futures Index higher, requiring SVXY to purchase more VIX futures contracts at higher prices in order to effectuate the rebalancing; and (iv) once this self-inflicted death spiral took hold, it would cause SVXY's value to plummet in a matter of minutes – leading to catastrophic losses for investors. Defendants also violated Item 105 because the foregoing risks were not adequately disclosed, or disclosed at all, even though they were some of the most – if not *the* most – significant factors that made an investment in SVXY shares speculative or risky.

---

[11]    Effective May 2, 2019, the SEC relocated Item 503(c) to Item 105 of Regulation S-K to reflect that the Item applies to periodic reporting, as well as registration statements. *See* FAST Act Modernization and Simplification of Regulation S-K, 84 Fed. Reg. 12674 (April 2, 2019); *see also* 17 C.F.R. §229.105. The SEC stated the amendments do not "substantively chang[e] the underlying disclosure requirements." 84 Fed. Reg. at 12712.

## VII.   1933 ACT COUNTS

### COUNT I

#### For Violations of §11 of the 1933 Act
#### Against All Defendants

143.    Lead Plaintiffs incorporate herein ¶¶1-7, ¶¶9-92, ¶¶95-106, and ¶¶109-142 by reference.

144.    This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

145.    This Count does not sound in fraud.  Lead Plaintiffs do not allege that the ProShares Defendants or the Underwriter Defendants had scienter or fraudulent intent, which are not elements of a §11 claim.

146.    The Registration Statement was inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

147.    The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

148.    The Trust is the registrant for the SVXY shares sold during the Class Period.  As the issuer of the shares, the Trust is strictly liable to Lead Plaintiffs and the Class for the misstatements and omissions.

149.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

150.    By reason of the conduct alleged herein, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

- 46 -

151.     Lead Plaintiffs purchased SVXY shares pursuant or otherwise traceable to the Registration Statement.

152.     Lead Plaintiffs and the Class have sustained damages.  The value of SVXY shares has declined substantially subsequent to and due to Defendants' violations.

153.     At the time of their purchases of Fund shares, Lead Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year has elapsed from the time that Lead Plaintiffs discovered or reasonably could have discovered the facts upon which this consolidated amended complaint is based to the time that this action was filed.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time that this action was filed.

## COUNT II

### For Violation of §15 of the 1933 Act
### Against the ProShares Defendants

154.     Lead Plaintiffs incorporate herein ¶¶1-7, ¶¶9-92, ¶¶95-106, and ¶¶109-153 by reference.

155.     This Count is brought pursuant to §15 of the 1933 Act against the Trust, the Sponsor and the Individual Defendants.

156.     The Individual Defendants were each control persons of the Trust by virtue of their positions as directors, senior officers and/or principals of the Trust or the Sponsor.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or principals of the Trust and/or the Sponsor.  The Individual Defendants signed the Registration Statement and were responsible for its contents.  The Sponsor controlled the Trust as its commodity pool operator and fund manager.  The Trust and the Sponsor also controlled the Individual Defendants and all of their employees.

157.    The Defendants named herein each were culpable participants in the violations of §11 of the 1933 Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statement, selling SVXY shares and/or having otherwise participated in the process that allowed the offer and sale of SVXY shares to investors be successfully completed.

## VIII.   1934 ACT ALLEGATIONS

### A.    False and Misleading Statements During the Class Period

158.    The Class Period begins on May 15, 2017.   On that date, the Trust filed the Registration Statement.  For the reasons set forth above in Section VI.A., the statements contained in the Registration Statement were materially false and misleading when made.

159.    In addition to the Registration Statement, during the Class Period, the Trust filed with the SEC the following periodic reports and draft registration statements:

(a)    The Trust's quarterly report on Form 10-Q for the period ended June 30, 2017, filed on August 9, 2017 (the "2Q17 10-Q");

(b)    The Trust's quarterly report on Form 10-Q for the period ended September 30, 2017, filed on November 9, 2017 (the "3Q17 10-Q"); and

(c)    a registration statement on Form S-3 for the sale of additional SVXY shares, filed on September 28, 2017 and amended on February 1, 2018 (the "Draft Registration Statement").

160.    The 2Q17 10-Q and the 3Q17 10-Q each represented that: "***There has not been a material change to the Risk Factors previously disclosed in the Trust's Annual Report on Form 10-K for the year ended December 31, 2016, filed on March 1, 2017***."

161.    The "Risk Factors" set forth in the 2016 10-K, in turn, included many of the same false and misleading statements contained in the Registration Statement, set forth above in Section VI.A., thereby reinforcing the fallacy that the risks of investing in SVXY were the same

risks that had always existed in the Fund and other volatility-related ETPs – when in fact, those risks had dramatically increased and metastasized before and during the Class Period, as detailed herein.

