UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PROSHARES TRUST II SECURITIES LITIGATION | Civil Action No. 1:19-cv-0886-DLC<br><br>**Oral Argument Requested** |

**MEMORANDUM OF LAW OF PROSHARES TRUST II, PROSHARE CAPITAL MANAGEMENT LLC, MICHAEL L. SAPIR, LOUIS M. MAYBERG, EDWARD J. KARPOWICZ, AND TODD B. JOHNSON IN SUPPORT OF THEIR MOTION TO DISMISS THE <u>CONSOLIDATED SECOND AMENDED COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ................................................................................................ 7

    A.    Defendants ..................................................................................... 7

    B.    The Structure and Operation of SVXY.......................................... 8

    C.    The SVXY Registration Statement .................................................. 10

    D.    Disclosures in the SVXY Registration Statement .............................. 11

        1.    SVXY Had a Daily Investment Objective to Provide Inverse (-1x) Exposure to the Daily Performance of Its Benchmark Index .................. 12

        2.    SVXY Seeks Its Daily Inverse Investment Objective But Is Not Otherwise Actively Managed, Regardless of Market Developments and Trends ..... 13

        3.    SVXY Achieves Its Daily Investment Objective by Rebalancing Its Portfolio of VIX Futures Contracts............................................ 14

        4.    SVXY's Investments Can Be Highly Volatile Such that SVXY May Experience Large Losses Rapidly, Including a Total Loss in a Single Day .................................................................................. 15

        5.    SVXY Can Experience Larger Losses Due to Rebalancing in an Illiquid VIX Futures Market and the Large Size of the Positions It May Hold .... 15

        6.    SVXY Faces Risks During Periods of Low Volatility Because of the "Mean-Reverting" Nature of Volatility, and Such Reversals Can Be Significant and Unexpected .................................................... 17

    E.    Events of February 5 and 6, 2018 ........................................................ 18

    F.    Alleged Misrepresentations and Omissions......................................... 19

ARGUMENT ................................................................................................ 21

I.    ALL CLAIMS MUST BE DISMISSED BECAUSE THE CSAC FAILS TO  PROPERLY ALLEGE MATERIAL MISREPRESENTATIONS OR OMISSIONS IN THE FUND'S REGISTRATION STATEMENT OR OTHER DISCLOSURES ..................................... 22

    A.    SVXY's Registration Statement Fully and Accurately Disclosed the Very Features and Risks of the Fund that Allegedly Caused Its Value to Decline ....... 24

        1.    The Registration Statement Disclosed that SVXY's Losses Could Be Exacerbated by Illiquidity and the Need to Rebalance Daily SVXY's Large Holdings in a Concentrated Market for VIX Futures Contracts to Maintain Its Investment Objective............................................ 25

        2.    The Registration Statement Disclosed that Volatility Is Mean-Reverting and During Periods of Low Volatility Likely Will Reverse, and that Such Reversals Can Be Significant and Unexpected......................................... 28

i

3.     The Registration Statement Warned that SVXY's Performance Could Be Highly Volatile and that Large Losses Could Occur Quickly, Including Total Loss in a Single Day ...................................................................... 29

B.     Plaintiffs' Assertion that the Registration Statement Failed to Provide More Detailed Risk Disclosures Is Impermissible Pleading by Hindsight .................... 32

C.     Plaintiffs' Argument that the ProShares Defendants Were Required to Update the Registration Statement to Disclose Ongoing Market Developments in Real-Time Must Fail ............................................................................................................... 35

D.     Plaintiffs' Additional Arguments Regarding the Registration Statements Also Fail to State a Claim ..................................................................................................... 37

E.     Plaintiffs' Allegations as to Other Disclosure Documents Simply Track the Registration Statement Allegations and Fail as a Matter of Law for the Same Reasons .............................................................................................................. 40

II.     THE CSAC FAILS TO STATE A CLAIM UNDER SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 BECAUSE IT MAKES NO PLAUSIBLE ALLEGATIONS OF SCIENTER ........................................................................ 42

III.    THE CSAC FAILS TO STATE A CLAIM UNDER SECTION 11 OF THE SECURITIES ACT BECAUSE PLAINTIFFS HAVE NOT ESTABLISHED STANDING TO CHALLENGE THE REGISTRATION STATEMENT ...................................... 47

CONCLUSION ............................................................................................................. 49

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re AES Corp. Sec. Litig.*,
  825 F. Supp. 578 (S.D.N.Y. 1993) ...................................................35

*Alki Partners, L.P. v. Windhorst*,
  472 F. App'x 7 (2d Cir. 2012) ......................................................44

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
  693 F. Supp. 2d 241 (S.D.N.Y. 2010)..............................................44

*Anschutz Corp. v. Merrill Lynch & Co., Inc.*,
  690 F.3d 98 (2d Cir. 2012)...........................................................42

*Arfa v. Mecox Lane Ltd.*,
  No. 10-cv-9053, 2012 WL 697155 (S.D.N.Y. Mar. 5, 2012), *aff'd*, 504 F.
  App'x. 14 (2d Cir. 2012)...............................................................41

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)....................................................................21

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)................................................. *passim*

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
  No. 11-cv-6678, 2013 WL 5878814 (S.D.N.Y. Nov. 1, 2013)..............29

*In re Bank of Am. Corp. Sec., Deriv., & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
  281 F.R.D. 134 (S.D.N.Y. 2012) ...................................................47

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)....................................................................21

*In re BHP Billiton Ltd. Sec. Litig.*,
  276 F. Supp. 3d 65 (S.D.N.Y. 2017)...............................................44

*In re Britannia Bulk Holdings Inc. Sec. Litig.*,
  665 F. Supp. 2d 404 (S.D.N.Y. 2009)..............................................35

*In re Century Aluminum Co. Sec. Litig.*,
  729 F.3d 1104 (9th Cir. 2013) .......................................................49

*In re CIT Grp., Inc. Sec. Litig.*,
  349 F. Supp. 2d 685 (S.D.N.Y. 2004)..............................................39

iii

*In re Crude Oil Commodity Litig.*,
   No. 06-cv-6677(NRB), 2007 WL 1946553 (S.D.N.Y. June 28, 2007) ...................................21

*DeMaria v. Andersen*,
   318 F.3d 170 (2d Cir. 2003)...........................................................................................23, 47

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005).............................................................................................................42

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)..........................................................................21, 22, 38, 42

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976).............................................................................................................42

*In re Express Scripts Holdings Co. Sec. Litig.*,
   773 F. App'x 9 (2d Cir. 2019) .....................................................................................34, 38

*In re Fuwei Films Sec. Litig.*,
   634 F. Supp. 2d 419 (S.D.N.Y. 2009)...................................................................................22

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000)................................................................................................18

*In re Glob. Crossing, Ltd. Sec. Litig.*,
   313 F. Supp. 2d 189 (S.D.N.Y. 2003)..................................................................................47

*Halperin v. eBanker USA.com*,
   295 F.3d 352 (2d Cir. 2002)...................................................................................23, 24, 32

*Hart v. Internet Wire, Inc.*,
   145 F. Supp. 2d 360 (S.D.N.Y. 2001)...........................................................................44, 45

*Ho v. Duoyuan Glob. Water, Inc.*,
   887 F. Supp. 2d 547 (S.D.N.Y. 2012)...................................................................................49

*I. Meyer Pincus & Assoc. v. Oppenheimer & Co.*,
   936 F.2d 759 (2d Cir. 1991)................................................................................................23

*In re Initial Pub. Offerings Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006)............................................................................................47, 48

*In re Int'l Bus. Machs. Corp. Sec. Litig.*,
   163 F.3d 102 (2d Cir. 1998)................................................................................................36

*Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*,
   620 F.3d 137 (2d Cir. 2010)................................................................................................38

*In re JP Morgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005)................................................................22

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)................................................................43

*Kapps v. Torch Offshore, Inc.*,
    379 F.3d 207 (5th Cir. 2004) ................................................................41

*Lawrence v. Cohn*,
    325 F.3d 141 (2d Cir. 2003)................................................................22

*Lin v. Interactive Brokers Grp., Inc.*,
    574 F. Supp. 2d 408 (S.D.N.Y. 2008)................................................................23

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
    26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015)......................48

*In re Merrill Lynch & Co., Inc. Res. Reps. Sec. Litig.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003)................................................................24

*Merrill Lynch, Pierce, Fenner & Smith v. Young*,
    No. 91-cv-2923(CSH), 1994 WL 88129 (S.D.N.Y. Mar. 15, 1994) ......................................21

*In re N2K, Inc. Sec. Litig.*,
    82 F. Supp. 2d 204 (S.D.N.Y. 2000)................................................................36, 37

*Nguyen v. MaxPoint Interactive, Inc.*,
    234 F. Supp. 3d 540 (S.D.N.Y. 2017)................................................................41

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
    538 F. Supp. 2d 662 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 617 (2d Cir. 2009)...............25, 35

*Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax Fin.
Holdings Ltd.*,
    886 F. Supp. 2d 328 (S.D.N.Y. 2012)................................................................48

*In re ProShares Tr. Sec. Litig.*,
    889 F. Supp. 2d 644 (S.D.N.Y. 2012), *aff'd*, 728 F.3d 96 (2d Cir. 2013) ...................... *passim*

*In re ProShares Tr. Sec. Litig.*,
    728 F.3d 96 (2d Cir. 2013)................................................................ *passim*

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)................................................................ *passim*

*Rubin v. MF Global, Ltd.*,
    634 F. Supp. 2d 459 (S.D.N.Y. 2009)................................................................22

v

*SEC v. Yorkville Advisors*,
  305 F. Supp. 3d 486 (S.D.N.Y. 2018) ................................................................45

*Set Capital LLC v. Credit Suisse Grp. AG*,
  No. 18-cv-2268, 2019 WL 3940641 (S.D.N.Y. Aug. 16, 2019) ........................27, 28

*Set Capital LLC v. Credit Suisse Grp. AG*,
  No. 18-cv-2268, 2019 WL 4673433 (S.D.N.Y. Sept. 25, 2019) ........................27, 34

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019) ............................................................................42, 46

*Stadnick v. Vivent Solar, Inc.*,
  861 F.3d 31 (2d Cir. 2017) ............................................................................40, 41

*Steinberg v. PRT Grp., Inc.*,
  88 F. Supp. 2d 294 (S.D.N.Y. 2000) ....................................................................23

*Szulik v. Tagliaferri*,
  966 F. Supp. 2d 339 (S.D.N.Y. 2013) ..................................................................44

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) .............................................................................42, 44, 45

*In re TVIX Sec. Litig.*,
  25 F. Supp. 3d 444 (S.D.N.Y. 2014), *aff'd sub nom., Elite Aviation LLC v.
  Credit Suisse AG*, 588 F. App'x 37 (2d Cir. 2014) ......................................... *passim*

*Wendt v. BondFactor Co. LLC*,
  No. 16-cv-7751 (DLC), 2017 WL 3309733 (S.D.N.Y. Aug. 2, 2017) ....................49

**Statutes**

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4 ................................ *passim*

Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k and 77o ...................... *passim*

Sections 10(b) and 20(a) of the Securities Exchange Act of 1934,
  15 U.S.C. §§ 78j and 78t ............................................................................... *passim*

**Other Authorities**

17 C.F.R. § 229.105 ...........................................................................................40

17 C.F.R. § 229.303(a)(3)(ii) ...............................................................................40

17 C.F.R. § 240.10b-5 ................................................................................... *passim*

73 Fed. Reg. 14618 (Mar. 18, 2008) ....................................................................10

83 Fed. Reg. 7517 (Feb. 21, 2018) ................................................................................18

Fed. R. Civ. P. 8 .............................................................................................................22

Fed. R. Civ. P. 9(b) ................................................................................................ *passim*

Fed. R. Civ. P. 12(b)(6)...............................................................................7, 21, 23

## PRELIMINARY STATEMENT

Plaintiffs purport to bring this class action on behalf of investors who purchased shares of ProShares Short VIX Short-Term Futures ETF (the "Fund" or "SVXY") from May 15, 2017 to 11:35 a.m. Eastern Time on February 6, 2018 and/or pursuant to the Fund's purported May 15, 2017 registration statement, as amended (the "Registration Statement").[1]  CSAC ¶ 36.

**Background.**  SVXY is an exchange-traded fund ("ETF") with a daily investment objective tied to the performance of an underlying benchmark index – the S&P 500 VIX Short-Term Futures Index (the "Index").  The Index is comprised of publicly-traded futures contracts related to a widely referenced benchmark – the CBOE Volatility Index, commonly known as the "VIX."  The VIX is a measure of the *current* expected volatility of the S&P 500 Index over the next 30 days.  The Index is a measure of the *future* expected volatility of the VIX based on the price of the VIX futures contracts included in the Index.  It is not possible to invest directly in the VIX and not practical for many investors to invest directly in the VIX futures contracts included in the Index.

SVXY is a "short" fund.  It is designed to provide investors with results that correspond to the *inverse* (*i.e.*, -1x) of the daily performance of the Index.  When the value of the VIX futures contracts included in the Index goes up (*i.e.*, future expected market volatility as measured by the price of such contracts increases), the value of SVXY is designed to go down.  When the value of the VIX futures contracts included in the Index goes down (*i.e.*, future expected market volatility as measured by the price of such contracts declines), the value of SVXY is designed to go up.

---

[1] The Consolidated Second Amended Complaint ("CSAC") defines the operative "Registration Statement" to include collectively (a) the registration statement filed by ProShares Trust II (the "Trust") with the U.S. Securities and Exchange Commission ("SEC") on May 15, 2017; (b) the amendment to that registration statement, which was filed by the Trust with the SEC on July 11, 2017, *see* Ex. 1 to Declaration of Amy D. Roy, Esq. ("Roy Decl.") (hereinafter, "Registration Statement" or "RS"); and (c) the prospectus filed by the Trust with the SEC on July 13, 2017.

