UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re PROSHARES TRUST II SECURITIES LITIGATION | : | Civil Action No. 1:19-cv-00886-DLC-SLC |
|  | : |  |
|  | : | CLASS ACTION |
|  | : |  |
| This Document Relates To: | : | LEAD PLAINTIFFS' MEMORANDUM OF |
|  | : | LAW PURSUANT TO 15 U.S.C. §78u- |
| ALL ACTIONS. | : | 4(c)(1) |
|  | : |  |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND FACTUAL BACKGROUND ....................................................1

II.   PROCEDURAL BACKGROUND...........................................................................5

III.  ARGUMENT ....................................................................................................6

  A.   The Applicable Law ...................................................................................6

  B.   Lead Plaintiffs' Claims Were Supported by Prevailing Law..................8

    1.   The SAC's Allegations that the Registration Statement Contained
         Material Misstatements and Omissions Were Reasonable and
         Warranted by Existing Law .......................................................................8

    2.   The SAC's Allegations of Additional Misstatements and
         Omissions Under the Exchange Act Were Reasonable and
         Warranted by Existing Law ....................................................................13

    3.   The SAC's Scienter Allegations Were Reasonable and Warranted
         by Existing Law .....................................................................................15

IV.   CONCLUSION...............................................................................................18

# TABLE OF AUTHORITIES

## CASES

**Page**

*Bank v. CreditGuard of Am., Inc.*,
  2020 U.S. Dist. LEXIS 55065
  (E.D.N.Y. Mar. 30, 2020) ..................................................................................8

*Dobina v. Weatherford Int'l Ltd.*,
  909 F. Supp. 2d 228 (S.D.N.Y. 2012).............................................................15, 16

*Dodona I, LLC v. Goldman, Sachs & Co.*,
  847 F. Supp. 2d 624 (S.D.N.Y. 2012)...................................................................18

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)...................................................................................11

*Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*,
  794 F.3d 297 (2d Cir. 2015)...................................................................................15

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  873 F.3d 85 (2d Cir. 2017).......................................................................................8

*Fishoff v. Coty Inc.*,
  634 F.3d 647 (2d Cir. 2011).....................................................................................8

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000)................................................................................9, 17

*Gould v. Winstar Commc'ns, Inc.*,
  692 F.3d 148 (2d Cir. 2012)...................................................................................17

*Halperin v. eBanker USA.com, Inc.*,
  295 F.3d 352 (2d Cir. 2002)..............................................................................11, 12

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*,
  936 F.2d 759 (2d Cir. 1991).....................................................................................9

*I.B. Trading, Inc. v. Tripoint Glob. Equities, LLC*,
  280 F. Supp. 3d 524 (S.D.N.Y. 2017)...................................................................18

*In re OSG Sec. Litig.*,
  971 F. Supp. 2d 387 (S.D.N.Y. 2013)......................................................................9

*In re Proshares Tr. II Sec. Litig.*,
  2020 U.S. Dist. LEXIS 1533
  (S.D.N.Y. Jan. 3, 2020), *aff'd*,
  839 F. App'x 649 (2d Cir. 2021) ..................................................................... *passim*

**Page**

*In re Proshares Tr. II Sec. Litig.*,
    839 F. App'x 649 (2d Cir. 2021) ......................................................................6

*Litwin v. Blackstone Group, L.P.*,
    634 F.3d 706 (2d Cir. 2011)............................................................................9

*New V & J Produce Corp. v. NYCCaterers Inc.*,
    2014 U.S. Dist. LEXIS 137465
    (S.D.N.Y. Sept. 29, 2014) ...............................................................................8

*O'Brien v. Alexander*,
    101 F.3d 1479 (2d Cir. 1996)..........................................................................8

*Okla. Law Enf't Ret. Sys. v. Telefonaktiebolaget LM Ericsson*,
    2020 U.S. Dist. LEXIS 46302
    (S.D.N.Y. Mar. 13, 2020) ................................................................................8

*P. Stolz Family P'ship L.P. v. Daum*,
    355 F.3d 92 (2d Cir. 2004)............................................................................12

*Rodick v. City of Schenectady*,
    1 F.3d 1341 (2d Cir. 1993).............................................................................7

*Seoul Viosys Co. v. P3 Int'l Corp.*,
    2020 U.S. Dist. LEXIS 217692
    (S.D.N.Y. Nov. 19, 2020) ................................................................................7

*Set Capital LLC v. Credit Suisse Group AG*,
    2019 U.S. Dist. LEXIS 140368
    (S.D.N.Y. Aug. 16, 2019) ........................................................................12, 13

*Set Capital LLC v. Credit Suisse Group AG*,
    2019 U.S. Dist. LEXIS 164386
    (S.D.N.Y. Sept. 25, 2019) .............................................................................12

*Set Capital LLC v. Credit Suisse Group AG*,
    No. 19-3466, 2021 U.S. App. LEXIS 12471
    (2d Cir. Apr. 27, 2021)...................................................................5, 12, 13, 14

*Sid Bernstein Presents, LLC v. Apple Corps Ltd.*,
    2017 U.S. Dist. LEXIS 122732
    (S.D.N.Y. July 26, 2017) .................................................................................8

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010)..........................................................................14

