UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

────────────────────────────── x
In re PROSHARES TRUST II SECURITIES : Civil Action No. 1:19-cv-00886-DLC
LITIGATION :
 : CLASS ACTION
 :
 :
This Document Relates To: : LEAD PLAINTIFFS' REPLY
 : MEMORANDUM OF LAW PURSUANT TO
  ALL ACTIONS. : 15 U.S.C. §78u-4(c)(1)
 :
────────────────────────────── x

Lead Plaintiffs Thomas Butler, III, Anthony Ludovici, and Lisa Ludovici ("Lead Plaintiffs") respectfully submit this reply to the ProShares Defendants' response (ECF No. 167), and in further support of their memorandum of law and proposed findings of fact pursuant to 15 U.S.C. §78u-4(c)(1) (ECF Nos. 166 & 166-1).[1]

As set forth in detail in their opening papers, Lead Plaintiffs complied with the requirements of Rule 11(b). Defendants' response ignores the bulk of Lead Plaintiffs' submission and mischaracterizes Lead Plaintiffs' allegations in an effort to manufacture a violation of Rule 11(b).

Lead Plaintiffs' claims arose from one of the most extraordinary market events in recent financial history – the February 5, 2018 collapse of inverse volatility exchange-traded products ("ETPs"), such as SVXY, which cost investors hundreds of millions of dollars in losses. Far from being a product of "conjecture" (ECF No. 167 at 9), the events underlying the SAC were widely covered by the financial media and analysts after the collapse of the volatility markets, many of whom attributed the market implosion to the daily rebalancing of SVXY and other ETPs and the resulting liquidity gap in VIX futures. Every fact pled in the SAC had an objectively reasonable basis. Co-Lead Counsel conducted a robust investigation which, among other things, included a review of more than 100 media articles, analysis of SEC filings, and the retention of an industry expert. Although Defendants characterize the SAC as "rank speculation" (ECF No. 167 at 9), SVXY's own registration statement acknowledged that the Fund was "typically rebalanced at or about the time of its NAV calculation time" which "is typically 4:15 p.m. (Eastern Time)" – *i.e.*, the time that the liquidity gap occurred. ECF No. 149-1 (Registration Statement) at 169, 190. Indeed, Defendants cannot point to a single fact in the SAC which had no objectively reasonable basis.

---

[1] Capitalized terms not defined herein have the meaning ascribed to them in Lead Plaintiffs' opening memorandum of law. ECF No. 166. Emphasis in quotations is added unless otherwise noted. As used herein, "Defendants" refers to the ProShares Defendants.

Instead, as detailed below, Defendants resort to creating their own allegations, in a search for grounds to challenge Lead Plaintiffs' investigation where none exists.

Although the Court dismissed the SAC, we respectfully submit there is no legitimate question that Lead Plaintiffs and Co-Lead Counsel complied with Rule 11(b).

## I.     ARGUMENT

### A.     Defendants' Challenges to the SAC Rely on Mischaracterizations and Are Baseless

Defendants contend that Lead Plaintiffs have "not describe[d] any objectively reasonable inquiry or factual support" for their "'liquidity gap' theory," and engaged in "rank speculation unsupported by any factual allegations." ECF No. 167 at 8-9. However, as detailed below, Lead Plaintiffs' theory of liability was based on extensive due diligence, factual and legal research, a wide-ranging review of media and financial analyses, and consultation with an expert with specific expertise in the complex securities at issue.