162.    In addition, the Draft Registration Statement contained identical statements to those in the Registration Statement, as set forth above in Section VI.A., which were materially false and misleading for the reasons set forth in that section.

163.    By reiterating verbatim the purported risk warnings and other statements contained in the Registration Statement, the Draft Registration Statement perpetuated the fallacy that, as late as February 1, 2018 – just days before the Fund's near-total collapse – the risks of investing in SVXY were the same risks that had always existed in the Fund and other volatility-related ETPs.  In truth, those risks had dramatically increased and metastasized before and during the Class Period, as detailed herein, such that SVXY had become a ticking time bomb that would ultimately self-destruct before the SEC could declare the Draft Registration Statement effective.

**B.    1934 Act Violations of Items 303 and 105 of Regulation S-K**

164.    The ProShares Defendants also violated the affirmative disclosure duties imposed by Item 303 by failing to disclose that, by the start of the Class Period: (i) the exponential growth of SVXY and other volatility-related ETPs had pushed the size of their potential rebalancing requirements to unprecedented levels; (ii) as such, even a relatively moderate increase in volatility would lead to a VIX futures liquidity gap, as SVXY and other volatility-related ETPs rebalanced their portfolios in an overly-crowded VIX futures market during the same 15-minute interval – thereby causing the prices of VIX futures contracts to skyrocket; (iii) this, in turn, would trigger a destructive feedback loop, as the rising prices of VIX futures contracts drove the level of the VIX Short-Term Futures Index higher, requiring SVXY to purchase more VIX futures contracts at higher prices in order to effectuate the rebalancing; and (iv) once this self-inflicted death spiral took hold, it would cause SVXY's value to plummet in a matter of minutes – leading to catastrophic losses for

investors.  In addition, the ProShares Defendants violated Item 105 because the foregoing risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in SVXY shares speculative or risky.

**C.    Additional Scienter Allegations**

165.    As alleged herein, the ProShares Defendants acted with scienter in that the ProShares Defendants knew, or at the very least were reckless in not knowing, that the public documents and statements they issued or disseminated in the name of the Trust during the Class Period were materially false and misleading when made; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  The ProShares Defendants, by virtue of their receipt of information reflecting the true facts regarding SVXY, their control over, and/or receipt and/or modification of the Trust's allegedly materially misleading misstatements and/or their associations with the Trust and/or the Sponsor which made them privy to confidential proprietary information concerning SVXY, were active and culpable participants in the fraudulent scheme alleged herein.

166.    The Individual Defendants made, or caused to be made, the false and misleading statements that artificially inflated the price of SVXY shares, including by signing the Registration Statement and other documents filed with the SEC during the Class Period.  The Individual Defendants, because of their positions with the Trust and/or the Sponsor, possessed the power and authority to control the contents of the Trust's public statements during the Class Period.  The Individual Defendants were provided with copies of the Trust's statements alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Trust and/or the Sponsor and their access to material non-public information, the Individual Defendants knew or recklessly

disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations being made were materially false and misleading. As a result, each of the Individual Defendants is responsible for the accuracy of the Trust's public statements and is therefore liable for the misrepresentations contained therein.

167. The circumstances detailed above give rise to a strong inference that, throughout the Class Period, the ProShares Defendants knew about, or recklessly disregarded, the growing risk that a VIX futures liquidity gap would develop – setting in motion a destructive feedback loop that would obliterate the value of SVXY shares.

168. The ProShares Defendants created SVXY, designed its investment objective, assessed its risks and likely performance, and were responsible for the daily management of SVXY's portfolio. According to the Registration Statement:

> In seeking to achieve the Funds' investment objectives, . . . the Sponsor determines the type, quantity and mix of investment positions that the Sponsor believes, in combination, should produce daily returns consistent with the Funds' objectives.

169. The Trust and the Sponsor, as the issuer and manager, respectively, of some of the largest volatility-related ETPs then available, had access to investment and market data (including data proprietary to the Fund), which afforded them unique insider visibility into the VIX futures market. The ProShares Defendants closely monitored and analyzed the trading volume and prices of VIX futures contracts in real-time, in order to ensure that, at the end of each trading day, SVXY would be able to purchase or sell the requisite number of VIX futures contracts to effectuate the rebalancing and maintain the Fund's -1x leverage ratio.