Investors buy SVXY because they seek to benefit from expected declines in future market volatility.  For much of 2017 and early 2018, this was a very successful strategy as the level of the VIX, and the price of VIX futures generally remained very low throughout 2017.  However, this trend began to reverse in January 2018, as market volatility, the level of the VIX, and the price of VIX futures contracts gradually fluctuated upwards.

On February 5, 2018, U.S. equity markets declined, and both the VIX and the price of VIX futures contracts increased significantly.  The value of the VIX essentially doubled from its prior day close, as did the value of the Index.  Since SVXY seeks to deliver the inverse (-1x) of the daily performance of the Index, the increase in the price of the futures contracts in the Index led to a corresponding decline in the value of the Fund's investments and the net asset value of SVXY's shares.  It is undisputed by Plaintiffs that in response to these market events, SVXY performed as designed (and disclosed) on February 5 by delivering returns that corresponded to the inverse of the performance of the Index.

**Plaintiffs' Claims**.  Plaintiffs assert claims under Sections 11 and 15 of the Securities Act of 1933, as amended (the "Securities Act"), Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 alleging that the Registration Statement and related disclosures materially misrepresented the risk that the Fund would lose value.  Crucially, Plaintiffs do *not* allege that the Fund failed to meet its stated daily investment objective on February 5, 2018 or any other day.  Instead, they contend that "SVXY was subject to extreme risks that were known by the ProShares Defendants but not adequately disclosed to investors."  CSAC ¶ 62.

**Plaintiffs' Claims Fail as a Matter of Law**.

*First and foremost*, all of the CSAC's claims (Counts I – IV) fail because Plaintiffs do not

properly allege any material misstatement or omission of fact as required to state a claim under the Securities Act or Exchange Act. The Fund's disclosures clearly and consistently explained the structural features, investment risks, and market conditions that Plaintiffs allege caused SVXY's losses on February 5, 2018. The Registration Statement explained that SVXY was designed to provide daily inverse (-1x) exposure to the Index, without regard to market movements or trends. In other words, the Registration Statement told investors that SVXY would not otherwise be actively managed in response to market developments. If SVXY is successful in meeting its objective, its value on a given day (before fees and expenses) should increase approximately as much on a percentage basis as the value of the Index when the Index declines – and decline approximately as much on a percentage basis when the Index rises. SVXY's value for these purposes is represented by the change in its net asset value ("NAV") from one day to the next. This was clearly and prominently disclosed to investors, including the express warning that a one-day increase in the Index approaching 100% could cause a total loss in the value of SVXY shares.

On February 5, 2018, U.S. equity markets declined significantly and volatility increased dramatically. The Index experienced a sharp increase in value of approximately 96%, much of which occurred between 4:00 and 4:15 p.m. Eastern Time. In turn, and by design, the value of SVXY's portfolio holdings and NAV experienced a corresponding sharp decline, consistent with the Fund's daily inverse investment objective as described in the Registration Statement.

Plaintiffs claim that SVXY's losses were exacerbated by allegedly undisclosed Fund features and market conditions that left investors unaware of the potential risk of sudden losses of this magnitude. The gravamen of the claims seems to be that the daily portfolio rebalancing of SVXY required it to purchase, in the event of a volatility uptick, a large volume of VIX futures contracts in an allegedly illiquid market for these instruments – thereby creating a "liquidity gap"

3

that further drove up the prices of the contracts.  This price effect in turn allegedly caused the Index to increase yet further in value, which Plaintiffs contend set in motion "a destructive feedback loop of SVXY's own making."  CSAC ¶ 73.

These assertions fail to state a valid claim.  SVXY's Registration Statement clearly and fully informed investors of the relevant Fund features, market conditions, and attendant investment risks.  Specifically, the Registration Statement warned of the risks of illiquid markets (*i.e.*, difficulty executing trades at a desired price) and the potential negative impact on the Fund from trading large amounts of futures contracts in such market conditions.  The fact that nearly all of SVXY's portfolio would typically be held in VIX futures contracts was explained, as was the need for daily rebalancing of the Fund's portfolio to meet its investment objective (*i.e.*, daily -1x Index exposure).  In this regard, the Registration Statement warned investors that the large size of the Fund's holdings could make it more difficult to liquidate positions and increase the losses incurred while trying to do so.  The Registration Statement further warned that any type of market disruption or illiquidity would potentially be worsened because the Fund invests in derivative instruments relating to a single benchmark.  Contrary to Plaintiffs' core theory, investors were fully informed about how the Fund worked and the attendant risks, including, as alleged by the CSAC, that "SVXY's ***own conduct*** of rebalancing [to meet its daily investment objective] . . . could ***itself*** drive up the price of VIX futures contracts" and exacerbate losses.  *Id.* ¶ 10.[2]

Similarly, Plaintiffs also allege that because volatility during the Class Period was below its long-term historic average and "volatility has historically been a 'mean-reverting' asset," that "a spike in volatility was virtually inevitable" – and this risk was not adequately disclosed to investors.  *Id.* ¶ 70.  These assertions also fail to state an actionable omission.  The Registration

---

[2] Unless otherwise noted, any emphasis expressed in quoted language is as expressed in the original source.

Statement clearly warned investors that periods of low volatility will tend to reverse, as supported by multiple disclosures indicating that the VIX had historically reverted to its long-term mean.  In addition, the then-current levels of volatility (as well as historic spikes in volatility) were widely reported and readily available to investors – as conceded in the CSAC itself.  *Id.* ¶¶ 72–73 (providing chart of historical VIX volatility and acknowledging that "investors were aware of the risk that volatility might spike during the Class Period").  Further, the Registration Statement repeatedly warned investors that VIX futures contracts are highly volatile and subject to significant and unexpected reversals, and that investors could lose the entire value of their SVXY investment over a period as short as a day.  Investors were expressly cautioned – in bold font on the opening pages of the Registration Statement – that SVXY is not appropriate for all investors and presents many different risks than other types of funds, including risks relating to the use of leverage and exposure to VIX futures contracts.

In short, the CSAC identifies no material misstatement or omission in SVXY's disclosures, because investors were fully apprised of all relevant Fund features, market conditions, and resulting investment risks that could affect their investment, including the very factors Plaintiffs allege caused the Fund's losses on February 5, 2018.  Plaintiffs' efforts to plead around the Fund's clear and detailed disclosures are unsuccessful, as the CSAC identifies no additional information that would have been material to reasonable investors, *i.e.*, that would have significantly altered the total mix of information available to them.  Plaintiffs' suggestion that investors required more detailed descriptions of how and when the disclosed risks *might* come to fruition amounts to impermissible "pleading by hindsight".  Indeed, Plaintiffs' repeated focus on alleged developing market trends – such as the growth of the Fund and other similar funds, the relative size and liquidity of the VIX futures market, and then-current levels of volatility – suggests an obligation

for the ProShares Defendants to provide ongoing, real-time updates to the Fund's disclosures regarding these publicly-available data points and the speculative conclusions Plaintiffs draw from them. This obligation simply does not exist under federal securities laws.

In short, no reasonable investor could have been misled about the risks of investing in the Fund, given the total mix of information provided in the Registration Statement and publicly-available market data. The CSAC does not identify a material misstatement or omission as required to state a claim under the Securities Act or Exchange Act, and all of the CSAC's claims (Counts I – IV) fail as a matter of law for this reason alone.

*Second*, the Exchange Act claims fail as a matter of law for the additional reason that the CSAC does not plausibly allege that the ProShares Defendants acted with the requisite scienter to satisfy the heightened pleading standard of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4, and Fed. R. Civ. P. 9(b). The CSAC does not allege any plausible theory of scienter at all, let alone one that, as required by the PSLRA, is cogent, compelling, and supported by facts that give rise to a strong inference of scienter. Instead, Plaintiffs ask the Court to infer scienter based on nothing more than speculation, vague and unsubstantiated allegations of "unique knowledge," and the alleged omissions and misstatements themselves. *See* CSAC ¶¶ 107, 180. This is plainly insufficient. In addition, Plaintiffs' attempt to demonstrate the requisite motive and opportunity to mislead investors simply by pointing to the ProShares Defendants' alleged desire to receive management fees has been squarely rejected time and again by this Court.

*Third*, the Securities Act claims should be dismissed for the additional reason that Plaintiffs have still failed to allege proper standing. Section 11 requires that plaintiffs establish that they own shares originally purchased pursuant to the challenged registration statement. Plaintiffs have not adequately pled this "tracing" requirement, as the CSAC merely alleges without elaboration

that Plaintiffs' share purchases are "traceable" to the Registration Statement – with no factual assertion even remotely suggesting their shares were originally issued by the Fund pursuant to the challenged Registration Statement.  This is insufficient to plead standing.

For all the foregoing reasons, the CSAC should be dismissed with prejudice.

## BACKGROUND

### A.   Defendants

The Fund is a series of defendant ProShares Trust II (the "Trust").  The Trust is a Delaware statutory trust and a commodity pool registered with the Commodity Futures Trading Commission. *See* RS at 169, 172, 211.[3]  The Trust is comprised of multiple series, or funds, that operate as exchange-traded funds ("ETFs").  Shares of each Fund are registered with the SEC under the Securities Act.  Defendant ProShare Capital Management LLC (the "Sponsor") is the Trust's sponsor and commodity pool operator.  *See* RS at 179.  The Sponsor manages the portfolio of investments of each Fund of the Trust.  *Id.*

In addition to the Trust and Sponsor, the CSAC also names as individual defendants Michael L. Sapir, Louis M. Mayberg, Edward J. Karpowicz, and Todd B. Johnson (the "Individual Defendants").  Mr. Sapir is the CEO and Principal of the Sponsor.  RS at 256.  Mr. Mayberg is a Principal of the Sponsor.  *Id.*  Mr. Karpowicz is the Principal Financial Officer of the Trust and

---

[3] A court considering a Rule 12(b)(6) motion to dismiss "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, *legally required public disclosure documents filed with the SEC*, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (emphasis added) (citation omitted).  The Registration Statement is a "legally required public disclosure document[] filed with the SEC," which the Court can consider in evaluating a motion to dismiss.  *See id.*  The attached Registration Statement is part of an SEC filing that contains disclosures related to multiple securities and is extensively referenced and relied upon throughout the CSAC.  Page references herein are to the July 11, 2017 amendment to the May 15 registration statement.  The relevant disclosures in the May 15 registration statement, the operative July 11 amendment to the May 15 registration statement, and the operative July 13 prospectus are substantively similar in all material respects.  For ease of reference, the pincites included herein are to the page numbers indicated in the lower right-hand corner of the Registration Statement.

Principal of the Sponsor.  *Id.*  Mr. Johnson is the Principal Executive Officer of the Trust and Chief Investment Officer and Principal of the Sponsor.  *Id.*

The CSAC refers to the Trust, the Sponsor, and the Individual Defendants as the "ProShares Defendants," collectively.

The CSAC also names as defendants nine "Authorized Participants" whom the CSAC labels "Underwriter Defendants."[4]  Plaintiffs allege that the Authorized Participants sold SVXY shares on the secondary market pursuant to "Authorized Participant" agreements with the Trust and Sponsor.

### B.    The Structure and Operation of SVXY

SVXY is an ETF, which is a type of pooled investment product whose shares are publicly listed for trading on a national securities exchange.  ETFs pursue a variety of investment objectives. For example, index-based ETFs typically invest in a portfolio of securities or other assets that allow them to track the performance, or a multiple or inverse of the performance, of an underlying benchmark or index.  A *leveraged* ETF seeks to deliver a multiple of the daily performance (*e.g.*, 2x) of an underlying benchmark or index.  An *inverse* ETF, such as SVXY, seeks to deliver the opposite of the daily performance (*e.g.*, -1x) of an underlying benchmark or index.  The Registration Statement refers to leveraged and inverse ETFs as "Geared Funds."  RS at 169–70.

SVXY seeks inverse exposure to the daily performance of its benchmark, the S&P 500 VIX Short-Term Futures Index (the "Index").  The Index is an investable index of publicly-traded VIX futures contracts.[5]  *Id.* at 170.  Specifically, SVXY's investment objective is to correspond

---

[4] Those defendants are ABN AMRO Clearing Chicago LLC, Deutsche Bank Securities Inc., Goldman, Sachs & Co. (n/k/a Goldman Sachs & Co. LLC), J.P. Morgan Securities LLC, Knight Execution & Clearing Services, LLC, Merrill Lynch Professional Clearing Corp., Newedge USA LLC, SG Americas Securities, LLC, and Virtu Financial BD LLC.

[5] The Cboe Volatility Index, commonly known as the "VIX," is designed to measure the *expected* volatility (*i.e.*, the rate and magnitude of variations of performance) of the S&P 500 over the next 30 days.  The VIX is calculated based on a constantly changing portfolio of S&P 500 Index options and is generally regarded as a non-investable index.  The

with the inverse (-1x) of the performance of the Index for a single day (before fees and expenses). *Id.* In seeking to achieve its investment objective, SVXY invests in VIX future contracts, "to gain the appropriate exposure to the Index . . . . [and] produce economically . . . 'inverse' investment results . . . ." *Id.* at 179. As noted by Plaintiffs, "it is not possible to invest directly in the VIX." CSAC ¶ 46. Investors instead must invest in securities such as SVXY that provide exposure to VIX futures. *Id.* Investing in such volatility-related products "can be used as a means to hedge investment risks and diversify an investment portfolio." *Id.* ¶ 51.