**Page**

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..................................................................................................15

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
   §77k..........................................................................................................................1, 8, 9
   §77o.................................................................................................................................1
   §77z-1(c)(1) ....................................................................................................................7
   §78j(b).........................................................................................................................1, 9
   §78t(a) .............................................................................................................................1
   §78u-4(c)(1) ..............................................................................................................1, 5, 7

Federal Rules of Civil Procedure
   Rule 11 ......................................................................................................................1, 18
   Rule 11(b) ................................................................................................................ *passim*

Private Securities Litigation Reform Act of 1995
   Pub. L. No. 104-67, 109 Stat. 737 (1995)..................................................................6

Lead Plaintiffs Thomas Butler, III, Anthony Ludovici, and Lisa Ludovici ("Lead Plaintiffs") respectfully submit this memorandum of law pursuant to 15 U.S.C. §78u-4(c)(1), in accordance with the Court's April 5, 2021 Order.  ECF No. 162.  Accompanying this submission are: (i) [Proposed] Findings of Fact and Conclusions of Law pursuant to 15 U.S.C. §78u-4(c)(1); and (ii) the Declaration of Haim Bodek, an outside consultant with expertise in exchange-traded products and the VIX futures market, retained by Lead Plaintiffs' counsel.

## I.    INTRODUCTION AND FACTUAL BACKGROUND

Lead Plaintiffs respectfully submit that their claims, as set forth in the Consolidated Second Amended Complaint (the "SAC") (ECF No. 143), had ample factual and legal support.  This case was warranted under prevailing law and, therefore, the Court should find that Lead Plaintiffs and their counsel complied with Federal Rule of Civil Procedure ("Rule") 11.

This action alleged claims under: (i) Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of purchasers of ProShares Short VIX Short-Term Futures ETF ("SVXY" or the "Fund") shares pursuant or otherwise traceable to the May 15, 2017 registration statement, as amended (together with the July 13, 2017 prospectus, the "Registration Statement"); and (ii) Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of purchasers of SVXY shares during the period from May 15, 2017 to the time that trading in SVXY shares resumed at 11:35 a.m. on February 6, 2018 (the "Class Period").[1]

---

[1]    The defendants were: ProShares Trust II ("ProShares" or the "Trust"), the registrant for the Fund and issuer of SVXY Shares; ProShare Capital Management LLC (the "Sponsor"), the sponsor and commodity pool operator for the Fund; Todd B. Johnson, the Principal Executive Officer of the Trust; Edward Karpowicz, the Principal Accounting Officer of the Trust; Michael L. Sapir, the Chief Executive Officer and a principal and director of the Sponsor; and Louis M. Mayberg, the principal and director of the Sponsor (collectively, the "ProShares Defendants").  The following underwriters (along with the ProShares Defendants) were named as defendants solely with respect to the Section 11 claim: ABN AMRO Clearing Chicago LLC; Deutsche Bank Securities Inc.; Goldman, Sachs & Co.; J.P. Morgan Securities LLC; Knight Execution & Clearing Services, LLC; Merrill

The claims arose from the near-collapse of SVXY, an exchange-traded product ("ETP") issued by defendant ProShares. SVXY's value was inversely correlated to a volatility index known as the S&P 500 VIX Short-Term Futures Index (the "Index"). ¶¶2, 48.[2] SVXY was designed to increase in value when market volatility declined, and *vice versa*. *Id*. In order to maintain this inverse correlation, SVXY needed to "rebalance" its holdings at the end of every trading day by purchasing or selling VIX futures contracts. ¶¶5, 49-50, 75.[3]

In the SAC, Lead Plaintiffs alleged that by the beginning of the Class Period, historic low levels of volatility, combined with the exponential growth of volatility-related ETPs that all rebalanced shortly after the close of the stock market, had led to over-crowding of the market for the VIX futures contracts held by SVXY and similar ETPs. ¶¶6, 82-86.

The SAC alleged that this situation presented an acute risk that a liquidity crunch would arise in the VIX futures market if volatility increased even moderately, as SVXY and similar ETPs all attempted to purchase VIX futures contracts during the same 15-minute interval. ¶¶7, 89, 93. As alleged in the SAC, a liquidity crunch would cause the prices of VIX futures contracts to rise, which would drive down SVXY's value as it purchased VIX futures contracts in order to rebalance. ¶¶7, 94-95. Purchasing VIX futures contracts as prices rose would also drive up market volatility and the level of SVXY's benchmark Index, requiring SVXY to purchase still more VIX futures contracts at higher prices in order to effectuate its rebalancing – setting in motion a destructive feedback loop that would cause the value of its shares to plummet. ¶¶7, 93, 96-98.

---

Lynch Professional Clearing Corp.; Newedge USA LLC; SG Americas Securities, LLC; and Virtu Financial BD LLC. The remainder of the claims were brought against the ProShares Defendants.

[2]    Unless otherwise indicated, citations to "¶" and "¶¶" refer to paragraphs of the SAC.

[3]    A futures contract is an agreement to buy or sell a predetermined amount of a commodity – in this case, volatility itself – at a specific price on a specific date in the future. ¶46 n.6.