Unable to point to any specific fact in the SAC that lacked an objectively reasonable basis, Defendants create their own fact by characterizing the SAC as alleging "that the Fund (and other unnamed exchange traded products) completed *all* of their rebalancing purchases of VIX futures contracts 'during the same 15-minute interval.'" ECF No. 167 at 8-9 (emphasis supplied by Defendants); *see also id*. at 10. Notably, Defendants do not put the word "*all*" in quotations. That is because the SAC did not make this allegation. *Id*. at 8, 10. Neither the cited sentence in Lead Plaintiffs' memorandum of law (ECF No. 166 at 2), nor the SAC, says that SVXY and other inverse volatility funds completed all of their rebalancing during the same 15-minute interval. *See* ECF No. 166 at 2 ("The SAC alleged that this situation presented an acute risk that a liquidity crunch would arise in the VIX futures market if volatility increased even moderately, as SVXY and similar ETPs all attempted to purchase VIX futures contracts during the same 15-minute interval."). The

paragraphs of the SAC cited by Defendants do not even contain the word "all." ECF No. 143 at ¶¶7, 89, 93.  Similarly, the cited sentence from Lead Plaintiffs' memorandum of law simply says that SVXY and other ETPs "attempted" to engage in rebalancing during that time period.  ECF No. 166 at 2.[2]  To the contrary, the SAC actually alleges that the SVXY *could not* have completed its daily rebalancing during this interval because "there simply were not enough VIX futures contracts available in the market[.]"  ECF No. 143 at ¶114.

Furthermore, Defendants' invented allegation is immaterial to Lead Plaintiffs' substantive theory of liability – that the immense size of SVXY and the Fund's daily rebalancing activities contributed to acute illiquidity in the market for VIX futures.  *See, e.g.*, ECF No. 143 at ¶10.  That factual allegation holds true irrespective of whether Defendants purchased 100% of the VIX futures contracts during the 15-minute window, or some lesser percentage.

Similarly baseless is Defendants' related argument that "Lead Plaintiffs could not have identified any factual support for their speculative 'liquidity gap' theory" – *i.e.*, the "theory" that demand outpacing supply leads to price increase – because "the dollar volume of VIX futures contracts grew as volatility-related products grew in size."  *See* ECF No. 167 at 9-10.  Defendants initially made this argument in their motion to dismiss the CAC (ECF No. 137 at 27 n.15), and Lead Plaintiffs addressed it by adding the chart contained in ¶87 of the SAC – which notably had been supplied *by* Defendants (ECF No. 138-6) – along with supporting allegations showing that the supply of VIX futures contracts had *not* kept pace with demand.  ECF No. 143 at ¶87 ("While the supply of VIX futures contracts was also increasing during this time, supply was not increasing nearly as rapidly as demand.  Indeed, from December 31, 2016 to February 1, 2018 – the same time

---

[2]    That "VIX futures are available for trading almost around the clock" (ECF No. 167 at 10) says nothing whatsoever about when inverse volatility funds actually purchased VIX futures contracts.

period when SVXY's assets grew fivefold, from $228.6 million to $1.4 billion – there was no discernable increase in liquidity. The VIX futures average daily trading volume essentially remained constant from 2017 to 2018, with 294,000,000 and 295,000,000 contracts traded, respectively."); *see also* ECF No. 151 at 32-33 & n.13 (Lead Plaintiffs' opposition brief, addressing these same arguments). Nothing about these figures – which Defendants do not contest – amounts to "pure supposition." ECF No. 167 at 10; ECF No. 148 at 27 n.12 (same).

More fundamentally, Defendants' attacks on the factual basis for Lead Plaintiffs' "liquidity gap" allegations ignore that a liquidity gap, as described in the SAC, ***actually occurred*** on February 5, 2018 – as documented in legions of publicly available sources, including many of the more than 100 news articles that Co-Lead Counsel reviewed in drafting the CAC and the SAC. *See* ECF No. 143 at ¶¶110-118 (describing the "Volpocalypse"). Many of these articles – from third party media observers, financial analysts and industry experts – specifically blamed the size of the SVXY and its need to conduct daily rebalancing as a precipitating factor in the volatility crisis which ensued.[3] Lead Plaintiffs' investigation went beyond these materials, however, and included the