170. Additionally, as the size of SVXY's potential rebalance grew over the course of the Class Period, the ProShares Defendants needed to closely monitor SVXY's rebalancing requirements in order to comply with CBOE Futures Exchange Rule 412A, which required the

ProShares Defendants to notify the CBOE Futures Exchange if they held or expected to hold 50,000 or more VIX futures contracts.[12]

171.    The ProShares Defendants therefore knew or recklessly disregarded that, given the considerable growth in the size of SVXY and other volatility-related ETPs that had occurred by the beginning of the Class Period, there were not enough VIX futures contracts available from liquidity providers to absorb the rebalancing requirements of volatility-related ETPs in the event of even a modest spike in volatility – without a run on the market.

172.    Moreover, the circumstances detailed above give rise to a strong inference that the ProShares Defendants knew or recklessly disregarded *on* February 5, 2018 that a liquidity gap had in fact materialized in the VIX futures market.  The ProShares Defendants actively traded VIX futures contracts on February 5, 2018 in an effort to maintain SVXY's -1x leverage ratio, and hence had firsthand visibility into the liquidity gap as it developed and engulfed the VIX futures market.

173.    In addition, the ProShares Defendants had the motive and opportunity to commit fraud and were highly incentivized to induce investors to commit assets to SVXY by concealing the true risks of such investments.  Specifically, the Sponsor received fees for its management of Fund assets, paid monthly in arrears, in an amount equal to 0.95% per annum of the Fund's average daily net assets.  Thus, the fees received by the Sponsor were directly related to the amount of assets invested in SVXY.  As a result, as SVXY grew substantially in size over the course of 2017, the amount of management fees paid to the Sponsor from Fund assets ***increased by 60%*** year-over-year.  Additionally, the ProShares Defendants received a variable transaction fee of up to 0.1% of the value of each Creation Unit that was purchased or redeemed by the Underwriter Defendants.  Thus, as the price of the shares increased, the amount of creation and redemption fees received by the Trust

---

[12]    Notably, this 50,000-contract "position accountability level" was set by the CBOE Futures Exchange to "reduce the potential risk of price distortions and market disruptions."

increased.  The Individual Defendants, as principals of the Sponsor and/or employees of the Trust, were likewise highly incentivized to grow investments in SVXY during the Class Period.

174.    The strategy of the ProShares Defendants to market and grow the Fund was a success. SVXY became one of the largest ETFs managed by the Sponsor, with over $1 billion in assets under management near the end of the Class Period.  If the ProShares Defendants had disclosed the true risks of the Fund during the Class Period, the Sponsor would have received substantially less fees from one of the largest and most lucrative ETFs offered by the Trust.

### D.    Loss Causation and Economic Loss

175.    As detailed herein, the ProShares Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of SVXY shares and operated as a fraud or deceit on purchasers of SVXY shares.  As detailed above, when the truth about the ProShares Defendants' misconduct was revealed, the value of SVXY shares declined precipitously as the prior artificial inflation no longer propped up the Fund's prices.  The declines in the prices of SVXY shares were the direct result of the nature and extent of the Pro Shares Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the share price declines negate any inference that the loss suffered by Lead Plaintiffs was caused by changed market conditions, macroeconomic or industry factors or Fund-specific facts unrelated to the ProShares Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs, was a direct result of the ProShares Defendants' fraudulent scheme to artificially inflate the prices of SVXY shares and the subsequent significant decline in the value of the Fund's shares when the ProShares Defendants' prior misrepresentations and other fraudulent conduct were revealed.

176.    At all relevant times, the ProShares Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by Lead Plaintiffs.  Those statements were materially false and misleading through their failure to disclose a

true and accurate picture of the Fund's business and operations, as alleged herein.  Before and during the time of Lead Plaintiffs' purchases of SVXY shares, the ProShares Defendants issued materially false and misleading statements and omitted material facts necessary to make the ProShares Defendants' statements not false or misleading, causing the prices of SVXY shares to be artificially inflated.  Lead Plaintiffs purchased SVXY shares at those artificially inflated prices, causing them to suffer damages as complained of herein.

      **E.**      **Applicability of Presumption of Reliance: Fraud-on-the-Market Doctrine**

177.    At all relevant times, the market for SVXY shares was an efficient market for the following reasons, among others:

      (a)     SVXY shares met the requirements for listing, and were listed and actively traded on the NYSE Arca, a highly efficient and automated market;

      (b)     according to the Trust's Form 10-K for its fiscal year 2017, filed on March 1, 2018, the Fund sold over 52.5 million SVXY shares in 2017 alone, demonstrating a very active and broad market for SVXY shares;

      (c)     as a regulated issuer, the Trust filed periodic public reports with the SEC;

      (d)     the ProShares Defendants regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

      (e)     unexpected material news about the Fund was rapidly reflected in and incorporated into the price of the Fund's shares.

178.    As a result of the foregoing, the market for SVXY shares promptly digested current information regarding the Fund from publicly available sources and reflected such information in the

price of SVXY shares.  Under these circumstances, a presumption of reliance applies to Lead Plaintiffs' purchases of Fund shares.