SVXY, like similar leveraged and inverse ETFs, is structured based on a daily investment objective, not long-term results. RS at 178. In this regard, the Fund "does not seek to achieve its stated objective over a period greater than a single day." *Id.* at 207; *see also id.* at 170, 180–81, 207. A "single day" is measured from the time the Fund calculates its NAV to the time of the Fund's next NAV calculation. *Id.* at 207. Like traditional open-end mutual funds, ETFs must calculate the NAV of their shares on a daily basis. SVXY's NAV is typically calculated as of 4:15 p.m. Eastern Time – which is the end of regular trading hours for VIX futures contracts. *Id.* at 169, 260. If SVXY is successful in meeting its objective, its NAV on a given day (before fees and expenses) should gain approximately as much on a percentage basis as the value of the Index when the value of the Index declines, and decline approximately as much on a percentage basis as the value of the Index when the Index rises. *Id.* at 169.

SVXY's portfolio holdings are adjusted or "rebalanced" each day in order to keep the Fund's exposure to the Index consistent with its investment objective. *Id.* at 208–09. The Fund rebalances its portfolio by buying and selling futures contracts daily "[i]n order to achieve a high

---

VIX is calculated, maintained, and published by the Chicago Board Options Exchange ("Cboe"). *See* RS at 169, 194. As discussed above, the Fund is not benchmarked to the VIX itself, but rather, to the Index.

degree of correlation with the Index, [and] . . . to keep exposure consistent with its investment objective." *Id*. at 190.  While SVXY is "typically rebalanced at or about the time of [the Fund's] NAV calculation," *id.*, the purchase and sale of futures contracts to effect the rebalancing can take place at other times of the day as well.

ETFs and mutual funds, while similar, have several key operational differences.  For example, whereas individual investors in a traditional mutual fund may purchase and redeem (*i.e.*, sell back) individual shares directly from a mutual fund (at a share price equal to the NAV per share of the fund), only a limited number of institutional investors known as "Authorized Participants" may purchase and redeem ETF shares directly from an ETF.  Authorized Participants purchase and redeem shares from ETFs at NAV and only in large blocks of shares (typically 50,000 shares called "Creation Units").  Investors can buy and sell ETF shares on the secondary market through Authorized Participants or other intermediaries throughout the trading day at market prices that vary based on the forces of supply, demand, and other economic or regulatory factors over the course of the day.  *See* Roy Decl. Ex. 2 (SEC, "Exchange-Traded Funds", 73 Fed. Reg. 14618, 14619 (Mar. 18, 2008)).  Thus, ETF share prices in the secondary market are set by market forces, not by the ETF itself.  While in practice, ETF share prices in the secondary market often correspond to the NAV of the fund, they can (and often do) trade at a premium or discount to the NAV.  *See id.* at 14619 n.9.  In addition, most ETFs, including SVXY, publish their portfolio holdings on a daily basis, allowing investors to see the size and components of the ETF's portfolio.[6]

### C.    The SVXY Registration Statement

Plaintiffs purport to bring claims with respect to alleged misstatements and omissions in

---

[6] *See* ProShares website: https://www.proshares.com/funds/svxy_daily_holdings.html.

the purported May 15, 2017 Registration Statement, as amended on July 11, 2017.[7] The Registration Statement includes a prospectus describing SVXY and two other funds that track the same Index: (1) ProShares Ultra VIX Short-Term Futures ETF ("UVXY"), which had a 2x or "leveraged" daily objective; and (2) ProShares VIX Short-Term Futures ETF ("VIXY"), which had a 1x "long-term" objective. SVXY and UVXY are referred to collectively as the "Geared Funds" throughout the Registration Statement. Each fund invests in "Financial Instruments," which the Registration Statement explains are "futures contracts, swap agreements and other instruments whose value is based on the Index." RS at 179. "Financial Instruments also are used to produce economically 'leveraged' or 'inverse' investment results for the Geared Funds." *Id.*

### D.    Disclosures in the SVXY Registration Statement

The Registration Statement apprised shareholders of all relevant structural features, market conditions, and attendant investment risks that could affect their investment in SVXY, including the factors that allegedly caused losses on February 5, 2018. In particular, investors were told that (1) SVXY had a daily investment objective to provide inverse (-1x) exposure to the daily performance of its benchmark Index; (2) SVXY seeks its daily objective, but is not otherwise actively managed, regardless of market developments and trends; (3) SVXY achieves its daily

---

[7] The CSAC refers to the May 15, 2017 registration statement, the July 11 amendment to the May 15 registration statement, and the July 13 prospectus collectively as the "Registration Statement." Yet, as the Fund's SEC filings make clear, the May 15 registration statement was never declared effective by the SEC and never took effect as an operative registration statement. Rather, only the July 11 amendment to the May 15 registration statement was declared effective by the SEC on July 12 as Plaintiffs now admit. CSAC ¶ 171 n.12. Then, beginning on July 13, a newly filed July 13 prospectus was used in connection with the sale of the Fund's shares through the end of the putative class period. *See* Roy Decl. Ex. 3 (SEC Notice of Effectiveness as of July 12, 2017). Thus, during the first two months of the putative class period – from May 15 through July 12 – the operative SVXY registration statement was the registration statement filed on February 7, which had been declared effective by the SEC on March 1, and Plaintiffs have made no allegations at all concerning this February 7 registration statement. A March 1 prospectus was used in connection with the sale of the Fund's shares through the end of the trading day on the New York Stock Exchange on July 12. During the remainder of the putative class period – from July 13, 2017 through February 6, 2018 – the operative SVXY registration statement was the July 11, 2017 amendment to the May 15 registration statement. In sum, no shares of SVXY were ever sold pursuant to the May 15 registration statement. Nevertheless, Plaintiffs purport to bring claims under the Securities Act and the Exchange Act for a putative class period that begins on May 15, two months *before* the effective date of the Registration Statement.

investment objective by rebalancing its portfolio of VIX futures contracts; (4) SVXY's investments can be highly volatile such that SVXY may experience large losses rapidly, including potentially a total loss if the Index increases 100% in a day; (5) SVXY can experience larger losses due to rebalancing in an illiquid VIX futures market and the large size of the positions the Fund may hold; and (6) SVXY faces risks during periods of low volatility because of the "mean-reverting" nature of volatility, and such reversals can be significant and unexpected.

### 1. *SVXY Had a Daily Investment Objective to Provide Inverse (-1x) Exposure to the Daily Performance of Its Benchmark Index*

The Registration Statement clearly and repeatedly disclosed, starting on the cover page, that SVXY had an investment objective to return the inverse (-1x) (before fees and expenses) of the daily performance of the benchmark Index. *See, e.g.*, RS at 169, 170, 177–78, 180. It explained that the Index is comprised of and priced on the value of VIX short-term futures contracts, *id*. at 170, 177, and that VIX futures contracts derive their value in turn from "the expected value of the VIX at . . . the expiration date of the VIX futures contract." *Id.* at 191. It explained the difference between the Index and the VIX, noting among other things that "[t]he VIX seeks to measure the market's current expectation of 30-day volatility of the S&P 500® Index, as reflected by the prices of near-term S&P 500® options." *Id.*

The CSAC makes much of the fact that this structure is derivative in nature, asserting that it is therefore "highly complex and exotic." CSAC ¶¶ 65–66. But SVXY's structure and operations were made fully transparent to investors in the Registration Statement, and Plaintiffs do not assert otherwise. *See, e.g.*, RS at 179 ("Each Fund generally invests in Financial Instruments (*i.e.*, futures contracts, swap agreements and other instruments whose value is based on the Index.) Financial Instruments are used to gain the appropriate exposure to the Index."). Indeed, as a practical matter, investors cannot gain the "short" volatility exposure they seek

through an investment in SXVY by direct investment in the options contracts that make up the VIX, and many retail investors do not have access to the VIX futures contracts included in the Index. SVXY was designed to provide investors with inverse (-1x) exposure to the daily performance of the Index through a single, publicly-traded security.

In disclosing and explaining this derivative structure, the Registration Statement stated that "[w]hile there is a relationship between the performance of the Index and future levels of the VIX, the performance of the Index is not directly linked to the performance of the VIX, to the realized volatility of the S&P 500® or to the options that underlie the calculation of the VIX."  *Id.* at 190. As such, the Index and the Fund "should be expected to perform very differently from the VIX over all periods of time."  *Id.*

### 2.   *SVXY Seeks Its Daily Inverse Investment Objective But Is Not Otherwise Actively Managed, Regardless of Market Developments and Trends*

SVXY seeks **"to provide investment results that correspond (before fees and expenses) to the daily performance of . . . the inverse (-1x) of, the Index at all times, even during periods when the Index is flat or when the Index is moving in a manner which causes the value of the Fund to decline."**  *Id*. at 193.   In seeking to achieve this investment objective "through the appropriate amount of exposure to the VIX futures contracts included in the Index," *id.* at 169, SVXY remains fully invested and pursues its objective at all times, even in the event of declining prices. *Id.* at 179, 193, 208.

The Registration Statement cautioned that "[e]ach Fund generally seeks to remain fully invested at all times in Financial Instruments [*i.e.*, VIX futures contracts] and money market instruments that, in combination, provide exposure to the Index consistent with its investment objective *without regard to market conditions, trends or direction*."  *Id.* at 179, 208 (emphasis added).  In this regard, it twice repeated that "[t]he Sponsor does not invest the assets of the Funds

13

based on its view of the investment merit of a particular investment, other than for cash management purposes, nor does it conduct conventional volatility research or analysis, or forecast market movement or trends in managing the assets of the Funds." *Id.* at 179, 208.  "[T]he Funds are not actively managed by traditional methods (*e.g.*, by effecting changes in the composition of a portfolio on the basis of judgments relating to economic, financial and market considerations with a view toward obtaining positive results under all market conditions)." *Id.* at 193.

### 3.      *SVXY Achieves Its Daily Investment Objective by Rebalancing Its Portfolio of VIX Futures Contracts*

In seeking to meet its investment objective, SVXY's portfolio holdings are adjusted, or "rebalanced," each day to maintain inverse exposure (before fees and expenses) to the daily performance of the Index.  The Fund rebalances its portfolio by buying and selling VIX futures contracts "to achieve a high degree of correlation with the Index, [and] . . . to keep exposure consistent with its investment objective." *Id*. at 190.  In particular:

> The impact of the Index's movements during the day will affect whether the Geared Fund's portfolio needs to be rebalanced.  For example, if the level of the Index has risen on a given day, net assets of the Inverse Fund should fall.  As a result, inverse exposure will need to be decreased.  Conversely, if the level of the Index has fallen on a given day, net assets of the Inverse Fund should rise.  As a result, inverse exposure will need to be increased.

*Id.* at 209.

The Registration Statement disclosed that the NAV is typically calculated as of 4:15 p.m. Eastern Time, *id.* at 197, and, if necessary, the Fund is "typically" rebalanced around the time of the 4:15 p.m. Eastern Time NAV calculation so that the Fund's exposure to the Index is consistent with its investment objective.  *See id.* at 178, 190.  Because the NAV is not typically calculated until 15 minutes after the equity market trading day closes, the Registration Statement expressly warned investors that "during the time when the Exchange is closed [4:00 p.m.] but before the determination of NAV [4:15 p.m.], there could be market developments or other events that cause

14

or exacerbate the difference between the price of the Shares of a Fund and the NAV of such Shares." *Id*. The Registration Statement further explained that, in addition to rebalancing SVXY each day, the Sponsor also rebalances the other ETFs that track the Index. *Id.* at 178, 190, 209.

> **4.** ***SVXY's Investments Can Be Highly Volatile Such that SVXY May Experience Large Losses Rapidly, Including a Total Loss in a Single Day***

The Registration Statement repeatedly warned investors of significant volatility-related risks and the potential for large unexpected losses from the Fund's investments in VIX futures contracts. For example, the Registration Statement warned in several places that an investor could "lose the full principal value" of his or her investment, *id.* at 170, 177, 191, including that "[i]nverse positions can also result in the total loss of an investor's investment." *Id*. at 190. For SVXY, "a single-day or intraday increase in the level of the Fund's benchmark approaching 100% could result in the total loss or almost total loss of an investor's investment . . . ." *Id*. The Registration Statement also cautioned would-be investors in several places that "**[t]he Funds' investments can be highly volatile and the Funds may experience large losses from buying, selling or holding such investments**." *Id*. at 170, 177; *see also id.* at 191 ("Investments linked to equity market volatility, including VIX futures contracts, can be highly volatile and may experience large losses."). "**In addition, gains, if any, may be subject to significant and unexpected reversals**." *Id*. at 170, 177; *see also id.* at 191 (similar language).

> **5.** ***SVXY Can Experience Larger Losses Due to Rebalancing in an Illiquid VIX Futures Market and the Large Size of the Positions It May Hold***

In addition to warning investors of the significant risks posed by the very market volatility the Fund is designed to track, the Registration Statement also discussed risks posed by the Fund's transactions in VIX future contracts for rebalancing. In this regard, investors were specifically warned that "[i]t is difficult to execute a trade at a specific price when there is a relatively small volume of buy and sell orders in a market" – that is, in illiquid markets. *Id*. at 193. "A market

disruption can also make it difficult to liquidate a position or find a swap counterparty at a reasonable cost." *Id*. As a result, "*[f]luctuations in the price of these Financial Instruments or assets could materially adversely affect an investment in the Shares.*" *Id*. at 192. The Registration Statement further disclosed that "the price and/or liquidity of VIX futures contracts" may be affected by "[s]upply and demand" in the "equity derivatives markets" and that this "*could materially adversely affect an investment*" in SVXY. *Id.* at 192–93. Of particular note given Plaintiffs' allegations that the Fund's size exacerbated its rebalancing requirements, *see* CSAC ¶ 82, the Registration Statement clearly and fully disclosed that "[t]he large size of the positions which the Funds may acquire increases the risk of illiquidity by both making their positions more difficult to liquidate and increasing the losses incurred while trying to do so." RS at 193.