As described in the SAC, that risk materialized on February 5, 2018, when the Index rose 33%, sending SVXY shares down approximately 32% during regular market trading, as would be expected given the Fund's -1x ratio.  ¶¶12, 110, 111.  But between 4:00 p.m. and 4:15 p.m., as SVXY and other volatility-related ETPs sought to rebalance their portfolios in an overly crowded VIX futures market, a liquidity gap developed.  ¶¶12-14, 112-114.  The price of VIX futures contracts rose, which in turn drove down SVXY's NAV, resulting in a feedback loop that required SVXY and other volatility-related ETPs to purchase even more VIX futures contracts at higher prices, fueling volatility and causing SVXY's value to decline further.  ¶¶13, 112.  During that 15-minute interval, the prices of the VIX futures contracts making up the Index skyrocketed *96%*, ultimately causing the price of SVXY shares to plummet 90% – a decline that vastly exceeded the 13% increase in the VIX.  ¶¶14-15, 17, 113, 115, 117.  The SAC alleged that investors who correctly predicted that volatility would recede purchased hundreds of millions of dollars' worth of SVXY shares after 4:00 p.m., but saw the value of those investments virtually wiped out in a matter of minutes.  ¶¶16, 74, 116.

The SAC alleged that SVXY's Registration Statement and subsequent filings failed to adequately disclose the risk of a VIX futures liquidity crunch, or the role that SVXY's rebalancing could play in setting off an aftermarket death spiral that could cause catastrophic losses for investors.  ¶¶125-153, 171-176.  This Court disagreed, and dismissed the SAC with prejudice.  *See In re Proshares Tr. II Sec. Litig.*, 2020 U.S. Dist. LEXIS 1533 (S.D.N.Y. Jan. 3, 2020), *aff'd*, 839 F. App'x 649 (2d Cir. 2021).  The primary basis for the Court's dismissal was its conclusion that the Registration Statement: (i) "disclose[d] the primary omission alleged by plaintiffs – that the late-afternoon rebalancing of the Fund's portfolio could cause illiquidity in the VIX futures contract market"; and (ii) "adequately warn[ed] investors of the risks alleged in the SAC."  *Id.* at *19, *24.

Notwithstanding the Court's interpretation, Lead Plaintiffs were justified in alleging that the Registration Statement failed to adequately disclose that SVXY's *own conduct* of rebalancing in an overly crowded VIX futures market could *itself* cause market illiquidity, driving up the price of VIX futures contracts, the level of market volatility, and the level of the Index – thereby driving down the value of SVXY shares. *See, e.g.*, ¶10. Lead Plaintiffs reasonably contended that the Registration Statement warned of the consequences, but not the causes, of market illiquidity. Lead Plaintiffs' plain-language interpretation was supported by both the heading of the disclosure at issue – which *referred to losses* exacerbated by illiquid markets, *not the causes* of market illiquidity – and a holistic reading of the disclosure's entire, two-paragraph text. ¶143.

Under this interpretation, Lead Plaintiffs were also justified in contending that, based on existing law, the SAC adequately pled material misstatements and omissions under both the Securities Act and the Exchange Act, and adequately pled scienter with respect to the Exchange Act claims. Although the Court did not evaluate the SAC's scienter allegations, those allegations were based, in part, on an analysis of proprietary VIX futures trading volume and pricing data conducted by Haim Bodek, an outside consultant retained by Lead Plaintiffs, whose expertise includes exchange-traded products and the VIX futures market. *See* Declaration of Haim Bodek ("Bodek Decl."), submitted herewith, at ¶12. Based on Mr. Bodek's analysis of the liquidity in the VIX futures market, Lead Plaintiffs had a reasonable basis to allege that the potential for an aftermarket death spiral was known to the ProShares Defendants during the year leading up to SVXY's near-collapse, because significant movements in the price of VIX futures contracts during the 4:00 p.m. to 4:15 p.m. rebalancing period had become a relatively common occurrence. *See* ¶¶99-105. As Mr. Bodek attests in his Declaration, he also advised co-Lead Counsel about what information would have been available to the ProShares Defendants vis-à-vis retail investors, evaluated and assisted in

developing and verifying the allegations in the SAC, and believes that the allegations contained in the SAC were consistent with his analysis and input. *See* Bodek Decl. at ¶12.

Finally, Lead Plaintiffs respectfully submit that the reasonableness of their interpretation of the Registration Statement is evidenced by the decision to appeal the Court's dismissal of the SAC to the United States Court of Appeals for the Second Circuit. Lead Plaintiffs reached that decision after considering the recommendation of their counsel's experienced appellate attorneys. Lead Plaintiffs' counsel undertook a careful evaluation of the SAC, the motion to dismiss briefing, and the Court's Opinion and Order, to assess whether or not an appeal would have a reasonable chance of success, given the existing law in the Second Circuit, and recent federal statistics showing that the reversal rate for private civil appeals is only 11.7%. And while Lead Plaintiffs' appeal was unsuccessful, the Second Circuit's recent reinstatement of securities fraud claims against Credit Suisse, arising from an inverse-volatility product whose offering documents arguably contained more robust disclosures than the disclosures in this case (*see Set Capital LLC v. Credit Suisse Group AG*, No. 19-3466, 2021 U.S. App. LEXIS 12471 (2d Cir. Apr. 27, 2021)), only underscores that Lead Plaintiffs' claims, although unsuccessful, comported with Rule 11(b).