---

[3]   *E.g.*, Wayne Duggan, *Analyst Explains The Inverse Volatility Fund Fedback Loop*, BENZINGA (Feb. 8, 2018, 11:01 AM), https://www.benzinga.com/analyst-ratings/analyst-color/18/02/11158220/analyst-explains-the-inverse-volatility-fund-feedback-l?utm_source=dlvr.it&utm_medium=twitter ("Inverse volatility funds, including the Credit Suisse AG – VelocityShares Daily Inverse VIX Short Term ETN NASDAQXIV and the ProShares Trust II SVXY . . . have taken much of the blame for the historical spike in stock market volatility this week. In a note on Thursday, Bernstein analyst Noah Weisberger explained the two ways that these inverse volatility funds create feedback loops that drive volatility. The trigger of these feedback loops is the constant rebalancing that exchange-traded notes like the XIV and the SVXY require."); *Anatomy of a Blowup – How a Volatility Spike in February Destroyed XIV & SVXY*, HOUNDSTOOTH CAPITAL MANAGEMENT (May 6, 2018), https://houndstoothcapital.com/2018/05/06/anatomy_of_a_blowup/ ("In short, the market makers that provided liquidity to VIX ETPs required to rebalance squeezed prices higher and higher. This created a devastating feedback loop for the ETPs. As prices for VIX futures spiraled higher, so did the required number of shares for rebalancing. Essentially these ETPs were forced to chase the prices of VIX futures higher and higher until they crossed their point of elasticity, irreparably breaking the products indefinitely."); Stuart Barton, *XIV And SVXY – What Really Happened?*, SEEKING ALPHA (Mar. 16, 2018), https://seekingalpha.com/article/4156919-xiv-

retention of an expert with specific expertise in analyzing and understanding the complex securities at issue. ECF No. 143 at ¶¶52-123; Bodek Decl., ECF No. 166-2.[4]

and-svxy-what-really-happened ("[B]y February 5th VIX ETPs had come to dominate the short dated SPX volatility market, and the risks tied up in them may have approached what the market was able to digest. Attempting to make a large VIX futures rebalance in such a market was likely the reason we saw the VIX futures move so much further than some would have expected concurrent with a 4.1% move in the SPX. Furthermore, the rebalancing of VIX ETPs in an already strained VIX futures market probably catalyzed a feedback loop, where the expected rebalance caused a sudden rise in VIX futures prices that resulted in a further need to rebalance, and so on, and so on."); Mark Sebastian, *How XIV and SVXY Went Off the Rails and Took the Market With Them*, REAL MONEY (Feb. 6, 2018), https://realmoney.thestreet.com/articles/02/06/2018/how-xiv-and-svxy-went-rails-and-took-market-them ("Monday, with the VIX already up huge by 4:00 p.m. ET, XIV and SVXY looked at their books and had a very large amount of VIX futures to cover, about 200,000 (this is more than the average daily volume for VIX futures). That type of bid in the TAS book is going to cause VIX futures to move, at precisely the time that volume tends to lighten up. Thus from 4 p.m. to 4:15 p.m. the February began to tick up aggressively. Based on the trading of these futures, VXX exploded higher (remember it tracks long futures) thus increasing the amount of futures XIV and SVXY needed to buy to cover, thus pushing VXX even higher. By 4:15 the Feb VIX future was up $10.00, a cool 43% move in 15 minutes."); Tony Yiu, *The XIV Meltdown*, TOWARDS DATA SCIENCE (July 1, 2019), https://towardsdatascience.com/the-xiv-meltdown-1b0608110b9f ("There were tons of investors unknowingly trapped in an extremely crowded short VIX trade via ETFs, like XIV and SVXY, which because of strong historical performance had sucked up billions and billions of dollars. The VIX was near all time lows, which meant that the price investors could charge for supplying market crash insurance was also near all time lows. . . . This forced the managers of short VIX ETFs like XIV and SVXY to cover their shorts in order to cap their losses. But what do you think happens when everyone simultaneously tries to escape through the same tiny door? The amount of bets that everyone was trying to escape was greater than the market could bear and thus each trade was executed at incrementally higher prices. That is, each trade to cancel a short bet (equivalent to going long the VIX) had the painful effect of pushing VIX up even further. And sensing the desperation of the ETF managers, traders on the opposite side, like sharks smelling blood in the water, were determined to extract their pound of flesh. By the time everyone was done trading, the VIX had nearly doubled, and investors holding large short VIX positions had lost nearly everything.").