179.    A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Lead Plaintiffs' claims are based, in significant part, on the ProShares Defendants' material omissions.  Because this action involves the ProShares Defendants' failure to disclose material adverse information regarding the Fund's business and operations, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the ProShares Defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

### F.    No Safe Harbor

180.    The ProShares Defendants' false or misleading statements alleged to be actionable herein were not forward-looking statements ("FLS"), or were not identified as such by the ProShares Defendants, but rather, were statements of historical and present fact, and thus did not fall within any "Safe Harbor."

181.    The ProShares Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of the Trust or the Sponsor who knew that the FLS was false.  Further, none of the historic or present tense statements made by the ProShares Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## IX.   1934 ACT COUNTS

### COUNT III

#### For Violation of §10(b) of the 1934 Act and Rule 10b-5
#### Against the ProShares Defendants

182.    Lead Plaintiffs incorporate herein ¶¶1-142 and ¶¶158-181 by reference.

183.    The Trust, the Sponsor and the Individual Defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

184.    These defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and Class members in connection with their purchases of SVXY shares.

185.    Lead Plaintiffs have suffered damages in that, in reliance on the integrity of the market, Lead Plaintiffs paid artificially inflated prices for SVXY shares.  Lead Plaintiffs would not have purchased SVXY shares at the price paid, or at all, if Lead Plaintiffs had been aware that the market price had been artificially and falsely inflated by the ProShares Defendants' misleading statements.

186.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the Class suffered damages in connection with their purchases of SVXY shares.

**COUNT IV**

**For Violation of §20(a) of the 1934 Act**
**Against the ProShares Defendants**

187.     Lead Plaintiffs incorporate herein ¶¶1-142 and ¶¶158-186  by reference.

188.     The ProShares Defendants were control persons within the meaning of §20(a) of the
1934 Act.

189.     By virtue of their high-level positions, and their ownership and contractual rights,
participation in and/or awareness of the Trust's operations and/or intimate knowledge of the false
and misleading statements filed by the Trust with the SEC and disseminated to the investing public,
the Sponsor and the Individual Defendants had the power to influence and control and did influence
and control, directly or indirectly, the decision-making of the Trust, including the content and
dissemination of the various statements Lead Plaintiffs contend are false and misleading.  The
Sponsor and the Individual Defendants were provided with, or had, unlimited access to copies of the
Trust's reports, public filings, and other statements alleged by Lead Plaintiffs to be misleading
before and/or shortly after these statements were issued and had the ability to prevent the issuance of
the statements or cause the statements to be corrected.  The Trust and the Sponsor, meanwhile,
controlled the Individual Defendants and all of their employees.

## X.     PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal
Rules of Civil Procedure, certifying Lead Plaintiffs as class representatives, and designating Lead
Counsel as Class Counsel;

B.     Awarding Lead Plaintiffs and the other members of the Class compensatory damages at an amount to be determined at trial, together with pre-judgment and post-judgment interest thereon;

C.     Awarding Lead Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this litigation, including attorneys' fees, accountants' and experts' fees, and other costs and disbursements; and

D.     Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiffs hereby demand a trial by jury.

DATED:  June 21, 2019                    ROBBINS GELLER RUDMAN
                                                                & DOWD LLP
                                                            SAMUEL H. RUDMAN
                                                            DAVID A. ROSENFELD
                                                            ERIN W. BOARDMAN
                                                            LINDSAY LA MARCA


                                                            */s/ Erin W. Boardman*
                                                            ERIN W. BOARDMAN

                                                            58 South Service Road, Suite 200
                                                            Melville, NY  11747
                                                            Telephone:  631/367-7100
                                                            631/367-1173 (fax)
                                                            srudman@rgrdlaw.com
                                                            drosenfeld@rgrdlaw.com
                                                            eboardman@rgrdlaw.com
                                                            llamarca@rgrdlaw.com

                                                            HAGENS BERMAN SOBOL SHAPIRO LLP
                                                            KARL BARTH
                                                            1301 Second Avenue, Suite 2000
                                                            Seattle, WA  98101
                                                            Telephone:  206/623-7292
                                                            206/623-0594 (fax)
                                                            karlb@hbsslaw.com

HAGENS BERMAN SOBOL SHAPIRO LLP
REED R. KATHREIN
LUCAS GILMORE
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone:  510/725-3000
510/725-3001 (fax)
reed@hbsslaw.com
lucasg@hbsslaw.com

*Lead Counsel for Lead Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I, Erin W. Boardman, hereby certify that on June 21, 2019, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*/s/ Erin W. Boardman*
_____
ERIN W. BOARDMAN