The Registration Statement also warned that losses due to illiquidity can be exacerbated by concentration in a single type of instrument. *Id.* at 197. ("The Index for the Funds is concentrated solely in VIX futures contracts" and "[c]oncentration in fewer underlying components may result in a greater degree of volatility in an index and the NAV of the fund which tracks that index under specific market conditions and over time."). In a paragraph labeled "*Possible illiquid markets may exacerbate losses*," the Registration Statement explained that "[m]arket illiquidity may cause losses for the Funds" and that "[a]ny type of disruption or illiquidity will potentially be exacerbated due to the fact that the Funds will typically invest in Financial Instruments related to one benchmark, which in many cases is highly concentrated." *Id*. at 193.

In addition, the Registration Statement detailed a number of other "factors [that] may affect the price and/or liquidity of VIX futures contracts" held by the Fund, including prevailing market prices, forward volatility levels, interest rates, inflation rates, investor expectations, supply and demand, hedging activities, trading disruptions, and economic, financial, political, regulatory,

geographical, biological, or judicial events across various markets. *Id.* at 192–93. It explained that "[t]hese factors interrelate in complex ways, and the effect of one factor on the market value of a Fund may offset or enhance the effect of another factor." *Id.* at 193.

In light of the investment objective of the Fund and the volatile nature of VIX futures and the VIX itself, the Registration Statement clearly warned upfront – in bold font – that SVXY is a risky investment that is "**not appropriate for all investors and present[s] many different risks than other types of funds, including risks relating to investing in VIX futures and . . . risks associated with the use of leverage.**" *Id.* at 170; *see also id.* at 177, 181. "**An investor should only consider an investment in a Fund if he or she understands the consequences of seeking exposure to VIX futures contracts.**" *Id.* at 170. Indeed, "**[t]he Funds generally are intended to be used only for short-term investment horizons. As with all investments, an investor in any of the Funds could potentially lose the full principal value of his/her investment, even over periods as short as one day.**" *Id.* at 170, 177. Finally, the Registration Statement warned would-be investors that "*[t]he Funds [including SVXY] generally are intended to be used as trading tools for short-term investment horizons and investors holding shares of the Fund over longer-term periods may be subject to increased risk of loss.*" *Id.* at 191.

> **6.     SVXY Faces Risks During Periods of Low Volatility Because of the "Mean-Reverting" Nature of Volatility, and Such Reversals Can Be Significant and Unexpected**

The Registration Statement explained that the VIX has a "mean-reverting" nature that constrains the potential upside of investing in the Fund, and that the VIX is subject to significant and unexpected reversals. Specifically, the Registration Statement states: "[T]he potential upside of long or short exposure to VIX futures contracts may be limited as the performance of VIX reverts to its long-term average." *Id.* ("*The level of the VIX has historically reverted to a long-term mean (i.e., average) level and any increase or decrease in the level of the VIX will*

*likely continue to be constrained.*"); *see also id.* at 170, 177.  It continued:

> When economic uncertainty or other market risks increase and there is an associated increase in expected volatility, the value of VIX futures contracts has historically tended to increase.  Similarly, when economic uncertainty or other market risks recede and there is an associated decrease in expected volatility, the value of VIX futures contracts has historically tended to decrease.  Historically, each of these patterns have tended to reverse.

*Id.* at 191; *see also id.* at 170, 177.  As a result, in a market experiencing low volatility, "any gains may be subject to significant and unexpected reversals as the VIX reverts to its long term mean." *Id.* at 191; *see also id.* at 170, 177.  The Registration Statement thus disclosed the likelihood of a significant spike in volatility when volatility had hovered below the long-term average for an extended period of time.

### E.    Events of February 5 and 6, 2018

On Friday, February 2, 2018, trading of SVXY shares in the secondary market closed at $105.60.[8]  On Monday, February 5, 2018, "both the U.S. and global markets experienced increased selling pressure and the Dow Jones Industrial Average ('DJIA') closed 4.6% down over the prior closing day," and "the [VIX volatility index] . . . more than doubled from its prior close."  *See* Roy Decl. Ex. 4 (SEC, "Self-Regulatory Orgs.," 83 Fed. Reg. 7517, 7517 (Feb. 21, 2018)) (hereinafter "SEC Notice").  When U.S. equity markets closed for the day at 4:00 p.m. Eastern Time, SVXY shares were trading in the secondary market at or about $71.82.  The market for the VIX futures contracts included in the Index, on the other hand, remained open.  The equity market decline coupled with a significant increase in volatility contributed to a sharp increase in the market price

---

[8]  Historical share price and NAV data for SVXY and other publicly-traded securities is publicly available through a number of sources, including for example, the NYSE-Arca and Nasdaq websites, and is appropriate for use in a motion to dismiss.  *See, e.g., Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000) ("[T]he district court may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment." (citations omitted)); ProShares Short VIX Short Term Futures ETF SVXY, NYSE, https://www.nyse.com/quote/ARCX:SVXY (last accessed on Sept.26, 2019) (displaying historic prices).

18

of the VIX futures contracts between 4:00 and 4:15 p.m., causing a corresponding decline in the price of the short positions in the VIX futures contracts held by SVXY.[9]  As provided in its Registration Statement, SVXY's 4:15 p.m. NAV was calculated based on the then-current market value of the Fund's short positions in such VIX futures contracts and was determined to be $3.96. *See* Roy Decl. Ex. 4 (SEC Notice at 2); CSAC ¶ 14.  The decline in SVXY's NAV reflected the increase in the price of the VIX futures contracts and the level of its underlying Index.  In short, SVXY's performance reflected the *inverse* of the change to the level of the Index and was consistent with its fully-disclosed daily investment objective.

### F.    Alleged Misrepresentations and Omissions

The CSAC alleges various misrepresentations and omissions in SVXY's Registration Statement relating to the Fund's structure, the circumstances of the Fund's rebalancing, and the effects of the Fund's rebalancing, among other things.   In particular, the CSAC alleges misrepresentations and omissions regarding the following Fund features, market conditions, and investment risks: (1) SVXY had a "complex" derivative structure that "posed a heightened risk of extreme and sudden price movements," CSAC ¶¶ 65–67, 136; (2) SVXY engaged in daily mandatory, "price-insensitive" rebalancing at 4:15 p.m. Eastern Time, when other volatility-related ETPs also rebalanced their portfolios in an over-crowded market, *id*. ¶¶ 5, 75–81, 132, 136; (3) volatility had a mean-reverting nature such that a market disruption was likely to occur, *id*. ¶¶ 70–71, 144–46; (4) "[t]he exponential growth of SVXY and other volatility-related

---

[9] The CSAC states – without any actual factual support – that the Fund's rebalancing purchases of VIX futures contracts all took place between 4:00 and 4:15 p.m. Eastern Time on February 5.  CSAC ¶ 114 n.10.  This is pure supposition.  Plaintiffs' sole support for this statement is a vague reference to "VIX futures transactional data" (none of which is provided or cited in the CSAC) and "the rebalancing policy set forth in the Registration Statement."  *Id*. The so-called "rebalancing policy" is simply a disclosure stating that the Fund is "typically rebalanced at or about the time of its NAV calculation time," RS at 190, which is "typically" 4:15 p.m. Eastern Time. RS at 169.  In fact, Cboe's public disclosures reflect that VIX futures are available for trading almost around the clock.  *See* Roy Decl. Ex. 5 ("CBOE Volatility Index® (VIX®) Futures Specifications" showing weekday trading hours at all times other than 4:15-4:30 p.m. Eastern Time).

ETPs prior to and during the Class Period pushed the size of their potential rebalancing requirements to unprecedented levels," thereby increasing the risk that there would be a so-called "liquidity gap" (*i.e.*, more demand for VIX futures contracts than the market could provide) in the event of a relatively moderate increase in volatility, *id.* ¶¶ 6–7, 82–92, 136, 142, 146, 155, 177; (5) "by purchasing VIX futures contracts [as a part of their rebalancing], SVXY and other volatility-related ETPs were, in essence, purchasing expected volatility – which drove expected volatility up further" causing a "destructive feedback loop" perpetuated by the "mathematical approach to investing," *id.* ¶¶ 7, 93–98, 132, 122, 134, 142, 148, 177; and (6) the Fund was inappropriate for any investor to manage trading risks because the historic low volatility, exponential growth of SVXY, and the liquidity gap could cause "catastrophic losses that could materialize ***in a matter of minutes***" as a result of a "relatively modest increase in volatility" and the "self-inflicted death spiral." *Id.* ¶¶ 4, 62–63, 68–69, 74, 138, 146, 148, 153.

Plaintiffs further allege that the Registration Statement misrepresented SVXY as a "useful tool" for investors who "actively manage and monitor their investments, as frequently as daily." *Id.* ¶ 9 (quoting RS at 181); *see also id.* ¶¶ 126–27. Plaintiffs contend that the Fund was inappropriate for investors who managed their investments daily because "even a relatively modest increase in volatility would subject investors to catastrophic losses occurring in a matter of minutes." *Id.* ¶ 9. Next, Plaintiffs contend that the Registration Statement understated the "worst-case scenario" in a table demonstrating the effect of compounding on returns over a one-year period. *Id.* ¶¶ 149–51. Plaintiffs also note that the Sponsor's revision to the Fund's investment objective on February 27, 2018 to seek results (before fees and expenses) that correspond to one-half the inverse (-0.5x) of the Index for a single day was a "belated de-risking" of SVXY. *Id.* ¶¶ 121–22. Finally, Plaintiffs claim that there were misrepresentations in the Trust's August 9, 2017

Form 10-Q, November 9, 2017 Form 10-Q, and September 28, 2017 Form S-3 draft 2018 registration statement because those documents "contained identical statements to those in the Registration Statement." *Id.* ¶¶ 171–76.

## ARGUMENT

When challenged by a Fed. R. Civ. P. 12(b)(6) motion to dismiss, a plaintiff's factual allegations must be sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also id.* at 555, 557 (explaining that a complaint must contain factual allegations sufficient "to raise a right to relief above the speculative level" and that such factual allegations must "plausibly suggest[]" liability) (citations omitted). While the court must take all well-pled *facts* as true in deciding a motion under Rule 12(b)(6), "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In addition, Fed. R. Civ. P. 9(b) imposes a heightened pleading standard on claims alleging fraud, requiring plaintiffs to plead allegations of misstatements or omissions with particularity.[10] *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Rule 9(b) requires that a plaintiff specify which statements were fraudulent, identify who made the statements, specify when and where the statements were made, and explain why the statements were fraudulent. *See ATSI Commc'ns*, 493 F.3d at 99. The particularity requirement applies to claims brought under Section 10(b) of the Exchange Act and Rule 10b-5, as well as claims under Section 11 of the Securities Act when those claims are "grounded in fraud." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004). Even claims that are not "styled or

---

[10] Relatedly, Plaintiffs' repeated use of group pleading – without specifying the conduct of individual defendants – also renders the CSAC facially inadequate in light of Rule 9(b). *See, e.g., In re Crude Oil Commodity Litig.*, No. 06-cv-6677(NRB), 2007 WL 1946553, at *6 (S.D.N.Y. June 28, 2007); *Merrill Lynch, Pierce, Fenner & Smith v. Young*, No. 91-cv-2923(CSH), 1994 WL 88129, at *7 (S.D.N.Y. Mar. 15, 1994).

denominated" as fraud are held to the Rule 9(b) heightened pleading requirements if they are based on allegations of fraud.  *Id.* at 171.  Here, Plaintiffs allege that certain defendants intentionally and/or recklessly provided misleading information in the Registration Statement to induce investors to invest in SVXY by concealing the risks – allegations grounded in fraud, which must therefore satisfy Rule 9(b)'s particularity requirements.  *See, e.g.*, CSAC ¶¶ 8, 106, 186; *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005).

Even without invocation of the heightened pleading requirements, all of Plaintiffs' claims still fail.  The CSAC fails even to meet the basic standard pleading requirements set forth in Rule 8 since the disclosures in the Registration Statement on their face fully and accurately describe the nature of the securities and the risks described in the CSAC.

## I.    ALL CLAIMS MUST BE DISMISSED BECAUSE THE CSAC FAILS TO PROPERLY ALLEGE MATERIAL MISREPRESENTATIONS OR OMISSIONS IN THE FUND'S REGISTRATION STATEMENT OR OTHER DISCLOSURES

To assert a claim under Sections 11 or 15 of the Securities Act, Plaintiffs must allege that the Registration Statement contained a false statement of material fact or omitted a material fact "necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a); *see also In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 433–34 (S.D.N.Y. 2009); *Rubin v. MF Global, Ltd.*, 634 F. Supp. 2d 459, 466 (S.D.N.Y. 2009).  For claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5, Plaintiffs must similarly establish that the defendants "made a materially false statement or omitted a material fact" (not limited to the Registration Statement).  *ECA*, 553 F.3d at 197 (quoting *Lawrence v. Cohn*, 325 F.3d 141, 147 (2d Cir. 2003)).  A "registration statement need not disclose every possible permutation of the risk, nor predict the precise manner in which the risks will manifest themselves."  *In re ProShares Tr. Sec. Litig.* (hereinafter, "*In re ProShares I*"), 889 F. Supp. 2d 644, 655 (S.D.N.Y. 2012) (Koeltl, J.) (internal quotation marks omitted), *aff'd*, 728 F.3d 96 (2d Cir. 2013).

Moreover, it is axiomatic that a complaint alleging misrepresentations in an offering document cannot survive a motion to dismiss if the document discloses the risks in question:

> If a plaintiff's claims of misstatement or omission conflict with the plain language of the [offering document], the [offering document] controls and the court need not accept as true the allegations of the complaint.  In such a situation, dismissal of the complaint is proper, for no additional facts can prove the claims.  The Second Circuit has consistently affirmed Rule 12(b)(6) dismissals of securities claims where the risks of which plaintiffs complained were disclosed in the [offering document].