## II.    PROCEDURAL BACKGROUND

The Initial Complaint in this action was filed on January 29, 2019. *See* ECF No. 1.[4] Following the appointment of Lead Plaintiffs and co-Lead Counsel, and the consolidation of related actions (*see* ECF Nos. 120-121), Lead Plaintiffs filed a Consolidated Amended Complaint (the "CAC") with the Court on June 21, 2019. *See* ECF No. 132.

Defendants moved to dismiss the CAC on August 2, 2019. *See* ECF Nos. 136-38, 141. Rather than responding to the motion to dismiss, on September 6, 2019, Lead Plaintiffs filed the

---

[4]    The procedural history of the litigation is set forth in greater detail in the [Proposed] Findings of Fact and Conclusions of Law pursuant to 15 U.S.C. §78u-4(c)(1), submitted herewith.

SAC (*see* ECF No. 143), which Defendants again moved to dismiss, on September 27, 2019.  *See* ECF Nos. 147-150.  Lead Plaintiffs opposed the motion to dismiss on October 18, 2019 (*see* ECF No. 151), and Defendants filed their reply on November 1, 2019.  *See* ECF Nos. 152-153.

On January 3, 2020, the Court issued an Opinion and Order granting Defendants' motion to dismiss.  ECF No. 158; *In re Proshares Tr. II*, 2020 U.S. Dist. LEXIS 1533.  The same day, the Clerk of the Court entered a Judgment and closed the case.  ECF No. 159.

On January 31, 2020, Lead Plaintiffs filed a notice of appeal to the United States Court of Appeals for the Second Circuit.  ECF No. 160.  Lead Plaintiffs filed their opening appellate brief with the Second Circuit on May 14, 2020, Defendants filed their answering brief on August 13, 2020, and Lead Plaintiffs filed their reply brief on September 17, 2020.  On March 4, 2021, the Second Circuit held oral argument.  On March 15, 2021, the Second Circuit issued a Summary Order affirming the Judgment of this Court "[s]ubstantially for the reasons stated" in the Opinion and Order.  *In re Proshares Tr. II Sec. Litig.*, 839 F. App'x 649, 651 (2d Cir. 2021).

The Second Circuit's mandate was issued on April 5, 2021.  ECF No. 161.  Because the mandate constituted a final adjudication of the action, the same day, the Court directed Lead Plaintiffs to "file a Memorandum of Law and Proposed Findings of Fact and Conclusions of Law for the Court's consideration pursuant to 15 U.S.C. §78u-4(c)(1) . . . ."  ECF No. 162.

## III.    ARGUMENT

### A.    The Applicable Law

Under the Exchange Act, as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), district courts overseeing securities fraud suits must, "[u]pon final adjudication of the action, . . . include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil

Procedure as to any complaint, responsive pleading, or dispositive motion." 15 U.S.C. §78u-4(c)(1).

The Securities Act contains a parallel provision.  *See* 15 U.S.C. §77z-1(c)(1).

Under Rule 11(b), an attorney who presents a "pleading, written motion, or other paper" to the Court certifies that, "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances":

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

"'As [the Second Circuit] ha[s] repeatedly held, "Rule 11 is targeted at situations where it is patently clear that a claim has absolutely no chance of success under the existing precedents, and where no reasonable argument can be advanced to extend, modify or reverse the law as it stands."'" *Seoul Viosys Co. v. P3 Int'l Corp.*, 2020 U.S. Dist. LEXIS 217692, at *2-*3 (S.D.N.Y. Nov. 19, 2020) (quoting *Rodick v. City of Schenectady*, 1 F.3d 1341, 1350 (2d Cir. 1993), and rejecting defendants' request for sanctions).[5]  "'When divining the point at which an argument turns from merely losing to losing and sanctionable, [the Second Circuit] ha[s] instructed district courts to resolve all doubts in favor of the signer.'"  *Id*. at *3.

"An argument constitutes a 'frivolous legal position' for Rule 11 purposes if, "'under an objective standard of reasonableness, it is clear . . . that there is no chance of success and no

---

[5]     Unless otherwise indicated, some or all internal quotation marks, citations, and alterations are omitted from quoted material, and emphasis is added.

reasonable argument to extend, modify or reverse the law as it stands.'"" *Okla. Law Enf't Ret. Sys. v. Telefonaktiebolaget LM Ericsson*, 2020 U.S. Dist. LEXIS 46302, at *4 (S.D.N.Y. Mar. 13, 2020) (quoting *Sid Bernstein Presents, LLC v. Apple Corps Ltd.*, 2017 U.S. Dist. LEXIS 122732, at *21 (S.D.N.Y. July 26, 2017)). Moreover, the Second Circuit has held that "'sanctions may not be imposed unless a particular allegation is utterly lacking in factual support.'" *New V & J Produce Corp. v. NYCCaterers Inc.*, 2014 U.S. Dist. LEXIS 137465, at *14 (S.D.N.Y. Sept. 29, 2014) (quoting *O'Brien v. Alexander*, 101 F.3d 1479, 1489 (2d Cir. 1996)).