[4]       This case is a far cry from *In re AOL, Inc. Repurchase Offer Litigation*, 2013 WL 6331802 (S.D.N.Y. Dec. 5, 2013) and *In re Australia & New Zealand Banking Group Ltd. Securities Litigation*, 712 F. Supp. 2d 255 (S.D.N.Y. 2010), in which this Court determined that sanctions were appropriate. In *AOL*, the Court found, in its motion to dismiss opinion, that the plaintiff's factual allegation that a secret deal that had been reached during a phone call were "'recklessly made without any factual support'" because the source of those allegations was a news article that "directly contradict[ed] such an account[.]" 2013 WL 6331802, at *2. And in *In re Australia & New Zealand Banking Group*, the Court found that a "central" paragraph in the complaint utterly lacked factual support and contained a critical error in the date. 712 F. Supp. 2d at 264. That error had "enabled plaintiff to begin the Class Period a full twelve months sooner," formed the basis for

- 5 -

Finally, Defendants fault Lead Plaintiffs for not providing "further detail" about their factual investigation, including "the particular SEC filings, reports, or public information that they reviewed," and the input and analysis provided their consulting expert Mr. Bodek, to which Mr. Bodek attested in his declaration (ECF No. 166-2). ECF No. 167 at 10-12. But the Court asked for proposed factual findings and legal conclusions. ECF No. 162. It did not give notice of an intent to sanction, let alone provide any specific basis for doing so and an opportunity to respond. Defendants have also not pointed to any specific factual issues with the SAC (other than Defendants' own addition of the word "all" to the SAC's allegations). Lead Plaintiffs respectfully submit that the record before the Court, including Defendants' opposition, confirms that nothing occurred in this case beyond a good-faith complaint that the Court concluded did not clear the PSLRA's high bar. That said, if the Court were to give Lead Plaintiffs notice of an intent to issue sanctions, Lead Plaintiffs can and will provide additional and wide-ranging details about their investigation. But because no specific issues with the SAC have been identified, and detailing Co-Lead Counsel's entire investigation would reveal attorney work-product, should the Court require any additional information about Co-Lead Counsel's investigation or the basis for Lead Plaintiffs' allegations, Co-Lead Counsel respectfully requests an opportunity to submit such materials *in camera* for the Court's review.

### B.   Losing a 12(b)(6) Motion Does Not Equate to a Violation of Rule 11(b)

Although Defendants do not provide specific challenges to Lead Plaintiffs' opening submission, they nonetheless contend that the Court's dismissal of the claims equates to Lead Plaintiffs' "*substantial* failure to comply with Rule 11(b)." ECF No. 167 at 2.

---

alleging scienter as to 14 of 15 alleged misstatements, and went uncorrected due to counsel's "subsequent lack of diligence or further inquiry." *Id.* There are no remotely similar issues with Lead Plaintiffs' factual allegations here.