*Steinberg v. PRT Grp., Inc.*, 88 F. Supp. 2d 294, 300 (S.D.N.Y. 2000) (internal citations omitted).

As the Second Circuit has explained, the key inquiry is "whether the defendants' representations, taken together and in context, would have [misled] a reasonable investor." *I. Meyer Pincus & Assoc. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991); *see also Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 416 (S.D.N.Y. 2008) (alteration in original) (citation omitted) ("In evaluating claims under Sections 11 . . . , the court must review the Offering Documents as a whole rather than determining whether individual statements are true."). Accordingly, a misrepresentation or omission claim arises only if the challenged disclosure documents *read as a whole* could have misled a reasonable investor.  *In re ProShares Tr. Sec. Litig.* (hereinafter, "*In re ProShares II*"), 728 F.3d 96, 103 (2d Cir. 2013); *accord DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003).  "The touchstone of the inquiry is . . . whether defendants' representations or omissions considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered."  *Halperin v. eBanker USA.com*, 295 F.3d 352, 357 (2d Cir. 2002).  In applying the "reasonable investor" materiality standard, the Second Circuit has explained that courts should "presume that a reasonable investor can comprehend the basic meaning of plain-English

disclosures." *In re ProShares II*, 728 F.3d at 103.[11]  To bring an omission claim in particular, a plaintiff must also allege that the defendant had a duty to disclose the allegedly omitted information.  *See* 15 U.S.C. § 77k; *In re Merrill Lynch & Co., Inc. Res. Reps. Sec. Litig.*, 272 F. Supp. 2d 243, 248 (S.D.N.Y. 2003).

### A.   SVXY's Registration Statement Fully and Accurately Disclosed the Very Features and Risks of the Fund that Allegedly Caused Its Value to Decline

Plaintiffs' Securities Act claims (Counts I and II) are based on alleged misstatements and omissions in the Registration Statement.  The Exchange Act claims (Counts III and IV) are based on these same allegations, as well as nearly identical alleged misstatements and omissions in subsequent Fund filings.  All the claims fail as a matter of law because the CSAC points to no fact in the Registration Statement that is even arguably false or misleading, and asserts no omission of material fact that makes it misleading.  Simply put, the Registration Statement, read as a whole, could not have misled a reasonable investor about the risks of investing in SVXY.  The alleged risks Plaintiffs describe in the CSAC – and the structural features and market conditions allegedly causing them – were clearly and consistently disclosed to investors throughout the Registration Statement, while day-to-day market developments were readily available to the public.

Courts routinely dismiss securities claims where the registration statement sufficiently disclosed the risks or other features about which the plaintiffs claim to have been misled.  *See, e.g.*, *Halperin*, 295 F.3d at 361 (dismissing claims where "[t]he allegedly omitted facts were either disclosed or implied in the offering memoranda").  "When a registration statement warns of the

---

[11] The registration statements of different series of ProShares' leveraged and inverse ETFs were the subject of previous securities litigation in this Court, based upon alleged volatility-driven losses during the 2008 financial crisis.  *See In re ProShares I*, 889 F. Supp. 2d at 655 (granting motion to dismiss putative class action alleging violations of Sections 11 and 15 of the Securities Act for failure to allege actionable misrepresentations or omissions).  While the prior action involved different ProShares funds, the reasoning of Judge Koeltl and the Second Circuit – holding that the ProShares registration statements fully disclosed the risks of investing in leveraged and inverse products during times of market volatility – is nevertheless instructive here, given the analogous issues and similarities in the products and disclosures.

exact risk that later materialized, a Section 11 claim will not lie as a matter of law." *In re ProShares I*, 889 F. Supp. 2d at 653.

Specifically, the Registration Statement amply disclosed the Fund's features and the market conditions as to which Plaintiffs claim to have been misled.  In clear and oft-repeated disclosures, the Registration Statement warned investors, among other things, that:  (1) SVXY had a daily investment objective to provide inverse (-1x) exposure to the daily performance of its benchmark Index; (2) SVXY seeks its daily objective, but is not otherwise actively managed, regardless of market developments or trends; (3) SVXY achieves its daily investment objective by rebalancing its portfolio of VIX futures contracts; (4) SVXY's investments can be highly volatile such that SVXY may experience large losses rapidly, including potentially a total loss if the Index increases 100% in a day; (5) SVXY can experience larger losses due to rebalancing in an illiquid VIX futures market and the large size of the positions the Fund may hold; and (6) SVXY faces risks during periods of low volatility because of the "mean-reverting" nature of volatility and the resultant risk of significant and unexpected reversals.  These disclosures are easily of "sufficient precision and clarity to alert prudent investors to the nature of the offerings and the risks entailed." *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 664 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 617 (2d Cir. 2009).  Plaintiffs cannot plausibly claim that a reasonable investor could be misled by the Registration Statement concerning the Fund's structure, operation, or risks.

> **1.     *The Registration Statement Disclosed that SVXY's Losses Could Be Exacerbated by Illiquidity and the Need to Rebalance Daily SVXY's Large Holdings in a Concentrated Market for VIX Futures Contracts to Maintain Its Investment Objective***

Plaintiffs' theory – that the ProShares Defendants did not disclose the risks related to SVXY's rebalancing large portfolio positions in an illiquid market – fails because the Registration Statement plainly disclosed that SVXY's investment in a single, concentrated benchmark Index

and the large size of SVXY's holdings of VIX futures contracts could "exacerbate" the Fund's losses when rebalancing.  RS at 193.  While Plaintiffs concede that the Registration Statement warned of "risks associated with SVXY's inverse structure, daily rebalancing, market volatility, and the purchasing and selling of VIX futures contracts," they contend that "none of these warnings apprised investors of the fact that SVXY's ***own conduct*** of rebalancing in an overly-crowded VIX futures market could ***itself*** drive up the price of VIX futures contracts, the level of expected market volatility, and the level of the VIX Short-Term Futures Index."  CSAC ¶ 10.  Plaintiffs complain that SVXY's daily rebalancing requirement meant that it needed to purchase a large volume of VIX futures contracts in an allegedly illiquid market.  *Id.* ¶ 6.  According to Plaintiffs, when SVXY purchased those VIX futures contracts, it caused the Index to increase in value, "setting in motion a destructive feedback loop" that drove up the price of VIX futures contracts.  *Id.* ¶¶ 7, 10.  Plaintiffs' contention is flatly incorrect.  *First*, the Registration Statement specifically explained: "*The large size of the positions which the Funds may acquire increases the risk of illiquidity* by both making their positions more difficult to liquidate and increasing the losses incurred while trying to do so."  RS at 193 (emphasis added).  The disclosure explained that, in an illiquid futures market, there could be increased prices for the small volume of available futures contracts (*i.e.*, buy and sell orders).  *Id.* ("It is difficult to execute a trade at a specific price when there is a relatively small volume of buy and sell orders in a market.").  Thus, the Registration Statement not only warned that "*[p]ossible illiquid markets may exacerbate losses*," but fully disclosed that SVXY's large holdings of VIX futures contracts could itself increase illiquidity risk and the price of VIX futures contracts.[12]  *Id.*

---

[12] Plaintiffs' "liquidity gap" theory is based largely on the alleged "exponential growth" in demand for VIX futures contracts over time and Plaintiffs' speculative and conclusory statements regarding the market impact of this growth.  CSAC ¶¶ 6–8, 83–84.  But as is clear from published market data and as Plaintiffs acknowledge, *see id.* ¶ 87, the dollar volume of VIX futures traded grew as volatility-related products grew in size (*i.e.*, the trading volume grew to

*Second*, the Registration Statement cautioned that unlike other volatility indices that "may be more diversified in terms of both the number and variety of instruments included or in terms of the volatility exposure offered," the "Index for the Funds is *concentrated solely in VIX futures contracts*." RS at 197 (emphasis added). It explained that "[c]oncentration in fewer underlying components may result in a greater degree of volatility in an index and the NAV of the fund which tracks that index under specific market conditions and over time." *Id.* Moreover, "[a]ny type of disruption or illiquidity will potentially be exacerbated due to the fact that the Funds will typically invest in Financial Instruments related to one benchmark, which in many cases is highly concentrated." *Id.* at 193. In a recent case in this Court involving the rebalancing of VIX-related instruments, Judge Torres adopted the Magistrate Judge's Report and Recommendations that rebalancing disclosure language similar to SVXY's was "more than adequate[]." *Set Capital LLC v. Credit Suisse Grp. AG*, No. 18-cv-2268, 2019 WL 4673433, at *1 (S.D.N.Y. Sept. 25, 2019) (dismissing Section 11 claim regarding Credit Suisse exchange-traded notes ("ETN") tied to VIX futures). While the VIX ETNs have certain structural and other differences from SVXY, the alleged rebalancing conduct and related disclosures at issue were similar. *Set Capital LLC v. Credit Suisse Grp. AG*, No. 18-cv-2268, 2019 WL 3940641, at *12 (S.D.N.Y. Aug. 16, 2019)

---

meet the need) during the years on which the CSAC is focused. The data cited in the CSAC and published on the website of the Cboe shows that over that same time period the average daily dollar volume ("ADV") of VIX futures being traded increased from $95,000,000 per day in 2012 to $294,000,000 per day in 2017. *See id.* ¶ 87. The CSAC attempts to downplay the corresponding growth of the VIX futures market, alleging that the dollar volume of VIX futures traded indicates the supply of VIX futures contracts was insufficient to prevent a "liquidity gap." *Id.* ¶¶ 87–89. But Plaintiffs offer nothing but speculation to support this proposition. In fact, plaintiffs' own chart, *see id.* ¶ 72, and the CSAC's admission that "each time the level of the VIX spiked, SVXY's daily rebalancing was effectuated without incident," *id.* ¶ 73, both support the opposite conclusion. In addition, Plaintiffs' "liquidity gap" claim is premised on the trading volume of VIX futures being the sole measure of, and therefore a proxy for, market liquidity – but the CSAC offers no facts in support. This is pure supposition that ignores both (i) that VIX futures contracts can be readily created by market participants in response to demand, and (ii) that the liquidity of the VIX futures market can be affected by a variety of factors, as disclosed in the Registration Statement. RS at 192–93 (listing market factors that can affect price and liquidity).

(Netburn, Mag. J.).  In particular, the Court found that Credit Suisse "more than adequately warned investors" that its rebalancing activity could impact VIX futures prices by disclosing that "[t]he trading activity associated with these hedging transactions will contribute to the trading volume of the underlying futures contracts and may adversely affect the market price of such underlying futures contracts and in turn the level of the applicable underlying index."  *Id.* at 6, 12. Nevertheless, the *Set Capital* plaintiffs argued that these disclosures were misleading because Credit Suisse knew that its prior rebalancing activity had negatively impacted the market price in the past and would do so again in the future.  *Id.* at 12.  The Court rejected this argument, because "[i]t was public knowledge that the price of VIX futures rose disproportionately during three earlier volatility spikes."  *Id.*  Credit Suisse was not required to predict and describe when or how the adequately disclosed possibility of an adverse impact on the market price might take place.

Likewise, here, and contrary to Plaintiffs' theory, investors were fully informed as to how the Fund worked, including that "SVXY's ***own conduct*** of rebalancing" by purchasing VIX futures contracts to meet its investment objective "could ***itself*** drive up the price of VIX futures contracts, the level of expected market volatility, and the level of the VIX Short-Term Futures Index," thereby exacerbating the Fund's losses.  CSAC ¶ 10.  Simply put, Plaintiffs' alleged losses were caused by the market volatility to which they specifically *sought inverse exposure* in purchasing SVXY shares.  They were not caused by any undisclosed risks posed by the Fund's size, structure, or operations.

> ## 2. *The Registration Statement Disclosed that Volatility Is Mean-Reverting and During Periods of Low Volatility Likely Will Reverse, and that Such Reversals Can Be Significant and Unexpected*

The "mean-reverting" nature of the Fund was also clearly disclosed in the Registration Statement.  Specifically, the Registration Statement noted "***[t]he level of the VIX has historically reverted to a long-term mean (i.e., average) level and any increase or decrease in the level of the***

***VIX will likely continue to be constrained.***"  RS at 191; *see also id.* at 170, 177.  Thus, while Plaintiffs contend that the risk of volatility "was exacerbated by the fact that volatility has historically been a 'mean-reverting' asset" that reverts to its long-term historical average and that "a spike in volatility was virtually inevitable," CSAC ¶ 70, the Registration Statement already warned that "the potential upside of long or short exposure to VIX futures contracts may be limited as the performance of VIX reverts to its long-term average."  RS at 191.  The Registration Statement thus disclosed that SVXY faces risks in periods of low volatility (including at so-called "historically" low levels).  It further warned investors that "any gains may be subject to *significant and unexpected reversals* as the VIX reverts to its long term mean."  *Id.* (emphasis added).  In other words, if volatility hovers below the long-term average for an extended period of time, a significant spike in volatility is likely to occur.  *See id.*  This fulsome disclosure unequivocally warned investors that the VIX will revert to its average in a period of historically low volatility and that this reversion can be significant and unexpected.[13]

### 3. The Registration Statement Warned that SVXY's Performance Could Be Highly Volatile and that Large Losses Could Occur Quickly, Including Total Loss in a Single Day

As the CSAC acknowledges, the Registration Statement warned that "SVXY's inverse structure 'could result in the total loss . . . of an investor's investment' if the VIX Short-Term Futures Index experienced an increase 'approaching 100%.'"  CSAC ¶ 10 (quoting RS at 190).