"Even if a legal theory is a "'long-shot,'" that "'does not necessarily mean it is sanctionable.'"" *Okla. Law Enf't Ret. Sys.*, 2020 U.S. Dist. LEXIS 46302, at *4 (quoting *Fishoff v. Coty Inc.*, 634 F.3d 647, 654 (2d Cir. 2011) (additional citation omitted)); *see also Bank v. CreditGuard of Am., Inc.*, 2020 U.S. Dist. LEXIS 55065, at *8 (E.D.N.Y. Mar. 30, 2020) ("Although unsuccessful, and perhaps fairly categorized as 'long-shot' legal arguments, Plaintiff's assertion, maintenance, and defense of his . . . claims . . . do not rise to the level of sanctionable conduct."). "'That Plaintiff's claims failed to pass the motion-to-dismiss threshold does not mean that they clearly had no chance of success and that there was no reasonable argument to extend the law as it stood at the time of filing.'" *Okla. Law Enf't Ret. Sys.*, 2020 U.S. Dist. LEXIS 46302, at *4.

Here, Lead Plaintiffs' claims had adequate support under prevailing precedent, although they were dismissed by the Court, and Lead Plaintiffs and their counsel complied with Rule 11(b).

**B.    Lead Plaintiffs' Claims Were Supported by Prevailing Law**

**1.    The SAC's Allegations that the Registration Statement Contained Material Misstatements and Omissions Were Reasonable and Warranted by Existing Law**

Section 11 of the Securities Act "'imposes strict liability on issuers and signatories, and negligence liability on underwriters,' for material misstatements or omissions in a registration statement." *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 99 (2d Cir. 2017).

The pleading requirements for a Section 11 claim are "relatively minimal." *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 718 (2d Cir. 2011). "A plaintiff need only plead a material misstatement or omission in the registration statement." *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 395 (S.D.N.Y. 2013). To plead a claim under Section 10(b) of the Exchange Act, "a plaintiff must plead that the defendant . . . made a materially false statement or omitted a material fact, with scienter, and that . . . defendant's action caused injury to the plaintiff." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).

"Materiality under Section 10(b) of the Exchange Act is measured by the same standard as Section 11" of the Securities Act. *In re Proshares Tr. II*, 2020 U.S. Dist. LEXIS 1533, at *24. "'The central inquiry in determining whether a prospectus is materially misleading . . . is . . . whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the investment.'" *Id.* (quoting *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991)).

Although the Court determined that the SAC "failed to plausibly allege that the Registration Statement was materially misleading" (*id.*), the SAC reasonably alleged both Securities Act claims and Exchange Act claims under these standards. As the Court recognized, the "gravamen" of the SAC was Lead Plaintiffs' allegation that Defendants failed to adequately disclose (either in the Registration Statement or in any other Class Period statement) "that the Fund's '*own conduct* of rebalancing in an overly crowded VIX futures market could *itself* drive up the price of VIX futures contracts, the level of market volatility, and the level of the . . . Index – thereby driving down the value of SVXY shares.'" *Id.* at *18. Notwithstanding that the Court did not accept this contention, Lead Plaintiffs had a sufficient basis to make this allegation.

First, the disclosure that the Court relied upon in finding that the Registration Statement disclosed "that the late-afternoon rebalancing of the Fund's portfolio could cause illiquidity in the VIX futures contract market" (*id.* at *19) can reasonably be interpreted as warning of the *consequences* – not the *causes* – of market illiquidity. That disclosure read:

> *Possible illiquid markets may exacerbate losses.*
>
> Financial Instruments [such as VIX futures contracts] cannot always be liquidated at the desired price. It is difficult to execute a trade at a specific price when there is a relatively small volume of buy and sell orders in a market. A market disruption can also make it difficult to liquidate a position or find a swap or forward contract counterparty at a reasonable cost.
>
> Market illiquidity may cause losses for the Funds. The large size of the positions which the Funds may acquire increases the risk of illiquidity by both making their positions more difficult to liquidate and increasing the losses incurred while trying to do so. Any type of disruption or illiquidity will potentially be exacerbated due to the fact that the Funds will typically invest in Financial Instruments related to one benchmark, which in many cases is highly concentrated.

¶143. Under Lead Plaintiffs' plain-language reading of this disclosure, it warned that illiquidity may have adverse *consequences* for SVXY, *i.e.*, it may "mak[e] [SVXY's] positions more difficult to liquidate and increas[e] the losses incurred while trying to do so" – but did not warn about SVXY's own conduct *causing* illiquidity.

The reasonableness of Lead Plaintiffs' interpretation was supported by a plain-language reading of the entire disclosure, including its heading and its text. The heading of the disclosure – "*[p]ossible illiquid markets may exacerbate losses*" (¶143) – referred to losses exacerbated *by* illiquid markets, not the causes of market illiquidity. Therefore, Lead Plaintiffs reasonably interpreted the heading as referring to the consequences of illiquidity, not SVXY's capacity to cause it through its own conduct.