- 6 -

The Second Circuit and judges in this District have recognized for decades that a claim is not sanctionable or frivolous simply because it was dismissed. *See, e.g.*, *Simon DeBartolo Grp., L.P. v. Richard E. Jacobs Grp., Inc.*, 186 F.3d 157, 174 (2d Cir. 1999) (finding the Rule 11 sanctions on a dismissed Rule 10b-5 claim to be inappropriate); *Okla. Law Enf't Ret. Sys. v. Telefonaktiebolaget LM Ericsson*, 2020 U.S. Dist. LEXIS 46302, at *4 (S.D.N.Y. Mar. 13, 2020) (declining to find a Rule 11 violation in Section 10(b) case after complaint was dismissed, and stating: "'That Plaintiff's claims failed to pass the motion-to-dismiss threshold does not mean that they clearly had no chance of success and that there was no reasonable argument to extend the law as it stood at the time of filing.'"); *Sid Bernstein Presents, LLC v. Apple Corps Ltd.*, 2017 U.S. Dist. LEXIS 122732, at *21-*22 (S.D.N.Y. July 26, 2017) (granting motion to dismiss but denying motion for sanctions, because "[a]lthough Plaintiff has failed to state a plausible claim, the filings do not support a conclusion that the claims were clearly frivolous or were alleged in bad faith"); *In re Merrill Lynch Tyco Research Sec. Litig.*, 2004 U.S. Dist. LEXIS 2247, at *17 (S.D.N.Y. Feb. 18, 2004) ("Although the Court finds . . . that Plaintiff's allegations of loss causation are insufficient, this does not mean that Plaintiff's claim is so unreasonable that it had absolutely 'no chance' of success."); *Kalnit v. Eichler*, 99 F. Supp. 2d 327 (S.D.N.Y. 2000) (dismissal of the complaint was a finding that its allegations were without merit, but was not a finding that plaintiff's effort to state a claim was unreasonable or had no chance of success).

And while Defendants fault Lead Plaintiffs for "repeating" their allegations (ECF No. 167 at 1, 8), Lead Plaintiffs actually explained in detail why their interpretation of the applicable disclosures as warning of the *consequences* but failing to accurately disclose the *causes* of market illiquidity was reasonable under a holistic and plain-language reading of the Registration Statement and supported by existing law. *See* ECF No. 166 at 10-13. Indeed, the Second Circuit recently

reversed the dismissal of a related securities class action, finding that violations of the federal securities laws had been adequately pled in connection with the same liquidity events underlying this case, although distinguishing this case because of the structural differences between the two products at issue. *See Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 73, 85 (2d Cir. 2021) ("Credit Suisse's hedging trades contributed to a liquidity squeeze that caused the prices of VIX futures contracts to skyrocket. . . . Although we acknowledge that many risks were disclosed, we agree with Set Capital that the Offering Documents contain actionable misrepresentations or omissions."); *see also In re Direxion Shares ETF Tr.*, 279 F.R.D. 221, 232 (S.D.N.Y. 2012) (denying in part motion to dismiss complaint involving ETF because purported risk disclosures were offset by contra-indicators).

The fact that Co-Lead Counsel did not convince the Court of its different interpretation of the Registration Statement does not mean that Lead Plaintiffs' position was objectively unreasonable or frivolous. *See, e.g.*, *Wi-Lan Inc. v. LG Elecs., Inc.*, 2013 U.S. Dist. LEXIS 67833, at *32 (S.D.N.Y. May 10, 2013) (denying defendants' motion for an award of attorneys' fees and finding that defendants failed to establish that plaintiff's interpretation of "informational scheme" was objectively baseless or unreasonable).

## II.   CONCLUSION

Lead Plaintiffs respectfully submit that they have complied with the requirements of Rule 11(b).

DATED:  June 4, 2021                                   Respectfully submitted,

                                                                        ROBBINS GELLER RUDMAN
                                                                           & DOWD LLP
                                                                        SAMUEL H. RUDMAN
                                                                        DAVID A. ROSENFELD
                                                                        ERIN W. BOARDMAN
                                                                        MAGDALENE ECONOMOU

*/s/ Samuel H. Rudman*
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
eboardman@rgrdlaw.com
meconomou@rgrdlaw.com

HAGENS BERMAN SOBOL SHAPIRO LLP
STEVE W. BERMAN
KARL P. BARTH
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: 206/623-7292
206/623-0594 (fax)
steve@hbsslaw.com
karlb@hbsslaw.com

HAGENS BERMAN SOBOL SHAPIRO LLP
REED R. KATHREIN
LUCAS E. GILMORE
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: 510/725-3000
510/725-3001 (fax)
reed@hbsslaw.com
lucasg@hbsslaw.com

*Lead Counsel for Lead Plaintiffs*

CERTIFICATE OF SERVICE

I, Samuel H. Rudman, hereby certify that on June 4, 2021, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*/s/ Samuel H. Rudman*
SAMUEL H. RUDMAN