---

[13] Notably, Plaintiffs do not allege that the ProShares Defendants failed to disclose, or even had a duty to disclose, the alleged "historic low" volatility – the nature of which was publicly and widely-available information.  As shown in the Plaintiffs' own chart reflecting the publicly-available VIX performance data from Cboe, investors could readily see how the relatively low volatility levels of 2017 and early 2018 compared to earlier periods of low volatility, as well as how the upward spike of the VIX on February 5, 2018 was preceded by similar volatile upswings in prior years.  *See* CSAC ¶¶ 72–73 (acknowledging that "investors were aware of the risk that volatility might spike during the Class Period").  "Since historical volatility data or the volatility trends are publicly available, their disclosure is not required."  *In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444, 452 (S.D.N.Y. 2014), *aff'd sub nom., Elite Aviation LLC v. Credit Suisse AG*, 588 F. App'x 37 (2d Cir. 2014); *see also In re Bank of Am. AIG Disclosure Sec. Litig.*, No. 11-cv-6678, 2013 WL 5878814, at *7 (S.D.N.Y. Nov. 1, 2013) ("There is no duty to disclose information to one who reasonably should be aware of it." (internal quotation marks omitted)).

While the CSAC describes an unfortunate series of events – an increase in the value of the Index of 96% on February 5 and the resultant loss in value of SVXY shares over a short period of time – the risk of that result was more than adequately disclosed in the Registration Statement.

As the Second Circuit held in the prior *ProShares* litigation, there is no misrepresentation or omission when the offering documents "consistently disclosed the effect market volatility had on ETFs" and "warned that volatility could result in a 'total loss of an investor's investment.'" *In re ProShares II*, 728 F.3d at 104–05.  The Court further explained that there is no misstatement or omission when "no reasonable investor could read these prospectuses without realizing that volatility, combined with leveraging, subjected that investment to a great risk of long-term loss as market volatility increased." *Id.* at 105.  Similarly, in this instance, a reasonable investor could not read the Registration Statement without recognizing the substantial risk of sudden and large losses.  The Registration Statement warned repeatedly that "**[t]he Funds' investments can be highly volatile and the Funds may experience large losses from buying, selling or holding such investments**."  RS at 170, 177; *see also id.* at 172 ("**YOU SHOULD BE AWARE THAT COMMODITY INTEREST TRADING CAN QUICKLY LEAD TO LARGE LOSSES AS WELL AS GAINS.**").  It repeatedly cautioned investors that "**gains, if any, may be subject to significant and unexpected reversals**."  *Id.* at 170, 177; *see also id.* at 191.

Despite these clear and prominent warnings about the risks of "total loss," *see id.* at 190, Plaintiffs assert investors were misled by a table in the Registration Statement entitled "Estimated Fund Return Over One Year When the Fund Objective is to Seek Investment Results For a single day, Before Fees and Expenses, that Correspond to the Inverse (-1x) of the Daily Performance of an Index."  CSAC ¶ 149.  Plaintiffs claim that this table "suggested that SVXY was far less risky than it in fact was."  *Id.*  This argument misses the mark and takes the table out of context.  The

challenged table, which was in a section of the Registration Statement describing the risks of compounding on returns for periods *greater than a day*, simply illustrated how compounding works.  It demonstrated that the long-term performance of the Fund would differ from the long-term performance of the Index as a result of compounding, based on different assumptions of Index performance and volatility over that period.  RS at 180–89.  The table was not intended to illustrate how much money the Fund could lose in a single day, and nowhere purported to describe the outer limits of potential losses.

Indeed, the table was immediately preceded and followed by cautionary statements explaining its limited scope.  Above the table, the Registration Statement explained that the table sought to "isolate the impact of daily leveraged or inverse exposure" over a one-year period based on assumptions of Index performance and volatility as variable inputs.[14]  *Id.* at 187.  The Registration Statement cautioned that "[i]f these assumptions were different, the fund's performance would be different than that shown."  *Id.*  The following cautionary language is immediately below the table:

> The foregoing tables are intended to isolate the effect of index volatility and index performance on the return of leveraged and inverse funds.  The Geared Funds' *actual returns may be significantly greater or less than the returns shown above* as a result of any of the factors discussed above or under the below risk factor describing correlation risks.

*Id.* at 189 (emphasis added).  The "cautionary language" plainly states that the table is illustrative and that losses could be "significantly greater."  *Id*. at 187, 189.  The Registration Statement continued:  "Inverse positions can also result in the *total loss* of an investor's investment . . . [A] single-day or intraday increase in the level of the Fund's benchmark approaching 100% could result in *the total loss or almost total loss* of an investor's investment, even if such Fund's

---

[14]  For example, the table assumed "a volatility rate of 68%," which the Registration Statement explained "is an approximate average of the five-year historical volatility of the Index."  RS at 182.

benchmark subsequently moves lower." *Id.* at 190 (emphasis added). The table cannot be read without regard to the extensive risk disclosures that precede and follow it. *See Rombach*, 355 F.3d at 173 ("[A]lleged misrepresentations in a stock offering are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." (quoting *Halperin*, 295 F.3d at 357)).

In summary, no reasonable investor could read the challenged table, the accompanying cautionary language, and the remainder of the Registration Statement, without recognizing that a total or near-total loss could occur in a short period. *See In re TVIX Sec. Litig.*, 25 F. Supp. 3d at 454 (dismissing Securities Act claims where the plaintiff pointed to "hypothetical examples" that were "accompanied by explicit statements that they were intended merely to illustrate the effect of various factors on the value of the ETNs").[15]

### B. Plaintiffs' Assertion that the Registration Statement Failed to Provide More Detailed Risk Disclosures Is Impermissible Pleading by Hindsight

With 20/20 hindsight, Plaintiffs allege, in effect, that the Fund's disclosures should have predicted and disclosed the likelihood of a sudden increase in volatility and drop in value of SVXY shares on February 5, 2018. They contend that the ProShares Defendants actually knew in advance (and misleadingly failed to disclose) that the Fund was poised to enter a "death spiral" causing "catastrophic losses" to investors. CSAC ¶ 93; *id.* ¶¶ 8, 107 (alleging that the defendants "possessed unique knowledge about the risks faced by the Fund" but "failed to apprise investors of these risks"). The supposed source of the ProShares Defendants' foreknowledge of the volatility

---

[15] The Second Circuit rejected a similar attempt by plaintiffs in the prior *ProShares* litigation to challenge a virtually identical table designated "Estimated Fund Return Over One Year When the Fund Objective Is to Seek Daily Investment Results, Before Fees and Expenses, that Correspond to Twice (200%) the Inverse of the Daily Performance of an Index." *In re ProShares II*, 728 F.3d at 108–09. In rejecting plaintiffs' arguments, the Second Circuit held that the illustrative tables "do not undercut the disclosures regarding the ETFs' daily objectives with all the attendant warnings." *Id.* at 107–09 ("[I]t is implausible that a reasonable investor would read these offering documents without understanding the potential for rapid, substantial loss.").

spike was their "access to investment and market data . . . which afforded them unique insider visibility into the VIX futures market."  *Id.* ¶ 182.  But the only such data Plaintiffs describe is information readily available to investors (just as it was plainly available to Plaintiffs to be included in the CSAC), including:  "trading volume and prices of VIX futures contracts," *id.*; "SVXY's exponential growth, the low volatility environment, and the design of the Fund," *id.* ¶ 93; and "the historical pattern of price movement during the 4:00 p.m. to 4:15 p.m. rebalancing period during the year leading up to SVXY's collapse."  *Id.* ¶ 99.[16]  Plaintiffs have not plausibly alleged that any of this information was uniquely known to the ProShares Defendants.  Further, it is simply implausible on its face that the ProShares Defendants had the ability to predict with precision the timing and likelihood of a volatility spike (because this is dependent on a number of interrelated economic factors) or the manner in which VIX futures contracts would respond to a volatility spike (because this also is dependent on a number of factors, such as advance knowledge of the trading needs of other futures market participants, including the rebalancing needs of other volatility products).[17]

---

[16] For example, the array of data published on the Cboe website includes: (i) the daily performance of the VIX since its creation, *see* VIX Index Historical Data, CBOE, http://www.cboe.com/products/vix-index-volatility/vix-options-and-futures/vix-index/vix-historical-data; (ii) daily reports on settlement prices for VIX futures contracts, *see* Futures Daily Settlement Prices, CBOE, https://markets.cboe.com/us/futures/market_statistics/settlement/; (iii) daily reports on trading volume in VIX futures contracts, *see* Cboe Futures Exchange Daily Market Statistics, CBOE, https://markets.cboe.com/us/futures/market_statistics/daily/; (iv) archives of weekly and monthly VIX futures settlement prices, dating back to 2013, *see* Final Settlement Prices, CBOE, https://markets.cboe.com/us/futures/market_statistics/final_settlement_prices/; and (v) reports on the trading history of every VIX futures contract, set out by contract, including high, low and closing prices, and volume traded, *see* Historical Data, CBOE, https://markets.cboe.com/us/futures/market_statistics/historical_data/.  As the CSAC itself shows, the historical volatility of the VIX was also routinely published.  CSAC ¶¶ 72–73.  Similarly, VIX futures price movements during the 4:00 p.m. to 4:15 p.m. period were readily available, as demonstrated by Plaintiffs' own discussion of the price movements and volume in this trading.  *Id*. ¶¶ 101–03.  Similarly, Plaintiffs cannot suggest that the formula for calculating SVXY's rebalancing requirements was known only to the ProShares Defendants, given that the CSAC itself purports to calculate the number of futures contracts required to rebalance SVXY.  *Id.* ¶¶ 14, 114.

[17] As supposed evidence of this "unique knowledge" of the looming "death spiral," Plaintiffs point to the frequency with which the VIX futures contracts historically had daily price movements of more than 1% – somehow making the ProShares Defendants "aware that even more extreme price movements would likely occur."  CSAC ¶ 104; *see generally* ¶¶ 101–05.  But Plaintiffs nowhere explain why the arbitrary 1% threshold they have selected should be

But even assuming arguendo that the ProShares Defendants had "unique knowledge" of SVXY's potential performance results as Plaintiffs allege, failing to predict all hypothetical return scenarios in Fund disclosures is not an actionable omission. *See Set Capital*, 2019 WL 4673433, at *4 (adopting Magistrate Judge's finding that "[d]efendants were not required to project future volatility spikes and predict their effect on XIV notes' value, because '[i]t is not a material omission to fail to predict future market performance'" (quoting *In re TVIX Sec. Litig.*, 25 F. Supp. 3d at 452)).  For example, in the prior *ProShares* litigation, plaintiffs alleged that the defendants "possessed an undisclosed mathematical formula that accurately predicted potential market conditions and the effect market volatility would have on ETF shares."  *In re ProShares II*, 728 F.3d at 104.  In affirming dismissal, the Second Circuit held that – even assuming arguendo the existence of the alleged "mathematical formula"[18] – plaintiffs failed to allege "an actionable omission of an *objective fact*."  *Id*. at 105 (emphasis added).  It was insufficient to allege omission of "the risks associated with (1) hypothetical investments over (2) hypothetical periods of time during (3) hypothetically volatile market conditions."  *Id*.  Securities issuers are not "expected to predict and disclose all possible negative results across any market scenario."  *Id.*  Moreover, "[d]efendants need not be clairvoyant," and they are not expected to "anticipate[] future events." *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 15 (2d Cir. 2019) (summary order) (citation and internal quote omitted).

As discussed above, the events of February 5 were the result of a convergence of a number of factors, the risks of which were disclosed in the Registration Statement.  Moreover, the then-current market developments invoked in the CSAC – *e.g.*, recent low volatility, growth of SVXY,

---

seen as a bellwether for "significant" price movements, or how these past events provided the defendants with the ability to predict future movements.

[18] Judge Koeltl of this Court "concluded that the existence of the undisclosed mathematical formula was implausible on its face."  *In re ProShares II*, 728 F.3d at 104 (citing *In re ProShares I*, 889 F. Supp. 2d at 656.).

growth of other volatility products – were all known to the public.  Plaintiffs offer a speculative hypothesis as to just *how* these many publicly-known factors combined to *cause* a spike in the Index on February 5, 2018.  Even if their hypothesis is assumed to be accurate, Plaintiffs cannot premise a valid securities law claim on the materialization of the very risks about which the Fund warned investors.  *See, e.g.*, *In re AES Corp. Sec. Litig.*, 825 F. Supp. 578, 588 (S.D.N.Y. 1993) ("[W]hen defendants warn investors of a potential risk, they need not predict the precise manner in which the risks will manifest themselves."); *In re TVIX Sec. Litig.*, 25 F. Supp. 3d at 457 (same); *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 416 (S.D.N.Y. 2009) ("[T]he fact that the Offering Documents did not explicitly articulate every contingency in which the Company might use [financial contracts] to hedge against volatility in the charter-rate market did not 'affect the total mix of information' available to reasonable investors in [the defendant's] securities, and therefore, was not materially misleading on its face."); *Panther Partners*, 538 F. Supp. 2d at 668 ("In assessing whether a misrepresentation or omission was material, courts may not employ 20/20 hindsight." (internal quotation marks omitted)).  At bottom, the ProShares Defendants were not required to predict the precise way in which the well-disclosed risk factors would come together and cause a particular loss (even assuming they had the ability to do so), as this would not have significantly altered the total mix of information available to investors.