Moreover, in finding that the risks had been disclosed, the Court relied on the following sentence in the disclosure: "'[t]he large size of the positions which [SVXY] may acquire increases

the risk of illiquidity by both making their positions more difficult to liquidate and increasing the losses incurred while trying to do so.'" *In re Proshares Tr. II*, 2020 U.S. Dist. LEXIS 1533, at *20 (quoting ¶143). But that sentence was preceded by a sentence arguably confirming that the paragraph addressed the consequences, not the causes, of illiquidity: "Market illiquidity may cause losses *for* the Funds." ¶143. Lead Plaintiffs reasonably interpreted this sentence as having nothing to do with the causes *of* "market illiquidity." *Id*. Under Lead Plaintiffs' holistic reading, the introductory sentence illuminated its successor, explaining – consistent with the paragraphs' heading – that "illiquidity" had the negative *effects* of "making [SVXY's] positions more difficult to liquidate and increasing the losses incurred while trying to do so." *See id*.

Lead Plaintiffs' reasonably believed that no other reading made sense – since to suggest that SVXY's large positions could cause "[market] illiquidity by . . . increasing the losses incurred while trying to [liquidate SVXY's positions]" was a *non sequitur*. Lead Plaintiffs' holistic interpretation of the disclosure was warranted by existing law, given that a registration statement must be read "'cover-to-cover'" and its "disclosures and representations" must be "'taken together and in context.'" *In re Proshares Tr. II*, 2020 U.S. Dist. LEXIS 1533, at *19.

Under Lead Plaintiffs' interpretation, their contention that the alleged omissions were material was also warranted by existing law, given that warnings alerting investors to the risk that SVXY's own conduct could cause illiquidity would have likely "'"altered the 'total mix' of information made available."'" *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co*., 553 F.3d 187, 197 (2d Cir. 2009).

Lead Plaintiffs' argument that none of Defendants' other disclosures were effective was likewise warranted by existing law, which requires that cautionary language must "expressly warn of or . . . directly relate to the risk that brought about plaintiffs' loss." *Halperin v. eBanker USA.com,*

- 11 -

*Inc.*, 295 F.3d 352, 359 (2d Cir. 2002); *see also P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004) ("cautionary language must . . . warn[] of the specific contingency that lies at the heart of the alleged misrepresentation").  Under this standard, Lead Plaintiffs reasonably alleged that Defendants' additional risk disclosures did not "*expressly* warn of" or "*directly* relate to" (*Halperin*, 295 F.3d at 359), the "specific contingency that [lay] at the heart of" Defendants' omissions (*P. Stolz Family P'ship*, 355 F.3d at 97) – namely, the risk that SVXY's own conduct could bring about illiquidity in the market for VIX futures contracts, setting in motion a destructive feedback loop.

Second, the reasonableness of Lead Plaintiffs' allegation that Defendants omitted material facts was supported by the contrast between the disclosures made by Defendants in this case, and the disclosures at issue in *Set Capital LLC v. Credit Suisse Group AG*, 2019 U.S. Dist. LEXIS 140368 (S.D.N.Y. Aug. 16, 2019), *report & recommendation adopted*, 2019 U.S. Dist. LEXIS 164386 (S.D.N.Y. Sept. 25, 2019), *aff'd in part, vacated and remanded in part*, No. 19-3466, 2021 U.S. App. LEXIS 12471 (2d Cir. Apr. 27, 2021).  *Set Capital* involved inverse-volatility notes issued by Credit Suisse that, like SVXY shares, suffered losses during the volatility spike on February 5, 2018.

Unlike Defendants here, Credit Suisse explicitly disclosed that its own conduct in undertaking hedging transactions – an activity analogous to SVXY's rebalancing – could itself drive up the price of VIX-futures contracts and the level of the Index: "'[t]he trading activity associated with these hedging transactions will contribute to the trading volume of the underlying futures contracts and may adversely affect the market price of such underlying futures contracts *and in turn the level of the applicable underlying Index*.'"  *Set Capital*, 2019 U.S. Dist. LEXIS 140368, at *20. Credit Suisse thus warned that "'[t]he hedging activity [it disclosed] may adversely affect the level of the applicable underlying Index and, as a consequence, the market value of the [notes] and the

- 12 -

amount payable at maturity[.]'" *Id.* at *20-*21. Lead Plaintiffs reasonably contended that these plain-language warnings were precisely what was missing from Defendants' disclosures.

Indeed, Credit Suisse's warnings could easily have been modified to provide exactly the information that Lead Plaintiffs alleged was withheld from SVXY investors. Defendants could have disclosed that "'[t]he trading activity associated with these [rebalancing] transactions will contribute to the trading volume of the underlying futures contracts and may adversely affect the market price of such underlying futures contracts and in turn the level of the applicable underlying Index,'" and that "'[SVXY's rebalancing] activity . . . may adversely affect the level of the applicable underlying Index and, as a consequence, the market value of'" SVXY shares. *See id.* Because the Registration Statement did not contain anything even remotely as straightforward as Credit Suisse's disclosures, Lead Plaintiffs' allegations of material omissions were reasonable.[6]

2.    **The SAC's Allegations of Additional Misstatements and Omissions Under the Exchange Act Were Reasonable and Warranted by Existing Law**

Lead Plaintiffs' allegations that Defendants made additional misstatements and omissions, subsequent to the filing of the Registration Statement, were likewise reasonable and justified under existing law. The Court found that "[t]he SAC d[id] not adequately plead that there was a duty to update the Registration Statement, as it already disclosed precisely what plaintiffs allege was omitted – that the degree of risk could increase over time." *In re Proshares Tr. II*, 2020 U.S. Dist. LEXIS