### C.     Plaintiffs' Argument that the ProShares Defendants Were Required to Update the Registration Statement to Disclose Ongoing Market Developments in Real-Time Must Fail

By the same token, issuers also are not required to update their registration statements to describe real-time market developments, as the CSAC insists should have happened.  Plaintiffs acknowledge the Registration Statement's extensive disclosures throughout the CSAC, yet lament that the Registration Statement did not disclose the alleged parallel growth of the Fund and other similar funds, the relative size of the VIX futures market, and then-current levels of equity market

volatility in the months leading up to February 5.  But the securities laws do not impose a duty to update investors on day-to-day changes to the *degree* of disclosed risk where the *nature* of the risks already were fully disclosed.  *In re TVIX Sec. Litig.*, 25 F. Supp. 3d at 452 (dismissing Securities Act claims involving a volatility product that tracked the Index where the disclosure "stated clearly that daily rebalancing would impair performance if there was any volatility" and finding "[i]n the context of an instrument tied to an index of volatility, this disclosure was sufficient, without detailed computations, to disclose the fundamental risk associated with volatility and daily rebalancing"); *In re ProShares II*, 728 F.3d at 104–05 (rejecting plaintiffs' "allegation that ProShares failed to disclose that the more an ETF's underlying index changed value day-to-day for a particular investor, the more likely it became that the investor would experience long-term losses").  Rather, issuers have a duty to update statements that were reasonable at the time they were made only if they later "become[] misleading." *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998).

Plaintiffs cannot point to anything in the Registration Statement that had *become misleading* as a result of the alleged growth of the Fund, the size of the VIX futures market, or the level of equity market volatility.  The Registration Statement described the Fund's features, potential market conditions, and the attendant risks that could arise; it never purported to state, nor could it, how *acute* or *imminent* those risks were as of a given point of time.  Because the Registration Statement fully disclosed the nature of the risks to investors, the defendants did not have any obligation to provide ongoing, real-time updates to the Fund's disclosures regarding day-to-day market developments.  *See In re N2K, Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 208 (S.D.N.Y. 2000) (a prospectus update is only required if the interim information involves "an *extreme departure* from the *range of results* which could be anticipated based on *currently available*

*information*" (internal quotation marks omitted)).[19]  Moreover, as noted above, an issuer is under

no obligation to provide data on day-to-day market developments – such as the current volatility

level of the VIX, the trading volume of VIX futures, the asset levels of the Fund or the asset levels

of competing volatility products – that is otherwise publicly available to investors.  *See supra* n.16.

Even assuming arguendo the truth of Plaintiffs' allegations that the risk of illiquidity

became *more acute* before and during the class period, there can be no conceivable duty to update

when the *nature* of the risk was disclosed and there was never a statement as to *how acute* that risk

was.  Similarly, there is no duty to add details to further refine previously-disclosed risks.  Issuers

cannot be expected to continuously update their registration statements with the changing tides of

the market, and the law does not require it.

### D.    Plaintiffs' Additional Arguments Regarding the Registration Statements Also Fail to State a Claim

Plaintiffs argue that the Registration Statement was also misleading in describing the

Fund as a "useful tool" if monitored closely.  CSAC ¶¶ 126–27.  They take issue with the following

statement:

> Daily objective geared funds, if used properly and in conjunction with the investor's
> view on the future direction and volatility of the markets, *can be useful tools for*
> *investors* who want to manage their exposure to various markets and market
> segments and who are willing to monitor and/or periodically rebalance their
> portfolios.

RS at 181 (emphasis added).  Plaintiffs contend that this statement was misleading because "SVXY

was inappropriate even for investors who 'actively manage[d] and monitor[ed] their investments'

on a 'daily' basis."  CSAC ¶ 9 (alterations in original); *see also id.* ¶¶ 127, 151 ("[I]n truth, SVXY

---

[19] Given that the Registration Statement warned of the potential of a *total loss* in SVXY in the event of a 100% increase in the Index in a single day, *see* RS at 190, the losses experienced on February 5, 2018 as a result of a 96% increase in the Index can hardly be seen as "an extreme departure from the range of results" anticipated in the disclosures.  *See In re N2K, Inc. Sec. Litig.*, 82 F. Supp. 2d at 208 (emphasis omitted).

was inappropriate even for short-term investing.").

      This claim fails for a number of independent reasons.  As an initial matter, the challenged statement – that the Fund can be "useful" if used correctly – is not a statement of present fact but an opinion that is not actionable under the securities laws.  *Rombach*, 355 F.3d at 174.  "[E]xpressions of puffery and corporate optimism do not give rise to securities violations" because the securities laws allow defendants to express optimism that their Fund will be useful to investors.  *See In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x at 13 (quoting *Rombach*, 355 F.3d at 174); *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 144 n.14 (2d Cir. 2010) (citing *ECA*, 553 F.3d at 205–06).  Moreover, the only reason Plaintiffs argue the Fund was not "useful" is because of the alleged undisclosed risks.  However, as explained above, all of those risks *were* fully disclosed.

      At bottom, Plaintiffs' complaint is that this product was too risky to be offered to investors at all.  Throughout the CSAC, Plaintiffs claim that "SVXY was inappropriate even for investors who 'actively manage[d] and monitor[ed] their investments' on a 'daily' basis."  CSAC ¶¶ 9, 127, 151.  This argument is a bridge too far.  The securities laws require disclosure and prohibit manipulative conduct; they are not a vehicle to challenge whether a product such as SVXY is appropriate for any investor whatsoever.  This argument is also belied by reality.  Since February 5, 2018, many investors continue to invest in the Fund – despite what Plaintiffs suggest were fundamental defects causing "catastrophic" losses – and the Fund's assets under management, net asset value, and share price have bounced back substantially.  Reasonable investors understand the product and that it was not flawed or broken – it behaved as expected and disclosed.[20]

---

[20] Moreover, a reasonable investor would plainly understand the daily nature of SVXY's investment objective and the need to monitor holdings closely, as evidenced by the transaction history of Plaintiffs themselves.  *See* ECF No. 86, Exhibit B (submitted herewith as Roy Decl. Ex. 6).  Lead Plaintiff Thomas Butler III, for example, actively traded SVXY *options* – that is, a derivative on SVXY shares – across five accounts.  *Id.* (reflecting 465 SVXY option (*i.e.*,

Separately, Plaintiffs note that the Sponsor changed SVXY's investment objective on February 27, 2018 (after the putative class period) to correspond with one-half the inverse (-0.5x) of the daily performance of the benchmark Index – rather than the inverse (-1x).  CSAC ¶ 121; Roy Decl. Ex. 7 (ProShares Trust II Prospectus ("Prospectus"), February 27, 2018, at 1).[21]  The Fund's February 27, 2018 Prospectus (issued at the time its daily objective changed from -1x to -0.5x) explained that "[a]s a result of recent market volatility, the exchange on which VIX futures contracts are traded [] increased the margin requirements for such contracts, making those margin requirements significantly higher than those for most other types of futures contracts."  Roy Decl. Ex. 7 at 24.   Plaintiffs describe this change as a "belated de-risking of SVXY."  CSAC ¶ 122.  To the extent that Plaintiffs seek to argue that the subsequent change to the investment objective is evidence of an earlier misrepresentation or omission regarding risk, this argument must fail.  *See, e.g.*, *In re CIT Grp., Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690–91 (S.D.N.Y. 2004) ("That defendants later decided to revise the amount of loan loss reserves that it deemed adequate provides absolutely no reasonable basis for concluding that defendants did not think reserves were adequate at the time the registration statement and prospectus became effective.").  As the disclosure makes clear, the change to the investment objective was made in light of intervening market events *following* February 5, 2018.  There is no legal or logical basis to view that change as indicating

---

put or call) transactions in Mr. Butler's accounts during the eight-month putative class period).  Significantly, in no fewer than 22 instances, Mr. Butler bought or sold SVXY put or call options that *expired the next day*.  In other words, under certain circumstances, Mr. Butler used SVXY to make bets on movements in expected volatility over a *one-day period*.  Overall, in at least 189 instances during the putative class period, Mr. Butler bought or sold options that expired in less than two weeks.  *Id.*  He can hardly say now that a reasonable investor could not understand the risks of loss in SVXY or how the product was intended to be used, or that he was misled into believing SVXY was a traditional "buy and hold" investment vehicle.

[21] As explained above, the Court may consider SEC filings both because they are "incorporated into the complaint by reference" and because they are "*legally required public disclosure documents filed with the SEC*, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *ATSI Commc'ns*, 493 F.3d at 98 (emphasis added) (citation omitted).

anything about the prior risk or disclosures.

For all of the reasons described above, Plaintiffs' allegations regarding the Registration Statement fail to support a claim under the Securities Act or the Exchange Act.

**E.    Plaintiffs' Allegations as to Other Disclosure Documents Simply Track the Registration Statement Allegations and Fail as a Matter of Law for the Same Reasons**

In support of their Exchange Act claims (Counts III and IV), Plaintiffs contend that there is further "evidence" of false and misleading statements in the Trust's August 9, 2017 Form 10-Q, November 9, 2017 Form 10-Q, and September 28, 2017 Form S-3 draft 2018 registration statement.  CSAC ¶¶ 171–76.  But Plaintiffs add nothing of substance to the allegations discussed above.  Instead, they simply note that the filings report no "***material change to the Risk Factors***" disclosed in the previous March 1, 2017 Form 10-K.  *See id.* ¶ 173.  They state that the Form 10-K's "Risk Factors" include "many of the same false and misleading statements contained in the Registration Statement" without specifying which statements they mean.  *Id.* ¶ 174.  Thus, Plaintiffs merely argue that the SEC filings failed to include the same disclosures that Plaintiffs contend were missing from the Registration Statement.  This argument fails for all of the same reasons detailed above.

In support of their claims, Plaintiffs also cite Item 303, 17 C.F.R. § 229.303(a)(3)(ii), and Item 105, 17 C.F.R. § 229.105, of Regulation S-K.  Item 303 requires issuers to describe any trend that is "(1) known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operations."  *Stadnick v. Vivent Solar, Inc.*, 861 F.3d 31, 39 (2d Cir. 2017) (internal quotation marks omitted).  Item 105 requires issuers to provide, in the Registration Statement, "under the caption 'Risk Factors' a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky."  17 C.F.R. § 229.105.  Plaintiffs allege, that pursuant to Items 303 and 105, the offering documents should have

disclosed the growth of SVXY and its competitors, the risk of a liquidity gap in VIX futures contracts in the event of an increase in volatility, the risk of a "destructive feedback loop" whereby the Fund's need to purchase VIX futures contracts would exacerbate the prices of VIX futures contracts, and the risk of a resulting decrease in the value of shares of SVXY.  CSAC ¶¶ 154–55. But Plaintiffs have failed to allege that any of these risks was a "trend" that required disclosure. *Arfa v. Mecox Lane Ltd.*, No. 10-cv-9053, 2012 WL 697155, at *12 (S.D.N.Y. Mar. 5, 2012), (explaining that there is no general "obligation to disclose the results of a quarter in progress"), *aff'd*, 504 F. App'x. 14 (2d Cir. 2012); *Nguyen v. MaxPoint Interactive, Inc.*, 234 F. Supp. 3d 540, 546 (S.D.N.Y. 2017) ("[E]vents occurring within a two month period of time do not establish a 'trend' for purposes of the disclosures required by Item 303.");  *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 220–21 (5th Cir. 2004) (holding that a five-month "decline in natural gas prices [did not yet constitute] a trend" requiring disclosure.   Besides, as described at length above, the Registration Statement disclosed all of these risks to investors in a section entitled "**RISK FACTORS**" in satisfaction of Items 303 and 105.   As in *Stadnick*, Plaintiffs' argument is "unavailing" because the "registration statement included ample warning that its business could be affected by" the risks.  *See Stadnick*, 861 F.3d at 39.

For all of the reasons described above, Plaintiffs have failed to assert a claim under Section 11 of the Securities Act, Section 10(b) of the Exchange Act, or Rule 10b-5.[22]

---

[22] Plaintiffs have thus failed to state a "control person" claim under Section 15 of the Securities Act or Section 20(a) of the Exchange Act because they have failed to adequately plead the primary violations of Section 11 of the Securities Act or Section 10(b) of the Exchange Act, respectively.  *See, e.g.*, *Rombach*, 355 F.3d at 177–78 ("Because we have already determined that the district court properly dismissed the primary securities claims against the individual defendants, these secondary claims must also be dismissed.").

## II.  THE CSAC FAILS TO STATE A CLAIM UNDER SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 BECAUSE IT MAKES NO PLAUSIBLE ALLEGATIONS OF SCIENTER

In addition to the reasons set forth in Section I, the Court should dismiss Count III as a matter of law because the CSAC alleges no facts demonstrating scienter.  To plead this claim, Plaintiffs must allege scienter sufficient to satisfy the heightened pleadings standard of the PSLRA.  A plaintiff must not only plead a material misstatement or omission but also "must allege those facts that give rise to an inference of scienter with particularity."  *Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019) (internal quotation marks omitted).  "The PSLRA expanded on the Rule 9(b) standard, requiring that 'securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)).  A court must consider "whether all of the facts alleged, taken collectively, give rise to a *strong inference* of scienter," and "the court must take into account plausible opposing inferences," including "nonculpable explanations for the defendant's conduct."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323–24 (2007) (emphasis added).  Under the PSLRA, "the inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling."  *Id.* at 324.