---

[6]    In opposing Defendants' motion to dismiss the SAC, Lead Plaintiffs argued that the *Set Capital* court's dismissal of the claims in that case demonstrated that Credit Suisse had disclosed the material facts, in contrast to the Defendants in this case. *See* ECF No. 151 at 2-3, 22-23. On April 27, 2021, the Second Circuit vacated in part the dismissal of those claims, "acknowledg[ing]" that, "[a]lthough . . . many risks were disclosed," Credit Suisse's offering documents nonetheless "contain[ed] actionable misrepresentations or omissions." *Set Capital*, 2021 U.S. App. LEXIS 12471, at *41-*42. Notwithstanding the differences between *Set Capital* and this case (*see id.* at *44 n.94), the Second Circuit's holding that Credit Suisse's risk disclosures – which were arguably more robust than those at issue here – were materially misleading further demonstrates that Lead Plaintiffs' claims were not unreasonable or frivolous. *See id.* at *41-*44.

1533, at *25-*26.  Respectfully, the SAC did not allege a duty to update the Registration Statement. Rather, it alleged that Defendants' post-Registration-Statement filings were materially misleading, both for the omissions discussed above, and also because although the risks of SVXY's conduct causing market illiquidity became more acute over time, Defendants continued to reiterate their deficient risk warnings.  ¶¶171-176.  Indeed, they did so as late as February 1, 2018 – just days before the Fund's near-total collapse.  ¶176.  Moreover, because Defendants never disclosed the risk that SVXY's own conduct could cause market illiquidity, they necessarily did not disclose that that risk increased over time.

Even if Defendants' risk warnings could have possibly sufficed when ProShares initially filed the Registration Statement, Lead Plaintiffs were justified in contending that later risk warnings were materially misleading because their wording remained unchanged, despite the growing potential for an aftermarket death spiral – which was apparent to Defendants from the historical pattern of price movement during the 4:00 p.m. to 4:15 p.m. rebalancing period in the year leading up to SVXY's near-collapse.  ¶¶99-105.  *See Set Capital*, 2021 U.S. App. LEXIS 12471, at *44 ("While these warnings could have possibly sufficed when Credit Suisse first issued XIV Notes, . . . the warnings remained unchanged for nearly a decade despite three episodes of market volatility putting to rest any uncertainty as to the price-impact of Credit Suisse's hedging."); *see also Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010) (finding cautionary statement in Form 10-Q inadequate in light of "[t]he consistency of the defendants' language over time despite the new information they received").[7]

---

[7]     For the same reasons, Lead Plaintiffs also reasonably contended that Defendants violated Items 303 and 105 of Regulation S-K by failing to adequately disclose the risks associated with an investment in SVXY.  ¶¶154-155, 177; ECF No. 151 at 33-36.

### 3.    The SAC's Scienter Allegations Were Reasonable and Warranted by Existing Law

In the Second Circuit, scienter can be established by alleging "facts showing either: 1) a 'motive and opportunity to commit the fraud'; or 2) 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015). The proper inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007) (emphasis in original). The inference "need not be irrefutable . . . or even the 'most plausible of competing inferences,'" but must merely be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. Although the Court did not evaluate Lead Plaintiffs' scienter allegations, those allegations were likewise warranted by existing law.

Lead Plaintiffs reasonably argued that the SAC's scienter allegations, taken collectively and accepted as true, gave rise to a strong inference that the ProShares Defendants knowingly or recklessly failed to disclose the material risk that SVXY's own rebalancing could cause a VIX futures liquidity gap that would drive up the prices of VIX futures contracts, the level of expected market volatility, and the level of the Index – requiring SVXY to continue purchasing VIX futures contracts in a self-inflicted death spiral as its share price collapsed. The SAC alleged that this risk was – or should have been – known to the ProShares Defendants throughout the Class Period because they: (i) created SVXY and designed its investment objective; (ii) assessed its risks and likely performance; and (iii) actively participated in the market for VIX futures contracts in the course of conducting SVXY's rebalancing. ¶¶8, 80, 99, 180-181. That sort of hands-on involvement in SVXY's design and functioning supported a strong scienter inference under the applicable case law. *See Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 246 (S.D.N.Y.

2012) (defendant's "personal participation in designing and evaluating the internal controls" supported inference of knowledge).

Additionally, the SAC made the common sense allegation that, since the Sponsor's trade desk was responsible for conducting SVXY's daily rebalancing, the Sponsor had firsthand knowledge of the size of SVXY's rebalancing requirements and the adverse pricing pressure that was occurring during the 4:00 p.m. to 4:15 p.m. rebalancing period. ¶¶8, 80, 105. And the SAC's allegation that the potential for an aftermarket death spiral was evident to the ProShares Defendants during the year leading up to SVXY's near-collapse because significant movements in the price of VIX futures contracts during the 4:00 p.m. to 4:15 p.m. rebalancing period became a relatively common occurrence (¶¶99, 101-104) was based upon an analysis of proprietary VIX futures trading volume and pricing data conducted by Lead Plaintiffs' consulting expert. *See* Bodek Decl. at ¶12. The SAC similarly alleged, based on publicly available analysis, that during 2017, VIX futures contracts began to experience larger price movements following relatively small fluctuations in the S&P 500 – indicating that the simultaneous rebalancing of volatility-related ETPs, rather than ordinary market volatility, was driving up the prices of VIX futures contracts. ¶92.