"The requisite state of mind in a Section 10(b) and Rule 10b-5 action is an intent 'to deceive, manipulate, or defraud.'"  *ECA*, 553 F.3d at 198 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).  To plead this state of mind under the PSLRA, "the complaint shall, with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *ATSI Commc'ns*, 493 F.3d at 99 (quoting § 78u-4(b)(2)).  "The plaintiff may satisfy this requirement by alleging facts (1) showing that the

defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Id.*

In the CSAC, Plaintiffs assert no facts whatsoever that could suggest the requisite state of mind, let alone a "strong inference of scienter," on the part of the ProShares Defendants.  Instead, Plaintiffs claim that "the ProShares Defendants had the motive and opportunity to commit fraud and were highly incentivized to induce investors to commit assets to SVXY" because they received management fees "directly related to the amount of assets invested in SVXY."  CSAC ¶ 186.  They ask the Court to infer scienter from the fact that certain of the ProShares Defendants issued and signed the Registration Statement and "by virtue of their receipt of information reflecting the true facts regarding SVXY" – that is, their supposed knowledge of the allegedly undisclosed risks themselves.  *Id.* ¶¶ 165–67.  They also contend that these defendants simply must have known that SVXY was subject to "extreme," "undisclosed," and "significantly increasing" risks, *id.* ¶¶ 62–64, and that "there were not enough VIX futures contracts available from liquidity providers to absorb the rebalancing requirements of volatility-related ETPs in the event of even a modest spike in volatility – without a run on the market."  *Id.* ¶¶ 170–71.  They leap to the conclusion that the ProShares Defendants must have known of these alleged risks because the Sponsor had "firsthand experience with" the VIX futures market conditions through its rebalancing activity.  *Id.* ¶¶ 80–81, 99–100.  These allegations come nowhere close to meeting the PSLRA's pleading requirements.

*First*, Plaintiffs fail to allege any facts "showing that the defendants had both motive and opportunity to commit the fraud."  *See ATSI Commc'ns*, 493 F.3d at 99.  They allege no motive other than to grow the fund and generate fees, CSAC ¶ 186, a theory consistently rejected by courts. Plaintiffs must "assert a concrete and personal benefit" in connection with the alleged actions, *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001), and "neither a desire to earn transactional fees

43

nor a desire to cultivate business relations is sufficient to establish scienter." *Alki Partners, L.P. v. Windhorst*, 472 F. App'x 7, 10 (2d Cir. 2012) (summary order); *Szulik v. Tagliaferri*, 966 F. Supp. 2d 339, 364 (S.D.N.Y. 2013) ("[A] general desire to earn management fees is an insufficient motive."). "The desire of . . . officers to increase company profits, keep their jobs, and increase compensation, are classic examples of motives that fail under the Second Circuit analysis as too general." *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 266 (S.D.N.Y. 2010).[23]

*Second*, the scienter allegations fail because the CSAC contains no facts demonstrating that any alleged misstatement or omission was reckless.  To plead a reckless misstatement, Plaintiffs were required to allege that the statement was "knowingly false or was so lacking a reasonable basis" that making it was essentially equivalent to an intent to defraud or mislead.  *See In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 94 (S.D.N.Y. 2017).  Allegations "that a defendant merely ought to have known is not sufficient to allege recklessness.  Rather, to withstand a motion to dismiss, Plaintiffs must detail specific contemporaneous data or information known to the defendants that was inconsistent with the representation in question." *Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360, 368 (S.D.N.Y. 2001) (citation omitted).

Plaintiffs' conclusory assertions regarding the issuance and signing of the Registration Statement fall well below the heightened pleading standards of the PSLRA.  *See Tellabs*, 551 U.S.

---

[23] Indeed, it is simply implausible that the ProShares Defendants were motivated to mislead investors into believing that an investment in SVXY – which is based on a belief that expected volatility would be low – was less risky than it really was.  After all, the very same prospectus that offered SVXY also offered two funds based on the opposite investment thesis – that expected volatility would increase.  These "long volatility" funds sought, as more fully described in the prospectus, to match (1x) the performance of the Index over time or to correspond to two times (2x) the daily performance of the Index, respectively.  Because the ProShares Defendants offered products designed to provide exposure in either direction to expected volatility (*i.e.*, up or down), and thereby stood to potentially profit from whichever direction volatility moved, Plaintiffs' theory is implausible.  Moreover, it is implausible that the ProShares Defendants, which are a part of the ProFunds Group with more than $29 billion in combined assets under management, CSAC ¶ 23, would have been motivated to mislead investors about this particular product.  Plaintiffs have not alleged any facts demonstrating that the ProShares Defendants were motivated to lull investors about the riskiness of an investment in one direction or the other.

at 324.  The fact that a defendant issued or signed a registration statement does not "give rise to a *strong inference* of scienter."  *Id.* at 323–24 (emphasis added).  If it did, any plaintiff in any action asserting claims based on a registration statement could allege scienter simply by pointing to the signed or issued registration statement.  Nor can Plaintiffs expect the Court to infer that the ProShares Defendants acted recklessly simply by pointing to the ProShares Defendants' alleged knowledge of supposed "red flag" market conditions and undisclosed risks – such as the alleged illiquidity in the futures market – with the benefit of hindsight.  *See SEC v. Yorkville Advisors*, 305 F. Supp. 3d 486, 511–12 (S.D.N.Y. 2018); *Hart*, 145 F. Supp. 2d at 368.  The unremarkable assertion that the ProShares Defendants' investment professionals are knowledgeable about day-to-day market conditions – such as the trading volume of VIX futures contracts – in no way supports an inference that the risk of an imminent upswing in volatility was so obvious as to make it reckless for the defendants not to have made additional disclosures.  Plaintiffs bear the burden of pointing to facts that make their theory of scienter "more than merely 'reasonable' or 'permissible' – it must be cogent and compelling."  *Tellabs*, 551 U.S. at 324.  As discussed above, it is simply implausible that the ProShares Defendants had the ability to forecast accurately when volatility would increase or how the VIX futures market would react to a volatility spike on a given day, given (as but one example) their lack of knowledge regarding the changing trading needs of third parties also engaged in the market.  Moreover, Plaintiffs' acknowledgement that the Fund rebalanced per its design following prior significant volatility spikes further shows the implausibility of Plaintiffs' assertions that the ProShares Defendants knowingly or recklessly ignored the risk that a spike in volatility could trigger a so-called "death spiral."  *See* CSAC ¶ 73.

The Court is required to consider "plausible opposing inferences," including "nonculpable explanations for the defendant's conduct."  *Id.* at 323–24.  The more plausible inference here is

that the ProShares Defendants sought to have SVXY perform as described in the Registration Statement and as required by federal securities laws.  As disclosed in the Registration Statement, SVXY is a passively managed indexed ETF:

> Other than for cash management purposes, the Funds are not actively managed by traditional methods (e.g., by effecting changes in the composition of a portfolio on the basis of judgments relating to economic, financial and market considerations with a view toward obtaining positive results under all market conditions).  Rather, the Sponsor seeks to cause the NAV of each Fund to track the daily performance of the Index in accordance with such Fund's investment objective, even during periods in which the Index is flat or moving in a manner which causes the value of the Fund to decline.

RS at 193.  Unlike an "actively managed" mutual fund that seeks to outperform the market based on the manager's views, SVXY, like other index-based funds, is designed to passively track the performance (in this case the inverse of the daily performance) of an identified benchmark in a formulaic fashion without use of discretion by the manager.  *Id.*  The Sponsor has no discretion to forecast volatility or manage the Fund according to any other forecasts.  In light of these disclosures, no reasonable investor could have believed that the Sponsor undertook to give advance warning of particular market conditions – and there is no basis to infer an intent to deceive from the fact that it did not do so.

In addition, none of Plaintiffs' assertions describes the intent of any particular defendant, let alone offers "facts giving rise to a strong inference that the defendant acted with the required state of mind." *ATSI Commc'ns*, 493 F.3d at 99 (internal quotation marks omitted).  Without more, Plaintiffs cannot establish scienter to satisfy the PSLRA or Rule 9(b).  Accordingly, the Court should dismiss the Section 10(b) and Rule 10b-5 claims because the CSAC fails to "allege those facts that give rise to an inference of scienter 'with particularity.'"  *See Singh*, 918 F.3d at 62.

### III.   THE CSAC FAILS TO STATE A CLAIM UNDER SECTION 11 OF THE SECURITIES ACT BECAUSE PLAINTIFFS HAVE NOT ESTABLISHED STANDING TO CHALLENGE THE REGISTRATION STATEMENT

Plaintiffs' Section 11 claim (Count I) fails for the additional reason that the CSAC does not allege any facts to demonstrate that they purchased shares pursuant to the allegedly misleading Registration Statement.   Section 11 "provides a cause of action for 'any person acquiring' a security issued pursuant to a materially false registration statement . . . ."   *DeMaria*, 318 F.3d at 175.   To survive a motion to dismiss, "a named plaintiff must have purchased shares traceable to the challenged offering."   *In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 207 (S.D.N.Y. 2003).

There are two ways in which plaintiffs can establish that their shares are traceable to the allegedly misleading Registration Statement:   "either through proof of a direct chain of title from the original offering to the [plaintiff] . . . or through proof that the [plaintiff] bought her shares in a market containing only shares issued pursuant to the allegedly defective registration statement."   *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 31 n.1 (2d Cir. 2006).   While this is straightforward if there has only been one offering, *see, e.g.*, *DeMaria*, 318 F.3d at 178, "where shares issued under an allegedly defective registration statement are publicly traded alongside shares already in the secondary market from prior offerings, tracing is considerably more complicated."   *In re Bank of Am. Corp. Sec., Deriv., & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 147 (S.D.N.Y. 2012).   "[P]laintiffs who purchased securities not issued pursuant to the misleading registration statement lack standing as surely as the purchasers of other securities entirely."   *In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d at 208.   Public SEC filing records demonstrate that SVXY has issued shares pursuant to numerous registration statements since it was created in 2011.   *See, e.g.*, September 2011 Form S-1 Registration Statement; July 2014 Form S-1 Registration Statement; February 7, 2017 Form S-3 Registration Statement.   Thus, Plaintiffs

have failed to allege *facts* that would establish that they "bought [their] shares in a market containing only shares issued pursuant to the allegedly defective registration statement."  *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d at 31 n.1; *Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax Fin. Holdings Ltd.*, 886 F. Supp. 2d 328, 339 (S.D.N.Y. 2012) (explaining that when "Plaintiff purchased shares before the challenged offerings, it cannot possibly 'trace' its stock purchases to an offering or registration statement").

Indeed, the CSAC makes no attempt to allege any facts that could show that Plaintiffs purchased shares of SVXY pursuant to or traceable to the challenged Registration Statement – which took effect on July 12, 2017 – rather than pursuant to one of the numerous other SVXY registration statements.  Instead, in the preceding Consolidated Amended Complaint (hereinafter "CAC"), ECF No. 132, Plaintiffs pled in the alternative that their claims were traceable to the Registration Statement:  Lead Plaintiffs purchased SVXY shares during the Class Period *and/or* pursuant or otherwise traceable to the Registration Statement."  CAC ¶ 22 (emphasis added) (citing Declaration of Plaintiffs, ECF No. 86, Ex. B. (attaching certifications of each Plaintiff, which do *not* state that any Plaintiff purchased Fund shares pursuant to the challenged registration statement)).  This artful pleading, that Plaintiffs *either* purchased shares during the Class Period *and/or* purchased shares traceable to the Registration Statement, was plainly insufficient.  By using the conjunctive phrase "and/or" to describe these purchases in the alternative, the CAC left open the possibility that Plaintiffs purchased shares "during the Class Period" and not pursuant to the Registration Statement.  *See, e.g.*, *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 303 (S.D.N.Y. 2014) (indicating "plaintiffs who originally filed suit" lacked standing to bring Section 11 claims, because they did not allege stock purchases in or traceable to the offering), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).

In the CSAC, Plaintiffs endeavored to plug this hole by pivoting away from their "and/or" allegation to a naked assertion that they purchased traceable shares during the class period.  Yet, Plaintiffs offer absolutely no factual support of any kind for their bald assertion that their shares are traceable to the Registration Statement.  Instead, the CSAC merely pleads that "Lead Plaintiffs purchased SVXY shares pursuant or otherwise traceable to the Registration Statement."  CSAC ¶ 22; *see also In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) ("Standing alone, the conclusory allegation that plaintiffs 'purchased [the Company's] common stock directly traceable to the Company's Secondary Offering' does not allow us to draw a reasonable inference about anything because it is devoid of factual content."); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 561 (S.D.N.Y. 2012) (rejecting sufficiency of traceability pleading where plaintiffs did "not offer any facts to support their conclusory statements that their shares can be traced to" a particular offering).  Moreover, the putative class period begins on May 15, 2017, two months *before* the effective date of the Registration Statement – and Plaintiffs purport to rely for standing in part on SVXY shares purchased after May 15 and *before* the effective date of the challenged Registration Statement.  *See* ECF No. 86, Ex. B.  Such shares cannot have been purchased "pursuant to" the subsequent Registration Statement.  For these reasons, the CSAC fails to allege that any Plaintiff purchased SVXY shares traceable to the Registration Statement.

## CONCLUSION

For all the foregoing reasons, the Court should dismiss the CSAC with prejudice. Dismissal with prejudice is warranted because Plaintiffs have twice tried yet failed to state a cognizable claim.  *See* Case Management Order, ECF No. 120, at 4 ("It is unlikely that Lead Plaintiff will be granted any further opportunities to amend."); *see also Wendt v. BondFactor Co. LLC*, No. 16-cv-7751, 2017 WL 3309733, at *7 (S.D.N.Y. Aug. 2, 2017) (Cote, J.).

Dated:  September 27, 2019        **ROPES & GRAY LLP**

By:   /s/ Robert A. Skinner
        Robert A. Skinner (*admitted pro hac vice*)
        Amy D. Roy (*admitted pro hac vice*)
        Jessica M. Bergin (*admitted pro hac vice*)
        ROPES & GRAY LLP
        Prudential Tower
        800 Boylston Street
        Boston, MA 02199-3600
        Telephone: 617-951-7000
        Facsimile: 617-951-7050
        robert.skinner@ropesgray.com
        amy.roy@ropesgray.com
        jessica.bergin@ropesgray.com

        *Counsel for Defendants ProShares Trust II,*
        *ProShare Capital Management LLC,*
        *Michael L. Sapir, Louis M. Mayberg,*
        *Edward J. Karpowicz, and Todd B. Johnson*