Moreover, because SVXY was rebalanced based on the percentage change in the Index, the historic low market volatility during the Class Period meant that a relatively small point increase in the value of the Index would amount to a significant percentage increase for purposes of SVXY's rebalancing. ¶¶68-69. By the start of the Class Period, this historic low volatility had combined with the unprecedented size of the rebalancing requirements of volatility-related ETPs to present an acute risk of a VIX futures liquidity gap.

Based upon both publicly available data and analysis from Lead Plaintiffs' consulting expert, the SAC alleged that the collective number of VIX futures contracts that SVXY and other volatility-

related ETPs needed to purchase to rebalance following a 4-point increase in VIX futures grew from just 20,000 in early 2013, to 140,000 by December 2017 – which represented nearly 500% of the average trading volume within the 4:00 p.m. to 4:15 p.m. rebalancing period. ¶¶6, 83-84. And while the 5.6-point increase in the VIX that occurred following the "Brexit" vote in June 2016 had caused the price VIX futures contracts to increase by 33%, requiring volatility-related ETPs to purchase approximately 66,000 VIX futures contracts to rebalance, just one year later, the same 5.6-point increase would have required those ETPs to purchase approximately 100,000 VIX futures contracts to rebalance. ¶¶6, 85-86.

The SAC alleged that in light of these facts, "the danger" that a spike in volatility would lead to a VIX futures liquidity gap, causing extreme movements in the price of VIX futures contracts during the rebalancing period that would trap SVXY in a destructive feedback loop, "'was either known to'" the ProShares Defendants "'or so obvious that [they] must have been aware of it'" – thus satisfying the standard for recklessness in the Second Circuit. *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 158-59 (2d Cir. 2012). *See* ¶¶8, 80, 104-105, 184. Yet, the ProShares Defendants failed to disclose this risk.

The SAC also set forth motive allegations that – even if not independently sufficient to plead a strong inference of scienter – reasonably contributed to that inference under Second Circuit case law. *See Ganino*, 228 F.3d at 170. The SAC alleged that the ProShares Defendants were motivated to conceal SVXY's true risks in order to induce investors to purchase SVXY shares because the Sponsor received monthly fees for its management of SVXY's assets, in an amount equal to 0.95% per annum of the Fund's average daily net assets. ¶186. Thus, the fees received by the Sponsor were directly related to the amount of assets invested in SVXY. *Id*. As the Fund's assets under management grew throughout 2017, to over $1 billion near the end of the Class Period, the amount

- 17 -

of management fees the Sponsor received from the Fund's assets increased by 60% year-over-year. ¶¶186-187.  Had the ProShares Defendants disclosed the true risks of investing in SVXY during the Class Period, those fees would have been jeopardized, supporting a scienter inference.  ¶187.  *See Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 640 (S.D.N.Y. 2012) (earning "significant fees from structuring and selling" collateralized debt obligations contributed to strong inference of scienter); *see also I.B. Trading, Inc. v. Tripoint Glob. Equities, LLC*, 280 F. Supp. 3d 524, 538 (S.D.N.Y. 2017) (allegations that company earned commissions based on the amount of money defendants raised constituted a "concrete motive to commit the fraud").

Based on all of the foregoing, Lead Plaintiffs had a reasonable basis to contend that, under existing law, the SAC pled a strong inference that the ProShares Defendants knew or recklessly disregarded – but failed to disclose – the risk that an increase in volatility would set in motion a destructive feedback loop, whereby SVXY's rebalancing would continuously drive up the price of VIX futures contracts and the level of the Index.  Lead Plaintiffs' scienter allegations were substantially supported under the facts and the law, and complied with Rule 11(b).

## IV. CONCLUSION

Although the Court found that this action did not meet the applicable pleading standards, Lead Plaintiffs' positions were reasonable under the facts and the law.  For the reasons set forth above, Lead Plaintiffs respectfully request that the Court determine that Lead Plaintiffs' claims were warranted by existing law, that all factual contentions had evidentiary support, and that Lead Plaintiffs and their counsel complied with Rule 11.

DATED:  May 10, 2021

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
ERIN W. BOARDMAN
MAGDALENE ECONOMOU

*/s/ Samuel H. Rudman*
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
eboardman@rgrdlaw.com
meconomou@rgrdlaw.com

HAGENS BERMAN SOBOL SHAPIRO LLP
STEVE W. BERMAN
KARL P. BARTH
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone:  206/623-7292
206/623-0594 (fax)
steve@hbsslaw.com
karlb@hbsslaw.com

HAGENS BERMAN SOBOL SHAPIRO LLP
REED R. KATHREIN
LUCAS E. GILMORE
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone:  510/725-3000
510/725-3001 (fax)
reed@hbsslaw.com
lucasg@hbsslaw.com

*Lead Counsel for Lead Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I, Samuel H. Rudman, hereby certify that on May 10, 2021, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.



*/s/ Samuel H. Rudman*
SAMUEL H. RUDMAN